**Law Office of James Burr Shields**
**4647 N. 32nd Street, Suite 170**
**Phoenix, Arizona 85018-3351**
**(602) 307-0780 (Office)**
**(602) 307–0784 (Facsimile)**

James Burr Shields II, State Bar #011711
John A. Conley, State Bar #016429
W. Blake Simms, State Bar #021595
Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| VANESSA HALL,  ) | Case No. |
| )  ) | |
| Plaintiff,  ) | **COMPLAINT and DEMAND** |
| )  ) | **FOR JURY TRIAL** |
| vs.  ) | |
| )  ) | |
| ERIC K. SHINSEKI, Secretary, United  ) | |
| States Department of Veterans Affairs,  ) | |
| )  ) | |
| Defendant.  ) | |
| _____ ) | |

Plaintiff, Vanessa H. Hall, by and through counsel undersigned, as and for her claims of relief against Defendant, Eric K. Shinseki, Secretary, United States Department of Veterans Affairs, alleges as follows:

1.     Plaintiff is an individual residing in Maricopa County, Arizona.

2.     Defendant is the Secretary of the United States Department of Veterans Affairs.

3.     Defendants have caused to occur in the State of Arizona events out of which the Complaint arises.

4.     This Court, under 28 U.S.C. § 1331, has jurisdiction over Plaintiff's claim under Title VII of the Civil Rights Act of 1964.

5.     Venue in this district is, under 28 U.S.C. § 1391, proper, as the events complained of occurred in Maricopa County.

6.     Plaintiff, on February 20, 2008, filed with the Department's EEO Counselor a timely complaint alleging race discrimination and hostile work environment.

7.     Plaintiff decided to, rather than pursuing these claims, attempt to forge with the

1   Department an informal resolution.

2       8.      Plaintiff, on March 22, 2008, filed with the Department's EEO Counselor a

3   timely informal complaint alleging retaliation under Title VII.

4       9.      Plaintiff later filed with the EEO Counselor a formal complaint based on the

5   allegations underlying that informal complaint.

6       10.     Plaintiff, on June 4, 2008, filed with the EEO Counselor an informal complaint

7   alleging retaliation under Title VII and race discrimination under Title VII.

8       11.     Plaintiff later filed with the EEO Counselor a formal complaint based on the

9   allegations underlying that informal complaint.

10      12.     The Office of Resolution Management ("ORM") investigated Formal

11  Complaint 200P-X002-2008103234.

12      13.     The United States Department of Veterans Affairs, Office of Employment

13  Discrimination Complaint Adjudication (OEDCA) has, however, failed to provide a timely

14  Final Agency Decision.

15      14.     As such, the claims in Complaint 200P-X002-2008103234 are ripe for

16  adjudication in federal court.

17      15.     The United States Equal Employment Opportunity Commission ("EEOC")

18  investigated the allegations in Formal Complaint 200P-X002-2008101837.

19      16.     The EEOC concluded its investigation and, on January 28, 2009, issued

20  Plaintiff a notice of her right to file a civil action.  See Exhibit 1, January 28, 2009, EEOC

21  Determination.

22      17.     Plaintiff now, within the applicable limitations periods, files against Defendant

23  this civil action.

24                              **GENERAL ALLEGATIONS**

25      18.     Plaintiff is an African-American woman.

26      19.     Plaintiff, in 1996, obtained from Western School of Health and Business

27  Careers a diploma in Paralegal Studies.

28      20.     Plaintiff worked for the federal government for nearly twenty-four years.

21.     Plaintiff has worked in numerous positions within the federal sector.

22.     Plaintiff has, during her entire career in the federal sector, performed in a stellar manner her various duties.

23.     Plaintiff, in 1985, went to work for the National Labor Relations Board ("NLRB") as Program Technician to Executive Assistant, Office of General Counsel, Human Resources.

24.     Plaintiff, in 1986, became Secretary to Director of Program Development and Performance Management Evaluation for the NLRB.

25.     Plaintiff, in 1988, became Staff Assistant to Director of the United States Information Agency.[1]

26.     Plaintiff, in that position, enjoyed a top secret clearance.

27.     Plaintiff, in 1990, became a Legal Assistant for the United States Department of Justice in the Pennsylvania United States Attorney's Office.

28.     Plaintiff, on June 8, 1993, received from the U.S. Department of Justice, Executive Office for U.S. Attorneys a critical-sensitive security clearance.

29.     Plaintiff's final rating by Michael L. Colville, Assistant U.S. Attorney, Department of Justice, U.S. Attorney's Office, Western District of Pennsylvania, was "Substantially Exceeds Expectations", the highest possible rating.

30.     Plaintiff, in 1993, became a Financial Litigation Agent and Certified EEO Counselor-Collateral Capacity for the United States Department of Justice.

31.     Plaintiff, in 1999, became a Paralegal Specialist, Employment Law and Torts, for the United States Department of Veterans Affairs, Office of General Counsel.

32.     Plaintiff began her service with the VA in Brecksville, Ohio, Region 7.

33.     The Veterans Integrated Service Network (VISN) 10 funded Plaintiff's position, but she was a VA Regional Counsel employee.

34.     Her first-line supervisor was Terry Wolk, and her second-line supervisor was

---

[1]The United States Information Agency is now known as the U.S. Department of State.

Donald Adams.

35.    Donald A. Adams, Regional Counsel for Region 7, in his 2006 review of Plaintiff's work, overrode a proposed performance rating of "Fully Successful" and assigned her the performance rating "Excellent."

36.    The proposed "Fully Successful" rating was the result of a dispute between Terry Wolk, Assistant Regional Counsel, and Mr. Adams.

37.    Mr. Adams rated Mr. Wolk as "Fully Successful" and, apparently, Mr. Wolk was unhappy with the rating.

38.    Mr. Wolk announced he would, as some sort of sign of protest, assign to everyone in the office the same rating he received from Mr. Adams.

39.    Mr. Adams, as reviewing official, overrode Plaintiff's "Fully Successful" rating and changed it to "Excellent."

40.    Mr. Adams, in that review, stated, "Ms. Hall has done an outstanding job managing the cases she is responsible for, both those actually assigned to her as well as those she provides administrative support on."

41.    He further stated, "Ms. Hall has become the Region's expert in 'how to' tort claims.  Additionally, she is quickly becoming the resource person for substantive ADR matters and accomplishing special projects."

42.    This evaluation was typical of those Plaintiff received while in Region 7 and, for that matter, throughout her federal career.

43.    Plaintiff, in 2007, asked for a transfer from Region 7 to Region 19, which is in Phoenix, Arizona.

44.    Plaintiff's husband had recently obtained in Phoenix with the United States Department of Labor a position as a Criminal Investigator, and Plaintiff, of course, intended to move to Phoenix with him.

45.    Plaintiff, on October 1, 2007, officially transferred to Region 19.

46.    Plaintiff's position was Paralegal Specialist, the United States Department of Veterans Affairs, Office of General Counsel, Region 19.

47. Plaintiff's duties as Paralegal Specialist in Region 7 included conducting desk audits and assisting in the preparation of accretion of duties statements; researching OPM classification standards, coordinating with the Department's Human Resources Department for reclassification of Regional Counsel support positions; conducting interviews and research and labor policy analysis to investigate claims of employment discrimination; training new personnel; and providing to the administrative staffs recommendations regarding collective bargaining contracts, supplemental contracts, and personal policies with grievance policies.

48. Plaintiff's duties in Phoenix, from December of 2007, through February of 2008, were to support the Confidential Financial Disclosure Program, work assigned Federal Tort Claims Act claims, and provide attorney support through substantive writing assignments in both tort and employment/labor law.

49. The above is only a small sample of the duties Plaintiff performed.

50. Plaintiff's first-line supervisor when she moved to Region 19 was Jeffrey D. Stacey, Assistant Regional Counsel.

51. Plaintiff's second-line supervisor was Mark Romaneski, Regional Counsel.

52. Plaintiff, during the time she worked in Region 19, was the only African-American employee in the office.

53. Plaintiff, during the first few months of her employment in Region 19, began to suspect there existed in the office disparities in her workload and the treatment she received as they related to the workloads and treatment of other employees.

54. Another employee's statement that Phoenix is a "White city" only added to these concerns.

55. Further, she, while looking for a form letter on the office's shared computer drive, came across personal letters in which Maria Worth, a Region 19 employee, used the term "nigger."

56. Plaintiff also noticed her workload was much heavier than that of Norma Kaping, a Caucasian paralegal in the office.

57.    Plaintiff received the more onerous work assignments, including very involved research and writing projects, while also supporting the agency's Confidential Financial Disclosure (CFD) Program.

58.    Ms. Kaping did not have to perform any research or writing assignments, nor did she provide attorney support.

59.    Plaintiff formed the belief her race might be playing a role in the amount of work she had to complete relative to that of Ms. Kaping.

60.    Plaintiff, on or about February 14, 2008, met with Mr. Romaneski and expressed her concerns regarding the disparate treatment to which management subjected her.

61.    Plaintiff discussed the differences in her workload relative to Ms. Kaping's.

62.    Mr. Romaneski, after refusing to address the substance of her complaints, informed Plaintiff he believed they had resolved the issues.

63.    Plaintiff, of course, disagreed with this assessment.

64.    That same day, Thomas C. Hayes, Plaintiff's husband, visited the office for the purpose of taking Plaintiff to lunch for Valentine's Day.

65.    Mr. Hayes is Caucasian.

66.    Mr. Romaneski, when he met Mr. Hayes and learned he was Plaintiff's husband, exhibited a strange facial gesture.

67.    Mr. Hayes firmly believes Mr. Romaneski did this because he, at that precise moment, learned Plaintiff and Mr. Hayes were involved in an interracial marriage.

68.    Plaintiff, on February 15, 2008, sent to Mr. Stacey an E-mail message in which she expressed concern over the disparity in treatment between herself and Ms. Kaping.  See Exhibit 2, February 15, 2008, E-mail message.

69.    Plaintiff, that same day, visited the agency's EEO Manager and requested contact information for ORM and information regarding filing an EEO claim.

70.    Mr. Romaneski, on February 19, 2008, after learning about Plaintiff's intention to file an EEO complaint and receiving Plaintiff's February 15, 2008, E-mail message to Mr.

Stacey, issued to Plaintiff a Memorandum entitled "Paralegal Duties." See Exhibit 3, February 19, 2008, Memorandum from Mark Romaneski.

71.    Mr. Romaneski, in that memorandum, responded to Plaintiff's concerns regarding disparate treatment.

72.    Mr. Romaneski's response, however, did not properly address Plaintiff's concerns.

73.    Mr. Romaneski provided no plausible explanation as to why Ms. Kaping did not have to perform substantive assignments and did not have to provide attorney support.

74.    Mr. Romaneski, in the memorandum, merely glossed over Plaintiff's concerns of disparate treatment.

75.    Mr. Romaneski, in the memo, went on to terminate Plaintiff's telecommuting privileges.

76.    Mr. Stacey, only two weeks earlier, had increased from two to three days per pay period the number of days Plaintiff could telecommute.

77.    This increase was to become effective on February 19, 2008, which was the date Mr. Romaneski issued the memorandum.

78.    Ms. Kaping, not surprisingly, continued to be able to telecommute.

79.    Plaintiff, on February 20, 2008, filed an informal EEO alleging race discrimination and hostile work environment based on race.

80.    Mr. Romaneski has testified he strongly suspected Plaintiff had filed an EEO complaint prior to or around the date of February 20, 2008.

81.    Plaintiff, on February 20, 2008, had with Mr. Romaneski and Mr. Stacey a discussion regarding her concerns of disparate treatment and Mr. Romaneski's memorandum.

82.    Plaintiff, during that meeting, in an attempt to demonstrate why she believed it was plausible to conclude there existed in the office racial animus, cited the letters in which Ms. Worth used the term "nigger."

83.    Plaintiff, after discussing with others these letters, had learned someone had left them in the office printer.

84.     Plaintiff informed Mr. Romaneski and Mr. Stacey the letters were found in the office printer.

85.     Plaintiff never told them she found them in the printer.

86.     Plaintiff, again, found them on the shared hard drive.

87.     Plaintiff did not, at that time, go into detail as to how she found the letters, as she did not believe how she found them was at all important.

88.     Mr. Romaneski showed very little interest in investigating whether and why there were on the office's shared drive letters containing such offensive language.

89.     Mr. Romaneski, in fact, stated he did not have time to follow up on the issue and instructed her to provide to Mr. Stacey copies of the letters, along with any additional information she wanted to present.

90.     Plaintiff, via E-mail, did present to Mr. Stacey scanned copies of the original letters.

91.     Plaintiff, as an attachment to a February 27, 2008, E-mail message, presented to Deo Engles, EEO Manager, copies of two of these letters.  See Exhibit 4, February 27, 2008, E-mail from Vanessa Hall to Deo Engles, with attachments.

92.     The first line of the letter states, "I am not one of you're [sic]…as you would say one of your so called 'Nigger Friends!'"

93.     The next line states, "how dare you and shame on you for the way you have treated me this last year."

94.     The author of the letter, Ms. Worth, has been the subject of many complaints, regarding both performance and conduct.

95.     Management, however, has taken against Ms. Worth, who is Caucasian, no disciplinary action.

96.     Plaintiff, on February 27, 2008, had with Mr. Romaneski a meeting.

97.     Mr. Stacey participated by telephone conference.

98.     Mr. Romaneski, during the meeting, requested Ms. Hall's resignation, which only added to the stress she was under at the office.

99.   Mr. Stacey, however, later confirmed her performance was "at least Fully Successful or higher."

100.   Plaintiff's work environment, meanwhile, became more intolerable each day.

101.   Mr. Romaneski, for instance, openly disparaged and berated Ms. Hall by laughing and joking with her co-workers about charging Ms. Hall with Absences Without Leave (AWOL) when Ms. Hall was on leave, which Mr. Stacey approved, to visit her terminally ill aunt in Ohio.

102.   Mr. Romaneski began to reward employees who treated Plaintiff in a disrespectful manner.

103.   Conversely, he began to punish employees who remained friendly with Plaintiff.

104.   Mr. Romaneski and Mr. Stacey posted in the Phoenix office's case-tracking system Plaintiff's various EEO complaints.

105.   All Region 19 employees have access to these files.

106.   The harassment escalated to the level that Plaintiff, on February 27, 2008, began to experience physical manifestations of stress and then collapsed at work.

107.   Paramedics arrived to treat her and found her blood pressure had climbed to 170/100.

108.   Plaintiff eventually had to see a cardiologist.

109.   The cardiologist diagnosed Plaintiff as suffering from hypertension, with a stiffening heart muscle.

110.   Plaintiff, prior to going to work for Region 19, had been hypotensive, *i.e.*, very low blood pressure.

111.   Plaintiff, however, due to her unbearable workload, believed she had no choice but to return to work the day following her collapse.

112.   Mr. Stacey, that day, February 28, 2008, sent Plaintiff an E-mail message informing her he wanted to meet on March 5, 2008, to discuss her performance.

113.    Mr. Stacey, during that March 5th meeting, admitted Plaintiff's performance was "at least Fully Successful or higher."

114.    Plaintiff, in the meantime, understanding she would have difficulty succeeding in an environment in which management held her to a different standard in comparison to other, non-Africa-American employees, received conflicting information by management, and was the target of unlawful reprisal, began to consider a career move.

115.    She, consistent with these feelings, applied for a position with the Federal Bureau of Investigation ("FBI").

116.    Plaintiff, in early March of 2008, learned the FBI had extended to her a conditional offer of employment.

117.    Plaintiff, on or about March 7, 2008, informed Mr. Stacey of this conditional offer of employment.

118.    Mr. Stacey immediately notified Mr. Romaneski of this development.

119.    Mr. Romaneski, on March 12, 2008, called Plaintiff into his office and demanded Plaintiff provide to him the telephone number to her "contact" at the FBI.

120.    Plaintiff believed Mr. Romaneski would, if he were able to speak to the relevant FBI official, attempt to sabotage Plaintiff's employment opportunity.

121.    Plaintiff politely informed Mr. Romaneski she did not believe it was appropriate for him to contact anybody at the FBI regarding her employment.

122.    She informed him the agency's Human Resources Department would take care of all administrative matters related to her potential transfer.

123.    Plaintiff, on March 12, 2008, due to the escalating retaliation, requested a leave of absence.

124.    Mr. Romaneski's superiors approved her leave to begin on March 14, 2008.

125.    Mr. Romaneski attempted to thwart her attempts to take leave and was successful in getting changing from March 14, 2008, to a date contingent upon completion of all pending work assignments the beginning of her leave of absence.

126.    Mr. Romaneski, on March 13, 2008, held with Plaintiff a meeting in which he

attempted to reprimand her.

127.    Mr. Romaneski informed her the basis of the reprimand was his belief she had fabricated evidence related to the racist letters Ms. Worth had saved on the office's shared drive and that Plaintiff had pointed out to management.

128.    Ms. Worth had created the letters prior to Plaintiff's transfer to Region 19.

129.    Plaintiff informed Mr. Romaneski she strongly disagreed with his decision to reprimand her and clarified for him his misunderstanding as to how she came across the letters.

130.    Plaintiff, at that point, went to the office of Maxine Romero, Staff Attorney, and asked if she (Ms. Romero) could provide clarification.

131.    Ms. Romero informed Mr. Stacey and Mr. Romaneski that the letters were consistent with computer misuse she previously reported to the both of them.

132.    Ms. Romero also specifically stated that she requested Mr. Romaneski and Mr. Stacey perform on Ms. Worth's computer an audit, so they could identify these letters.

133.    This confirmed to Mr. Romaneski both the author and location of the letters.

134.    Plaintiff was originally told she was being reprimanded for creating the letters.

135.    The clarification Ms. Romero provided on March 13, 2008, nullified the basis of the original reprimand.

136.    Mr. Romaneski, during the March 13, 2008, meeting never revealed the contents of the folder which he said contained the reprimand.

137.    As a result of Ms. Romero's clarification, Mr. Romaneski withheld his issuance of the reprimand at that time.

138.    Mr. Romaneski, at that point, stated that he would "hold off" on issuing the reprimand "until a later date".

139.    Plaintiff, from March 14, 2008, through March 21, 2008, experienced rotating and changing tasks and assignments.

140.    For example, Mr. Stacey and Mr. Romaneski decided to "rope-off" Plaintiff's time, which prohibited her from working on certain tasks during specified times.

141.    Plaintiff received instructions fifty percent (50%) of her time would be "roped-off" to provide attorney support.

142.    Management informed Plaintiff she, during Plaintiff's "roped-off" time, was to work specifically on attorney Dana Heck's assignments, some of which were already past due.

143.    In one instance, Plaintiff's time was "roped-off" for her to complete a litigation report Staff Attorney Dana Heck had already completed and submitted.

144.    When Plaintiff pointed out to Mr. Stacey and Mr. Romaneski this fact, they told her to "just write the report."

145.    Plaintiff, as they instructed, drafted the report.

146.    Mr. Romaneski, who had never before written a litigation report, intensely scrutinized the report; going so far as to count the number of words in it and determining the word count was too low.

147.    Mr. Stacey began notifying Plaintiff via E-mail of additional assignments requiring her immediate attention.

148.    These E-mails were frequent and pre-empted her "roped off" time.

149.    Mr. Stacey, knowing that Plaintiff was in the "roped-off" status, stated that the "E-mails were necessary".

150.    If Plaintiff did not open the E-mails immediately, she would receive from Mr. Stacey another E-mail, enclosing another list of tasks and assignments.

151.    During the period March 14-21, 2008, the E-mails outlining tasks and assignments always began, "Since you might [emphasis added] be leaving VA for FBI, it is imperative that you complete the following tasks:".

152.    However, she received instructions she was not to complete other tasks during the "roped-off" time.

153.    Plaintiff also received instructions to write for an arbitration she did not attend a closing arbitration brief.

154.    One month had elapsed between the arbitration and assignment of the task to

1    Plaintiff.

2    155.    Plaintiff, recognizing the lost time and in an effort to undertake the task

3    efficiently, requested a sample closing arbitration brief.

4    156.    Plaintiff learned that there were no samples, because no one within Region 19

5    had ever written a closing arbitration brief.

6    157.    When Plaintiff requested samples from the staff, management accused Plaintiff

7    of trying to reassign her work to other staff members.

8    158.    Under that misimpression, Plaintiff received instructions that no staff member

9    could assist her with the projects.

10    159.    Management also told Plaintiff it would be "inappropriate" for any staff

11    member to provide her assistance with completing the projects or assignments.

12    160.    Plaintiff received instructions that if she needed assistance, she was to ask Mr.

13    Romaneski or Mr. Stacey.

14    161.    When Plaintiff did ask for help, they simply told her to complete the

15    assignments on her own.

16    162.    Management informed Plaintiff she was not to collaborate with Attorney Heck,

17    the assigned attorney, on the assignments.

18    163.    Plaintiff received instructions to physically pick up assignments from Attorney

19    Heck from a hutch in the hallway.

20    164.    Plaintiff received instructions she was not to enter Attorney Heck's office.

21    165.    Plaintiff, despite all of these pitfalls and conditions, was determined to

22    complete the assignments.

23    166.    Plaintiff, on March 21, 2008, did complete all pending assignments, which, of

24    course, was a condition to her leave approval.

25    167.    Mr. Romaneski, at that point, objected to her approved leave and informed

26    Plaintiff he wanted her to return to work so she could face "increased penalties" for any

27    infractions that might occur.

28    168.    Mr. Romaneski, also on March 21, 2008, issued the written reprimand he had

1    threatened to issue on March 13, 2009.  See Exhibit 5, March 12, 2008, Reprimand.

2    169.    In the reprimand, Mr. Romaneski also cited "deliberate failure" to complete

3    assignments and meet deadlines.

4    170.    Plaintiff's leave was contingent upon completion of those same assignments

5    and, as stated above, and she completed them.

6    171.    Despite the fact she had completed all such projects, Mr. Romaneski also

7    reprimanded Plaintiff for a "deliberate failure" to complete those same assignments.

8    172.    The date on the reprimand was March 12, 2008, but Mr. Romaneski did not

9    issue it to Plaintiff until March 21, 2008.

10    173.    On March 21, 2008, shortly after receiving the reprimand, Plaintiff noticed the

11    date of issuance on the reprimand was incorrect.

12    174.    Mr. Romaneski refused to correct the date on the reprimand to the actual date

13    of issuance, i.e., March 21, 2008.

14    175.    Plaintiff, on March 24, 2008, sent an E-mail requesting that Mr. Romaneski

15    correct the date to reflect the date of issuance as March 21, 2008.

16    176.    Mr. Romaneski again refused to change the date. Mr. Romaneski in his

17    response stated: "As I indicated to you in my email on Friday when you raised this issue, the

18    reprimand is dated 12 March because that is the date that the ARC (imposing official) signed

19    and dated it.  It is not the date that it was received. It was originally to be presented on 13

20    March but that did not happen on that date."

21    177.    It is clear that Mr. Romaneski revised the reprimand from its original form to

22    include solicited misconduct allegations, which Plaintiff was never given the opportunity to

23    refute.

24    178.    The allegations in the reprimand are completely baseless.

25    179.    It is clear Mr. Romaneski chose to bypass lower-level discipline, such as, a

26    counseling in lieu of written reprimand and issued the reprimand on completely baseless and

27    unsubstantiated charges.

28    180.    The primary allegation in the reprimand was that Plaintiff falsified

communications related to the racist letter Ms. Worth wrote.

181. The allegation was that Plaintiff, during their first discussion of the letters, told them she found the letters in the printer.

182. Again, Plaintiff never said this.

183. She merely informed Mr. Stacey and Mr. Romaneski the letters were found in the printer.

184. What she meant was other employees previously found the letters in the office printer.

185. Plaintiff made clear she found the documents in the shared hard drive.

186. Plaintiff cleared up the confusion on this issue very quickly.

187. At no time after Plaintiff reported the letter containing the offensive word "Nigger", did Mr. Romaneski or Mr. Stacey display any concern or sensitivity for how Plaintiff felt.

188. Further, it is extremely odd Mr. Romaneski and Mr. Stacey would be more concerned with Plaintiff's disclosure of how she came across the letters than the nature of the letters themselves or the fact the author of the letters was a current employee.

189. Mr. Romaneski, also on March 21, 2008, issued a memorandum in which he denied Plaintiff's within-grade increase ("WIGI").   See Exhibit 6, March 21, 2008, Memorandum re Denial of WIGI.

190. Mr. Romaneski used to justify the denial of WIGI, the baseless allegations in the written reprimand.

191. Mr. Romaneski denied the WIGI, despite the fact Plaintiff's rating of record at the time of the denial was "Excellent."

192. Mr. Romaneski made sure the reprimand and denial of WIGI went into Plaintiff's Official Personnel File ("OPF").

193. It is clear the FBI became aware of the reprimand and denial of WIGI prior to rescinding the conditional offer of employment.

194. Plaintiff, on March 22, 2008, filed with the Department's EEO Manager a

1    complaint of retaliation under Title VII.

2         195.   This was related to the reprimand and the denial of WIGI memorandum.

3         196.   Michael Hogan, Deputy Assistant General Counsel requested Plaintiff, as a

4    condition of her leave, supply Mr. Romaneski and Mr. Stacey with regular status reports of

5    her background investigation for a top secret clearance with the FBI.

6         197.   Plaintiff objected to this request.

7         198.   She informed Mr. Hogan that she did not feel comfortable with the request,

8    because she was not sure how Mr. Romaneski and Mr. Stacey would use this information.

9         199.   Mr. Hogan informed Plaintiff via E-mail, that he "did not share her concerns"

10   and that she needed to provide this information.

11        200.   The VA, on or about March 31, 2008, put out a job announcement for

12   Plaintiff's position, even though Plaintiff was, at that time, still a VA employee.

13        201.   Mr. Hogan, on April 29, 2008, communicated to Plaintiff a settlement offer in

14   which she would have to resign and waive all claims, but would receive no monetary

15   compensation.

16        202.   Plaintiff did not sign the settlement agreement, and Mr. Hogan followed up

17   with Plaintiff on the status of the settlement by E-mail on May 23, 2008.

18        203.   Plaintiff, on May 25, 2008, received notice, postmarked May 23, 2008, the FBI

19   had withdrawn its conditional offer of employment.

20        204.   Plaintiff, at that point, asked Mr. Hogan for a transfer within VA but to another

21   office.

22        205.   Mr. Hogan denied the request.

23        206.   Plaintiff, on June 4, 2008, filed with the Department's EEO counselor a

24   complaint of retaliation and race discrimination under Title VII.

25        207.   Plaintiff, on June 6, 2008, understanding she would be unable to return to

26   Region 19 and have any chance of success due to threats by Mr. Romaneski and that another

27   individual had filled her former position, informed the Department of her resignation.

28        208.   Her resignation was, of course, really the result of a constructive discharge.

209.    Mr. Romaneski's retaliation against Plaintiff continued even after her employment with the Department ended.

210.    Plaintiff, on July 2, 2008, a month after the termination of her employment, learned Mr. Romaneski and Mr. Stacey had created for her a Performance Improvement Plan ("PIP").

211.    They created this PIP on June 10, 2008, only after Plaintiff ceased her active service with the Department.

212.    Mr. Romaneski, on or about July 2, 2008, circumvented Office of Personnel Management and Department of Veterans Affairs regulations when he requested obtained Plaintiff's Official Personnel File.

213.    He did so by initiating the transfer of the file from the Cleveland Human Resources' office to the Phoenix office.

214.    Mr. Romaneski then maintained possession of the file for four days, until he received orders to deliver it to the Phoenix VA Human Resources Office.

215.    Plaintiff, subsequent to her constructive discharge, has been unable to secure with the federal government employment.

**FIRST CLAIM FOR RELIEF**

**(Title VII- Retaliation/Wrongful Termination)**

216.    Plaintiff incorporates by reference all previous allegations.

217.    Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter."  42 U.S.C. § 2000e-3(a).

218.    Plaintiff, by raising with management issues of disparate treatment, engaged in protected activity.

219.    Plaintiff, by threatening to and the actually filing EEO complaints, engaged in protected activity.

220.    Defendant, through several actions, including terminating her telecommuting privileges, issuing her a written reprimand, denying her WIGI, interfering with her

conditional offer of employment with the FBI, creating the PIP, and terminating her employment, retaliated against Plaintiff.

WHEREFORE, Plaintiff demands judgment on her First Claim for Relief against Defendants for:

a.     An injunction ordering Defendants to cease their violations of Title VII, pursuant to 42 U.S.C. § 2000e-5(g)(1);

b.     Immediate reinstatement to her former position;

c.     Back pay in an amount to be demonstrated at trial, pursuant to 42 U.S.C. § 2000e-5(g)(1);

d.     Front pay, in an amount to be demonstrated at trial, pursuant to 42 U.S.C. § 2000e-5(g)(1);

e.     Compensatory damages, including damages for emotional distress, in an amount to be demonstrated at trial, pursuant to 42 U.S.C. § 1981a(a)(1);

f.     Punitive damages, pursuant to 42 U.S.C. § 1981a(a)(1);

g.     Plaintiff's reasonable attorney's fees and costs, pursuant to 42 U.S.C. § 2000e-5(k);

h.     Pre-judgment and post-judgment interest; and

i.     Such other relief as the Court deems appropriate.

## SECOND CLAIM FOR RELIEF

### (Title VII-Race Discrimination-Wrongful Termination)

221.   Plaintiff incorporates by reference all previous allegations.

222.   It is unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

223.   Defendant constructively discharged Plaintiff due to, in at least party, her race.

224.   A separation from an employer is a constructive discharge where, "looking at the totality of the circumstances, 'a reasonable person in [the employee's] position would have felt that he was forced to quit because of intolerable and discriminatory working

1    conditions.'" Watson v. Nationwide Ins. Co., 823 F.2d 360, 361 (9th Cir. 1987).

2         225.    The Ninth Circuit has stated, "In such cases the individual has simply had

3    enough; she can't take it anymore." *Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1110

4    (9th Cir. 1998).

5         226.    "Whether working conditions were so intolerable and discriminatory as to

6    justify a reasonable employee's decision to resign is normally a factual question for the jury."

7    *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1411 (9th Cir. 1996).

8         227.    A plaintiff, in order to demonstrate there was a constructive discharge, "must

9    show some aggravating factors, such as a continuous pattern of discriminatory treatment."

10   *Id.* at 1412.

11        228.    Defendant's actions vis-à-vis Plaintiff clearly constitutes a constructive

12   discharge.

13        WHEREFORE, Plaintiff demands judgment on her Second Claim for Relief against

14   Defendants for:

15        a.    An injunction ordering Defendants to cease their violations of Title VII,

16   pursuant to 42 U.S.C. § 2000e-5(g)(1);

17        b.    Immediate reinstatement to her former position;

18        c.    Front pay, in an amount to be demonstrated at trial, pursuant to 42 U.S.C. §

19   200e-5(g)(1)

20        d.    Back pay in an amount to be demonstrated at trial, pursuant to 42 U.S.C.

21   § 2000e-5(g)(1);

22        e.    Compensatory damages, including damages for emotional distress, in an

23   amount to be demonstrated at trial, pursuant to 42 U.S.C. § 1981a(a)(1);

24        f.    Punitive damages, pursuant to 42 U.S.C. § 1981a(a)(1);

25        g.    Plaintiff's reasonable attorney's fees and costs, pursuant to 42 U.S.C.

26   § 2000e-5(k);

27        h.    Pre-judgment and post-judgment interest; and

28        i.    Such other relief as the Court deems appropriate.

1

**DEMAND FOR JURY TRIAL**

2     Plaintiff also, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, hereby

3 demands a trial by jury in these proceedings.

4     Plaintiff is, pursuant to 42 U.S.C. § 1981a(c), entitled to a jury trial on her Title VII

5 claims.

6     RESPECTFULLY SUBMITTED this 21st day of April, 2009.

7                                 LAW OFFICE OF JAMES BURR SHIELDS

8

9                                 __s/ W. Blake Simms_____
                                 W. Blake Simms
10                                Attorney for Plaintiff

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28