UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

_____

```
VANESSA HALL,                   )
                                )
                 Plaintiff,     )
                                )
            vs.                 )
                                )   No. CIV-09-0837-PHX-FJM
                                )
ERIC K. SHINSEKI, SECRETARY,    )
UNITED STATES DEPARTMENT of     )
VETERANS AFFAIRS,               )
                                )
                 Defendant.     )
_____)
```

Phoenix, Arizona
June 8, 2010
9:45 A.M.

DEPOSITION OF VANESSA HALL

Transcript Prepared for:
The Strojnik Firm, LLC
PETER K. STROJNIK, Esq.
Of Counsel

COPPERSTATE REPORTING SERVICE
Court Reporters
12601 North 59th Place, Suite 100
Scottsdale, Arizona 85254-4312
(602) 795-5515

Reported by:                APRIL M. HUNT, RPR
                            CR # 50337

1                          I N D E X

2  VANESSA HALL                                    PAGE
   EXAMINATION

3

    BY MR. LANTKA                                    4

4

5

6

7                        E X H I B I T S

8  NUMBER              DESCRIPTION                 PAGE

9    1    Performance Standards for a              52
          Representational Paralegal Specialist

10

    2    Initial Contact Interview Sheet          61

11

    3    Document from Interview Packet            66

12

    4    Notice of Withdrawal of EEOC Complaint   84

13

    5    11/19/07 email from Vanessa Hall to      143
         Jeffrey Stacy

14

15   6    Flexiplace Work Agreement               146

16   7    Complaint                               156

17   8    Email string starting with 5/23/08      165

18   9    2/26/08 email                           177

19   10   5/21/08 letter to Vanessa Hall from Bonnie  195
          K. Adams at the FBI

20

    11   Supplemental Answers to Interrogatories  197

21

    12   Email string starting with 2/8/08 from   223
         Jeffrey Stacy

22

23   13   2/15/08 email from Vanessa Hall to Jeffrey  245
          Stacy regarding "New Claim"

24

    14   2/22/08 Memorandum on Department of       259
         Veteran's Affairs letterhead

25

1              THE DEPOSITION OF VANESSA HALL,

2   witness herein, was taken pursuant to notice by the

3   parties through their respective attorneys before APRIL

4   M. HUNT, RPR, a Certified Reporter #50337 in and for

5   the State of Arizona, at the offices of the United

6   States Attorney, Two Renaissance Square, 40 North

7   Central Avenue, Suite 1200, Phoenix, Arizona on June 8,

8   2010, commencing at the hour of 9:45 A.M. of said day.

9              Further, this deposition was taken

10  pursuant to the Rules of Civil Procedure.

11

12

13

14  APPEARANCES:

15          FOR THE PLAINTIFF:
                The Strojnik Firm, LLC
16              By:  PETER K. STROJNIK, Esq.
                3030 North Central Avenue
17              Phoenix, Arizona 85012

18

19          FOR THE DEFENDANT:
                United States Attorney
20              By:  PETER M. LANTKA, Esq.
                Two Renaissance Square
21              40 North Central Avenue, Suite 1200
                Phoenix, Arizona 85004

22

23  ALSO PRESENT:
                Betsy Gruber and John Gruber,
24              Videographers
                Donald C. Phillips
25              Sasha Meschkow
                Matthew Hegreness

                                                    Phoenix, Arizona
 1                                                  June 8, 2010
 2                                                  9:45 A.M.

 3

 4          THE VIDEOGRAPHER:  This is the deposition

 5  taken in the case of Vanessa Hall versus Eric Shinseki,

 6  Secretary of the United States Department of Veteran's

 7  Affairs, Case No. CIV-09-0837-PHX-FJM, in United States

 8  District Court, District of Arizona.

 9          Present are April Hunt, court reporter

10  with Copperstate Reporting; Betsy Gruber, John Gruber,

11  videographers with Copperstate Reporting; the attorney,

12  Peter M. Lantka for Assistant U.S. Attorney and for the

13  Defense; and then Peter J. Strojnik with the Strojnik

14  Firm for the Plaintiff.  Vanessa Hall is the witness

15  being deposed.

16          This deposition is taken at 9:45, June

17  8th, 2010, at 40 North Central Avenue, Suite 1200,

18  Phoenix, Arizona, 85004.

19          Would all attorneys present please

20  identify yourselves, beginning with the Plaintiff's

21  counsel?

22          MR. STROJNIK:  Peter Kristofer Strojnik,

23  the Strojnik Firm, LLC, representing Vanessa Hall.

24          MR. LANTKA:  Peter Lantka for Defendant

25  Shinseki.

1          THE VIDEOGRAPHER:  Will the court reporter

2 please swear in the witness?

3

4                    VANESSA HALL,

5 the witness herein, after having been first duly sworn,

6 was examined and testified as follows:

7

8                    EXAMINATION

9 BY MR. LANTKA:

10          Q.    Just for the record, also present are the

11 agency representative from the Department of Veteran's

12 Affairs, Donald Phillips, and two of the U.S.

13 Attorney's office's summer interns, Sasha Meschkow --

14 M-E-S-C-H-K-O-W -- and Matthew Hegreness --

15 H-E-G-R-E-N-E-S-S.

16          Ms. Hall, how would you like to be called?

17 Ms. Hall, Vanessa?

18          A.    Vanessa is fine.

19          Q.    Have you ever been deposed before?

20          A.    No, not formally.

21          Q.    Okay.  I'm going to go through typical

22 rules which probably will be old hat to you in your

23 capacity as a paralegal, but I just need to do my job.

24 You understand that everything you say today is

25 recorded; correct?

1           A.      Yes.

2           Q.      And you understand what it means to be

3    under oath?

4           A.      Yes.

5           Q.      So all we need to do, the only job is to

6    answer things truthfully and state things clearly so

7    that our court reporter can get everything down.  Also

8    as I'm sure your attorney told you, things like uh-huh

9    or yeah don't translate well, so I prefer yes or no or

10   a complete answer; is that all right?

11          A.      Yes.

12          Q.      And also, as you note, this is being video

13   recorded.  But because the court tends to officially

14   recognize the audio transcript, clear, annunciated

15   answers are important.  Is that all right?

16          A.      Yes.

17          Q.      The one thing that I do as a U.S. Attorney

18   is be elated about my job.  As I think we joked before

19   in an earlier dep, I get paid either way whether the

20   United States wins or loses.  So I don't want to trip

21   you up on anything.  If a question sounds screwy, it's

22   probably my fault.  So, please just ask me to rephrase.

23   Or if I don't have the facts straight because I wasn't

24   there and you were, just correct me.  Is that all

25   right?

1      A.    Yes.

2      Q.    We don't have too many exhibits.  I think

3  we only have 19 or 20 for your dep.  When I give you

4  one, just please look it over.  We're going to go in a

5  methodical fashion.  Like I said, we're not going to

6  sandbag anything, you know, start from the day you were

7  born and go up until five seconds ago.

8           As you know from your training as a

9  paralegal, I'm sure, your counsel is allowed to make

10  limited objections on the record.  And there is very

11  few instances where he can instruct you not to answer.

12  But Peter may choose to make an objection.  In that

13  case, we'll pause and let him make it, and I'll ask you

14  to continue to answer the question.  Is that all right?

15      A.    Yes.

16      Q.    You can take a break any time you want.

17  Because we have more security than we care to have

18  here, we will probably all go to the bathroom like

19  we're in second grade.  So we can do it at different

20  times.  But the only time I ask you not to take a break

21  is in the middle of a question.  That way so, I guess

22  the unwritten rule so we can't think something up in

23  the hallway.  Is that all right?

24           As far as today goes, are you under any

25  type of medication, either prescription or

1  nonprescription that would affect your ability to be

2  deposed today?

3        A.    No.

4        Q.    Anything that would affect your ability to

5  tell the truth or recall your past?

6        A.    No.

7        Q.    Are you suffering from any, aside from the

8  stress of being deposed, are you suffering from any

9  undue stress or emotional trauma that you think would

10  make it difficult to be deposed today?

11        A.    No.

12        Q.    How did you go about preparing for this

13  deposition today?

14        A.    Could you please be clearer?

15        Q.    Well, in getting ready for today, what did

16  you do to familiarize yourself with your case, or what

17  did you do to prepare before you came here today?

18        A.    I spoke with my attorney briefly yesterday

19  in preparation.

20        Q.    I can't ask you what you talked about.  I

21  can ask you, though, did you go over any documents?

22        A.    No.

23        Q.    Did you discuss it with anyone else?

24        A.    No.

25        Q.    Your husband, friends?

1          A.     My husband, of course I let him know the

2    deposition was today.

3          Q.     No ministers, like weird guys on the

4    street, anything like that?

5          A.     I guess you could say my minister.

6          Q.     What did you talk about?  Just fact the

7    fact that it was going on, stressors, or anything more

8    substantial?

9          A.     Just asked for prayer.

10         Q.     Anything else?

11         A.     No.

12         Q.     We're going to get into the kind of boring

13   stuff.  I'm going to go through your history kind of

14   methodically.  I'd like just for the record, can you

15   please state your full name?

16         A.     Vanessa Hilda Hall.

17         Q.     And do you have a maiden name, Vanessa?

18         A.     Howard.

19         Q.     Have you ever gone by any other aliases,

20   anything like that?

21         A.     Hall-Hayes.

22         Q.     Where did the Hayes come from?

23         A.     That's my current married name.

24         Q.     As far as legal documentation, would

25   you -- buying a house or a car, are you Hall-Hayes or

1   just Hall?  What do you go by?

2          A.     Hall.

3          Q.     And what is your birth date?

4          A.     January 7, 1964.

5          Q.     Since this is a Title 7 case, ma'am, how

6   would you self-identify yourself with regard to race?

7          A.     Black or African-American.

8          Q.     Would it be fair to say you identify

9   yourself as a woman as well?

10         A.     Yes.

11         Q.     Don't make presumptions.

12                Where were you born?

13         A.     Aliquippa, Pennsylvania.

14         Q.     How big was your family growing up?

15         A.     Ten children, mother and father.

16         Q.     Got me beat.  Are you still in contact

17  with them?

18         A.     Yes.

19         Q.     I'm going to talk a little bit about your

20  education.  Let's start with high school.  Where did

21  you go?

22         A.     Aliquippa High School.

23         Q.     Where is that at?

24         A.     Aliquippa, Pennsylvania.

25         Q.     Makes sense.  When did you graduate?

1    A.    1981.

2    Q.    And where did you go after that?

3    A.    After high school, I took a short break,

4  and then I went to Western School of Health and

5  Business.

6    Q.    Where is that at?

7    A.    That is located in Pittsburgh,

8  Pennsylvania.

9    Q.    What years did you attend that school?

10    A.    I believe it was 1995 to 1996.

11    Q.    Were you in any type of degree program?

12    A.    Certificate program, or diploma program.

13    Q.    Was that to be a paralegal?

14    A.    Yes.

15    Q.    Did you take any breaks within that

16  collegiate period, or was it straight through?

17    A.    It was straight through.

18    Q.    As far as being a paralegal, are you

19  certified by any state licensing agency?

20    A.    No, not certified.

21    Q.    Okay.  So aside from your -- is it a

22  diploma or degree?

23    A.    Diploma.

24    Q.    A diploma?

25    A.    Yes.

1        Q.    Have you had any other type of licensings
2   or exams, anything like that with regard to your
3   paralegal?
4        A.    No.
5        Q.    While you were in college, any discipline?
6        A.    No.
7        Q.    No academic probation, anything like that?
8        A.    No.
9        Q.    Do you recall your GPA?
10       A.    3.75.
11       Q.    Any other types of college after that, any
12   postsecondary schooling?
13       A.    Yes, I attended Pointe Park College.  I
14   believe now it's a university.
15       Q.    Where is that at?
16       A.    Pittsburgh, Pennsylvania.
17       Q.    What did you study there?
18       A.    Legal studies.  I just continued in the
19   same field.
20       Q.    Did you receive any type of diploma,
21   degree, certificate?
22       A.    No, just completed courses.
23       Q.    What time period do you think you went
24   there?
25       A.    1997, 1998.

1          Q.    How many courses did you complete?

2          A.    I believe three.

3          Q.    Would this be a GPA type granting

4    situation, or is it similar to continuing education?

5          A.    It was GPA.

6          Q.    Do you recall what kind your grades were?

7          A.    4.0.

8          Q.    Any other post-secondary studies in

9    addition to Pointe Park?

10         A.    I'm trying to think.  Phoenix University,

11   I believe I took one class.

12         Q.    Online or present?

13         A.    Online.

14         Q.    Where were you?  Were you back east when

15   you did that, or did you do that here?

16         A.    I was back east.

17         Q.    What did you take?  What course did you

18   take?

19         A.    I belive I completed an English course or

20   some requirement course towards a degree.  I can't

21   remember which one.

22         Q.    Was it a pre-req at the Pointe Park

23   College that you needed, or why did you take an English

24   class?

25         A.    Actually, it was a core requirement I was

1    told.  I'm not sure if it was an English class.  But I

2    was told I needed to complete certain courses in order

3    to get a degree.  So I allowed the enrollment counselor

4    to basically chose for me.  And I'm not sure which

5    course that was because I did not complete that course.

6         Q.    So you started an online course at U of

7    Phoenix?

8         A.    Yes.

9         Q.    And you didn't complete it?

10        A.    No.

11        Q.    Were you trying to go towards some type of

12   degree with U of Phoenix?

13        A.    I wanted to complete my degree in legal

14   studies.

15        Q.    Anything else besides that?  Anything

16   post-secondary?

17        A.    No.

18        Q.    And I'm sorry.  I may have asked you this.

19   May be duplicative.  What year do you recall taking

20   that U of Phoenix class?

21        A.    That was probably right before my move to

22   Phoenix.  So I would say 2006.

23        Q.    So we have your paralegal studies, high

24   school, of course, Pointe Park College, some pre-reqs

25   at Phoenix.  Have you undergone any type of continuing

1  education with regard to paralegal studies or your job

2  as a paralegal?

3          A.    No, not officially continuing it.

4          Q.    Any unofficial?

5          A.    Yes, the U.S. Attorney's Office we were

6  required to go to the NAC and take courses.  I took

7  basic paralegal.  I took advanced paralegal, legal

8  research and studies for paralegals.  I think all in

9  all I probably took four courses at the NAC.

10         Q.    And just for the record, since only you

11  and I know what that is, that's National Advocacy

12  Center maintained by the Department of Justice at the

13  University of South Carolina, correct?

14         A.    Yes.

15         Q.    And you would have done that in your

16  capacity as an employee of the U.S. Attorney's Office?

17         A.    And also Department of Veteran's Affairs

18  in Ohio.

19         Q.    Anything else?

20         A.    Not that I can think of, no.

21         Q.    You currently work at the EEOC?

22         A.    That's correct.

23         Q.    Have they sent you to any training,

24  anything?

25         A.    Yes, I was required to complete

1  investigator training in August of 2009.

2          Q.      Where was that held?

3          A.      That was held in Washington, D.C.

4          Q.      Anything else?

5          A.      Just ongoing training.  I would say two

6  training classes per month.

7          Q.      Would this be in the realm of

8  investigation, employment discrimination, things like

9  that?

10         A.      Yes.

11         Q.      While you were at the VA in Region 19,

12 aside from trips to the NAC, did you attend any type of

13 training at all?

14                 MR. STROJNIK:  Foundation.

15                 THE WITNESS:  Can you please be more

16 specific?

17 BY MR. LANTKA:

18         Q.      The case at issue deals with your

19 employment here in Region 19, General Counsel's Office;

20 correct?

21         A.      Yes.

22         Q.      In your capacity as an employee for the

23 Regional Counsel's Office, did you attend any type of

24 trainings?

25         A.      Such as conferences?

1      Q.    Yes.

2      A.    Yes.

3      Q.    What did you attend?

4      A.    Prior to transferring, so I'm not sure if

5   that would be considered Region 19 because I was still

6   officially a Region 7 employee, I attended the EEO

7   conference in San Francisco.  And I believe that was

8   August of 2007.

9      Q.    And how long of a conference was that?

10      A.    Five-day conference, I believe.

11      Q.    Any other training -- I guess that's

12   during the transition period.  We'd have to look at the

13   paperwork of whose payroll you were on at the time.

14   But any training since then since you left the VA?

15      A.    No.

16      Q.    Back to rudimentary questions.  What is

17   your current address?

18      A.    4217 East Redwood Lane.  That's Phoenix,

19   85048.

20      Q.    How long have you lived there?

21      A.    Approximately a year.

22      Q.    Does anyone live with you?

23      A.    Yes.

24      Q.    Who is that?

25      A.    My husband and my three children.

1      Q.    How old are your kids?

2      A.    Six, 22, and 24.

3      Q.    What is your husband's name?

4      A.    Thomas Hayes.

5      Q.    You said you lived there a year.  Let's

6  just go back.  And I don't need street addresses for

7  everything, but I just want to go with your living

8  arrangements.  Where did you live before this current

9  address?

10      A.    Silverwood Drive.  I believe it was 3217

11  East Silverwood Drive, Phoenix.

12      Q.    And living with you there, the same four

13  people?

14      A.    Same four people.

15      Q.    How long did you live there?

16      A.    From the time that we relocated to

17  Phoenix.

18      Q.    And when did you relocate to Phoenix?

19      A.    That would have been October of 2007.

20      Q.    And before that, if memory serves, you

21  were in Cleveland; correct?

22      A.    Yes.

23      Q.    And do you recall where your last

24  residence was in Cleveland?

25      A.    Actually, it was a 90-day lease at an

1 apartment complex, so I don't recall the exact number.

2 So it was an apartment complex in Middleburg Heights.

3        Q.    Who lived with you there?

4        A.    It was myself and my three children.

5        Q.    Okay.  As to your kids, is your current

6 husband their stepfather or biological father?

7        A.    Biological father of the six-year-old.

8        Q.    Okay.  When were you married to your

9 current husband?

10       A.    September of 2003.

11       Q.    Where were you married?

12       A.    The state of Washington.

13       Q.    And you said your youngest is his kid,

14 correct?

15       A.    Yes.

16       Q.    Any prior marriages?

17       A.    Yes.

18       Q.    Okay.  Let's go through them.  Who were

19 you married to before then?

20       A.    Richard Hall.  I was married to him from

21 1982 until 2002.

22       Q.    Anyone else?

23       A.    No.

24       Q.    Talk a little bit about your current

25 husband, since he lives with you now.  Where is he

1  currently employed?

2       A.    At the Department of Labor.

3       Q.    And what does he do?

4       A.    He is a criminal investigator.

5       Q.    Is the Department of Labor the division

6  out of Phoenix?

7       A.    Yes.

8       Q.    What is your understanding of his job

9  duties?

10      A.    He investigates cases that involve labor,

11 the unions.  So he works for the Office of Labor

12 Management Standards.  And that involves investigating

13 cases of possible embezzlement, unfair labor practices,

14 unfair elections.

15      Q.    Does he work out of the home or does he

16 have an office in town?

17      A.    He maintains both an office in town and he

18 works out of home.

19      Q.    Where is his office in the valley?

20      A.    It is in the old federal building.

21      Q.    Down on Adams Street, the bankruptcy

22 court?

23      A.    Yes.

24      Q.    Are you aware if your husband has ever

25 filed any type of employment discrimination claims with

1  any of his employers?

2       A.    No.

3       Q.    How does your husband self-identify

4  racially?

5       A.    He's Caucasian.

6       Q.    What prompted your move out to Phoenix?

7       A.    He transferred in approximately May or

8  June of 2007.

9       Q.    Was he employed with the Department of

10 Labor before then?

11      A.    Yes.

12      Q.    Did you and your current husband ever work

13 in the same federal agency?

14      A.    Yes.

15      Q.    When did that happen?

16      A.    We worked together at Department of

17 Veteran's Affairs in, I believe it was, 1999 for

18 approximately four months.

19      Q.    I'm going to paraphrase in the future,

20 then.  So he worked with you in the VA.  Where was his

21 next employment after that?

22      A.    It was Department of Labor.

23      Q.    And that was the job that facilitated the

24 transfer?

25      A.    No, he worked as the worker's compensation

1   claims examiner for the Department of Labor in

2   Cleveland.

3          Q.     Where did he go after that?

4          A.     He went to Office of Labor Management

5   Standards under DOL, and he was still in Cleveland.

6   And at that particular time we were not married.  He

7   then transferred to the state of Washington, Seattle

8   Washington, and we commenced a long distance

9   relationship.

10          Q.     So he was employed as a state employee in

11   Washington.  That probably explains why you got married

12   in Washington?

13          A.     Yes.

14          Q.     So how long was he a state employee in

15   Washington?

16          A.     He was actually a federal employee.

17          Q.     For the Department of Labor?

18          A.     U.S. Department of Labor.

19          Q.     How long was he employed in Washington?

20          A.     Approximately two years.

21          Q.     What years were that?

22          A.     I would say 2001, 2002.

23          Q.     And after that where did he head off to?

24          A.     He relocated back to Cleveland.

25          Q.     How long -- what department, what division

1  within DOL was he in Cleveland?

2          A.    Office of Labor Management Standards.

3          Q.    So he's OLM.  How long was he there?

4          A.    Approximately two years.

5          Q.    Two years.  And where did he go after

6  that?

7          A.    Actually, Phoenix, Arizona.

8          Q.    So the OLM position was until 2007?

9          A.    Right, yes, early 2007.

10         Q.    We talked about your current employment at

11  EEOC.  When was your start date there?

12         A.    June 22nd of 2008.

13         Q.    Where is that located?

14         A.    That is located at 3330 North Central

15  Avenue.

16         Q.    Is this your first employment since

17  leaving employment with Region 19?

18         A.    Yes.

19         Q.    What is your title at the EEOC?

20         A.    I'm a federal investigator.

21         Q.    And I don't have your current position

22  description, but how would you describe your duties as

23  a federal investigator?

24         A.    I basically work employment discrimination

25  claims, including race, age, color, national origin,

1  religion, disability, and gena claims.

2          Q.      When you say work claims, what do you mean

3  by that?

4          A.      Investigate.  I also do the intake

5  procedure.

6          Q.      Investigation.  Does that entail a lot of

7  contact with target agencies and target employers?

8          A.      We're talking about private employers,

9  nonfederal; so it's not agencies, it's businesses.

10         Q.      Okay.  Who is your supervisor at EEOC?

11         A.      Jeremy Yubeta.

12         Q.      Is he first line, second line?

13         A.      First line.

14         Q.      Who would you say your second line

15  supervisor is?

16         A.      That would be Rayford Irving.

17         Q.      Either of those gentlemen have a title?

18         A.      Yes, Rayford Irving is director, and

19  Jeremy Yubeta would be supervising investigator.

20         Q.      How big is your office at the EEOC?  How

21  many people?

22         A.      Approximately 30 individuals in

23  enforcement.

24         Q.      And you're in the enforcement division?

25         A.      Yes.

1       Q.    In a nutshell, I don't need person by

2  person, what is the racial make up?

3       A.    Approximately 75 to 80 percent Hispanic.

4  I would say two percent African-American, and the

5  remainder would be Caucasian.

6       Q.    Okay.  How about male to female, in a

7  nutshell?

8       A.    Probably half, 50 percent.  So it's equal.

9       Q.    You said your two main duties are intake

10  and you said work cases, investigation.  Anything else?

11       A.    Well, that is basically the general

12  description.

13       Q.    How heavy would you describe your current

14  caseload?

15       A.    Approximately 70 to 80 cases.

16       Q.    And how are cases assigned at the EOC?

17       A.    Every case that you perform intake on is

18  essentially your case.  You work it through to

19  completion.

20       Q.    Are you familiar with what the government

21  calls the GS Scale, the General Salary Scale?

22       A.    Yes.

23       Q.    Are you on the General Salary Scale at the

24  EEOC?

25       A.    Yes, I am.

1      Q.    What is your GS level at EEOC?

2      A.    Nine.

3      Q.    GS-9.  What would that yearly salary be as

4  a currently GS-9?

5      A.    Approximately 60,000.

6      Q.    Is that with the Phoenix adjustment, the

7  locality pay?

8      A.    Yes.

9      Q.    Are you enrolled in FERS, the Federal

10  Employee Retirement program?

11      A.    Yes, I am.

12      Q.    Are you currently contributing to FERS?

13      A.    Yes.

14      Q.    Are you currently contributing to the FERS

15  savings program?

16      A.    Yes.

17      Q.    I assume they, meaning the EEOC, have a

18  similar leave program as other federal employees that

19  you're familiar with.  Would that be a fair assumption?

20      A.    Yes.

21      Q.    What is your current allocation of hours?

22  Do you get six hours per pay period, annual leave

23  eight?

24      A.    I get four annual and four sick.

25      Q.    What are you currently banked at?

1      A.      I'm not sure.  Because that's for me

2  accruing four hours annual, four hours of sick is

3  erroneous due to the fact that my records have not yet

4  transferred from VA for some reason.  I have 25 years

5  of service and should be accruing eight hours of annual

6  and four hours of sick.  So I'm not sure how much I've

7  banked because the amount is not an accurate depiction

8  of what I should be banking.

9      Q.      When you say there's a problem with the

10  records transfer, could you elaborate on that

11  statement?

12      A.      My human resources office at EEOC has

13  attempted to obtain my records to support my years of

14  service and also my tenure, which dictates your leave

15  accrual status.  And they have not been successful in

16  their attempt.

17      Q.      So until -- is it your testimony until

18  EEOC verifies your tenure, you're treated as a new

19  federal employee; correct?

20      A.      Until VA transfers my records, I'm viewed

21  as a new employee.

22      Q.      Who have you spoken to at the EEOC

23  concerning this problem?

24      A.      His name would be Ron.  He is the district

25  resources manager and responsible for coordinating

1  transfer of human resources records.

2        Q.    Have you spoken to anyone at the VA

3  HR-wise?

4        A.    Early on.  Not recently.  I left that to

5  him that.  It's his responsibility.  And after

6  conferring with Ron, he told me to leave it to him.

7  And I did not contact anyone.

8        Q.    When early on -- do you recall early on

9  who you talked to?

10        A.    I believe her name is Sharon Heat.  She's

11  the lead human resources specialist in Phoenix.

12        Q.    And early on, date wise is that after you

13  took the position?

14        A.    I would say during the year 2008 I spoke

15  to her.

16        Q.    At the EEOC, within your division, you're

17  an investigator.  How many investigators compared to --

18  or is everyone considered an investigator, your roughly

19  30-person wide division?

20              MR. STROJNIK:  Form.

21              THE WITNESS:  No.  Actually there are

22  support individuals, investigator assistants and also

23  office assistants.

24  BY MR. LANTKA:

25        Q.    How many people would you estimate are at

1  your current job description, your level?

2              MR. STROJNIK:  Form.

3              THE WITNESS:  Twenty.

4  BY MR. LANTKA:

5        Q.    I would doubt you have personal knowledge

6  of everyone's GS level since we're not supposed to

7  know.  But just from what you know talking to people,

8  what are people generally hired in at, what GS level as

9  an investigator?

10       A.    I'm not sure.  I would not have that

11  knowledge.

12       Q.    All right.  I want to -- we did your

13  husband's employment post-actively.  We're going to do

14  yours in retroactively.  Do you recall what date you

15  left Region 19?

16       A.    Yes.

17       Q.    What date was that?

18       A.    June 7, 2008.

19       Q.    Were you actively seeking employment with

20  other agencies at the time?

21       A.    Yes.

22       Q.    I say agencies.  Generally were you just

23  looking within the federal government, private sector?

24  How were you looking?

25       A.    I limited my focus to the federal sector.

1      Q.      Why did you choose to do that?

2      A.      I was a 24-year career employee, and was

3   pretty much vested in my career.

4      Q.      How did you go about seeking employment?

5      A.      I applied through USA Jobs, which is the

6   government online database for applying for positions

7   and I believe it's completely electronic now.

8      Q.      From the time period in which you left

9   employment with the VA, Region 19, until you took

10  employment with the EEOC do you recall about how many

11  jobs you applied to?

12     A.      Approximately in the federal sector 180

13  positions.

14     Q.      And where were they located?

15     A.      Initially, Phoenix and Washington.  And as

16  time went on, I broadened the areas in which I applied.

17     Q.      Your current job is an investigator.  What

18  job field did you apply to within those 180 positions?

19     A.      Most of them were required some sort of

20  legal knowledge.  So I would say program specialist if

21  it actually entailed some type of legal duty, paralegal

22  specialist, investigator, jobs of those natures.

23     Q.      And out of those 180, how many do you

24  think you heard back from?

25     A.      Approximately, I would say, maybe 20 in

1  one way or the other.

2       Q.    Could you elaborate on one way or the

3  other?

4       A.    You said heard back from.  I received

5  letters on some.  I received calls on others.

6       Q.    Out of the 20, how many did you receive

7  positive responses from, as in furtherance of the

8  employment application process?

9       A.    Approximately four interviews.

10      Q.    And what agencies were those with?

11      A.    Department of Army, Department of

12  Veteran's Affairs, I believe Department of Education,

13  and, of course, Equal Employment Opportunity

14  Commission.

15      Q.    I want to talk with them -- talk about

16  them, sorry.  Department of Army, compound question:

17  Where was that and what was the position?

18      A.    The position was paralegal specialist.  It

19  was in Virginia.

20      Q.    Could you describe that process?

21           Did you have a formal interview, formal

22  application?

23      A.    I actually had two interviews.

24      Q.    What was the result?

25      A.    During the second interview I was asked if

1    I ever had any disciplinary actions, and I responded

2    truthfully that I had.  After being, I was told, one of

3    two candidates being considered, I was not hired.

4         Q.    Did they tell you why you were not hired?

5         A.    No.

6         Q.    VA, same types of questions.  What did you

7    apply for and where was the position?

8         A.    I applied for a paralegal specialist

9    position in Washington, D.C.  And I believe it was

10   under human resources.

11        Q.    Again, same general question with the

12   Army.  Please describe that process, the interviews,

13   how that went.

14        A.    I received, again, two interviews.  The

15   final interview, I was asked the same question, if I

16   had ever had any performance issues or disciplinary

17   issues.  And I had to respond in the affirmative that,

18   yes, I did have one disciplinary issue at Department of

19   Veteran's Affairs Region 19.

20        Q.    And did you get that job?

21        A.    No.

22        Q.    Did they tell you why you were not

23   selected?

24        A.    No.

25        Q.    Department of Education, where was it?

1  What was the position?

2         A.    It was in Washington, D.C.  It, again,

3  was, I believe, a program analyst position that was in

4  their legal department.

5         Q.    And could you describe the interview

6  process?

7         A.    I had one interview, which I physically

8  appeared for, and I did not get that position.

9         Q.    In the past two you made a point of

10 telling me that they asked about past discipline.  Did

11 the Department of Education ask about past discipline?

12        A.    Yes, performance and disciplinary issues.

13        Q.    How did they go about asking that?

14        A.    During the course of the panel interview I

15 was asked if I had ever been the subject of any

16 disciplinary actions, and also if I experienced any

17 performance issues during my 24-year career.  I had to

18 answer in the affirmative, yes.  I did receive a

19 disciplinary action from Department of Veteran's

20 Affairs Region 19.

21        Q.    You said you did not get that job?

22        A.    No, I did not.

23        Q.    Did they inform you why you were not

24 chosen?

25        A.    No.

1      Q.    Last is the EEOC.  And I know where that

2  is and I know what you're doing.  Could you describe

3  when you were first contacted, and just in your own

4  words, please tell me about the application process.

5      A.    I applied online through USA Jobs again.

6  I received a call for an interview.  I appeared.  It

7  was a panel interview with some participants on

8  conference call.  I was asked all of the standard

9  questions, including had I been a subject to any

10 disciplinary action.  I did respond that I had in

11 Region 19.  They further questioned me about why my

12 career was so stellar leading up to that point.  And I

13 told them what I had went through.

14     Q.    When you say what you went through --

15     A.    At Region 19.

16     Q.    -- you described the situation concerning

17 your discipline --

18     A.    I described the environment and the events

19 leading to the disciplinary action.

20     Q.    What was their reaction to that?

21     A.    Basically, they decided to still continue

22 and call and look into it, because I was told that the

23 fact that my career had been previously stellar leading

24 up to that point and that was only in the office, that

25 particular office being Region 19 for several months,

1    that they wanted to do further probing.

2          Q.    And they informed you of that?

3          A.    Yes.

4          Q.    Did they use the term "stellar"?

5          A.    Yes.

6          Q.    Aside from the panel interview, did you

7    have any other interview procedures with EEOC?

8          A.    No, just one interview.

9          Q.    How were you alerted that you received the

10   position?

11         A.    I received a call approximately three

12   weeks later from human resources informing me that I

13   was selected for the position.

14         Q.    Since employment with the EEOC, have you

15   sought employment with any other outside source?

16         A.    No.

17         Q.    With regard to the first three agencies,

18   the Department of Army, Veteran Affairs, this is the

19   HR, paralegal position, Department of Education, you

20   stated that they asked you about your past performance.

21   Do you have any personal knowledge as to whether any of

22   these agencies performed any inquiry on the basis of

23   your prior discipline?

24         A.    I do not.

25         Q.    During your job search period, did you

1  engage in any part-time work?

2      A.    No.

3      Q.    Did you have any source of income

4  generated by you yourself?

5      A.    No.

6      Q.    How did you pay the bills during that

7  time?

8      A.    My husband paid the bills, part from his

9  savings plan.  And managed.

10      Q.    Okay.  Since we're talking about bills, I

11  need to ask are you aware of what your husband's salary

12  is?

13      A.    I am not.

14      Q.    Are you aware of what his take-home pay

15  is?

16      A.    No.

17      Q.    Who pays the bills at your house?

18      A.    My husband.

19      Q.    So you have no personal knowledge of what

20  his pay grade is?

21      A.    He is a GS-12, I believe, Step 4.

22      Q.    How long -- do you know how long he has

23  been a GS-12 Step 4?

24      A.    GS-12 Step 4, approximately, I believe,

25  one year.

1      Q.    To present?

2      A.    Yes.

3      Q.    What GS level was he during the time

4 period you were looking for a job after leaving Region

5 19?

6      A.    I believe he was a GS-12.

7      Q.    Do you recall what step?

8      A.    It would have been a Step 3.

9      Q.    That's the same pay grade at which you

10 were classified while you were employed at Region 19;

11 is that correct?

12      A.    Yes.

13      Q.    How much was your annual salary at Region

14 19 at GS-12 Step 3?

15      A.    71,000.

16      Q.    Would it be safe for me to assume that

17 your husband's salary, then, during the time period in

18 which you were looking for work was approximately

19 $71,000?

20      A.    That's correct.

21      Q.    You stated that your husband had to dip

22 into his retirement.  Did you dip into your thrift

23 savings plan during that time period?

24      A.    I don't believe I had any savings.  I had

25 already borrowed from it.

1      Q.      When did you borrow from TSP?

2      A.      Shortly after transferring to Phoenix.

3      Q.      Why did you borrow from TSP?

4      A.      My children go to college.  They needed

5   the additional funds.

6      Q.      Had you dipped into TSP before that time?

7      A.      Yes.  I believe back in 2004, for closing

8   costs associated with our house.

9      Q.      How about any other times than those two?

10     A.      No.

11     Q.      I don't know the balance of my TSP off the

12  top of my head, but after you dipped into it for your

13  kids' college, do you recall ballpark how much it was?

14     A.      Approximately $5,000, I would say.

15     Q.      Still talking about job searches and

16  whatnot.  Would you attribute any cost, any economic

17  outlay, any money spent on these job searches from the

18  time you left Region 19 till the time you sought and

19  achieved a new job at EEOC?

20     A.      I would say yes.  I did physically go to

21  Washington for one interview.  And just the cost

22  associated with mailings.  It may not seem like a lot,

23  but it was a lot then.

24     Q.      Don't worry.  I've deducted them on my

25  taxes.

1          So the one trip -- that was the VA

2    interview?  That was the trip to Washington?

3          A.    No, that was the -- I believe it was the

4    Department of Education interview.

5          Q.    Okay.  Were the Army and VA conducted by

6    phone or video conference?

7          A.    Both were conducted by telephone.

8          Q.    So we had one trip.  I assume did that

9    have a corresponding hotel stay?

10         A.    I have family, no, it didn't.

11         Q.    Any other major expenses?  Not to qualify

12   as de minimus, but aside from the travel expenses, any

13   other larger expenses on the job search?

14         A.    No, none that I can think of.

15         Q.    Do you feel comfortable just assigning a

16   ballpark figure to how much money you think you spent?

17              If I was your accountant and we were doing

18   taxes right now, and I said, "Vanessa, we can deduct

19   this," what would you put?

20         A.    I would say $600, approximately.

21         Q.    Let's talk about your employment a little.

22   First, is there anything else you wanted to add about,

23   I guess, economic damages or anything related to the

24   job search itself?

25              MR. STROJNIK:  Form.

1              THE WITNESS:  Nothing I can think about,

2  think of right now.

3  BY MR. LANTKA:

4        Q.    Prior to the VA -- we're going to

5  backtrack -- we talked about your education.  You said

6  you took a break before you went to paralegal school.

7  Were you employed during that break?

8        A.    I was.

9        Q.    I know this is a kid job.  What did you

10  do?

11        A.    I actually worked for the National Labor

12  Relation Board.

13        Q.    Fun.  What did you do for them?

14        A.    I started off as a computer operator.

15        Q.    And did you quit entirely when you went to

16  school?

17        A.    No, I was working at the U.S. Attorney's

18  office while carrying full-time credits.

19        Q.    Was that your first job after the NLRB or

20  NLRE?

21        A.    NLRB.  No, actually I also worked for the

22  United States Information Agency.

23        Q.    So we have the NLRB?

24        A.    Uh-huh.

25        Q.    What did you do for the Information

1    Agency?

2         A.    I worked in the operations center under a

3    top secret clearance as a staff assistant.

4         Q.    Where was that?

5         A.    That was Washington, D.C.

6         Q.    And I have to ask, where is the NLRB?

7         A.    Washington, D.C. also.

8         Q.    Okay.  How long were you -- what years

9    were you employed with the Information Agency?

10        A.    Approximately 1986 to 1990.

11        Q.    Do you recall what your GS level was?

12        A.    GS-7, I believe.

13        Q.    Every good federal employee knows their GS

14   level.

15              Do you recall what GS level you were with

16   the NLRB?

17        A.    GS-6, I believe.

18        Q.    1990, why did you choose to leave the

19   information agency?

20        A.    Relocated back to Pennsylvania.

21        Q.    Okay.  Where did you work when you were

22   there?

23        A.    Federal Aviation Administration.

24        Q.    And what were your years of service there?

25        A.    Approximately 1990 to 1993.

1    Q.    And --

2    A.    I'm not sure.

3    Q.    When we say Pennsylvania, that's a big

4  state.  Where were you at?

5    A.    Pittsburgh, Pennsylvania.

6    Q.    What was your job title?

7    A.    I was a secretary to the director of

8  program development.

9    Q.    And what was your GS level?

10   A.    Five, I believe.

11   Q.    '93, where did we go after that?

12   A.    I worked for U.S. Attorney's Office in the

13  Western District of Pennsylvania, which is in

14  Pittsburgh.

15   Q.    And what did you do for them?

16   A.    I worked initially as a legal assistant

17  for the narcotics division.  Then I actually

18  transferred to a position in economic crimes.  And I

19  got a promotion to the civil side as a financial

20  litigation agent.

21   Q.    What was the total time period at the USAO

22  there?

23   A.    Approximately, I believe seven years.

24   Q.    Starting in '93?

25   A.    Yes, I believe so.

1    Q.    So to about 2000?

2    A.    Actually 1999.

3    Q.    Okay.  So within the U.S. Attorney's

4  Office, you had three separate positions.  Did you

5  maintain the same GS level for all those positions?

6    A.    Each one was a promotion.

7    Q.    Okay.  Where did you start?  What GS level

8  did you start?

9    A.    GS-6.

10    Q.    And where did you end?

11    A.    A GS-8, as a financial litigation agent.

12    Q.    As far as your last job as a GS-8, do you

13  recall who your supervisor was?

14    A.    Yes.  Michael Coville.

15    Q.    Do you recall if he's still with the U.S.

16  Attorney's Office?

17    A.    Yes, he is.

18    Q.    So now we're 1999.  Where did you go next?

19    A.    Transferred or relocated to Ohio

20  Department of Veteran's Affairs.

21    Q.    So that's 1999.  What did you do at the VA

22  in Ohio?

23    A.    I was a loan guarantee specialist.

24    Q.    Is that in Cleveland?

25    A.    That is in Cleveland.

1          Q.    What division -- that loan guarantee,
2    that's obviously not general counsel's office.  What is
3    that under?
4          A.    VA Loan Guarantee Division.
5          Q.    What GS level were you there?
6          A.    I was GS-7, I believe.
7          Q.    How long were you in the loan division?
8          A.    For five months.
9          Q.    And where did you go next?
10         A.    Paralegal specialist, Regional Counsel.
11         Q.    Where was that located?
12         A.    Cleveland Ohio, Region 7.
13         Q.    What was your GS level?
14         A.    GS-9.
15         Q.    And how long were you there?
16         A.    I was there from 1999 to 2007.
17         Q.    Was that your last employment before
18    transferring to Region 19?
19         A.    Yes, it was.
20         Q.    And I'm sorry, you said you were a GS-9?
21         A.    Yes, at loan guarantee.
22         Q.    And when you became a paralegal, what GS
23    level did you become?
24         A.    I was hired as a GS-9.
25         Q.    Could you please in your own words --

1  we'll go through a little more intricately.  Could you

2  describe your procession through GS levels?

3        A.    I was a GS-9 in approximately 1999 until

4  2000.  I then was promoted to the next progression,

5  which was a GS-11.  I was a GS-11 from the year 2000

6  until the year 2006.

7        Q.    What happened in 2006?

8        A.    There was a desk audit, which I was

9  promoted to a GS-12.

10       Q.    Okay.  I want to talk a little bit about

11 the composition of paralegals at the Cleveland office.

12 First off, in the general counsel's office, how big was

13 it, manpower?  How many people were there?

14       A.    The entire general counsel's office or at

15 the region?

16       Q.    At the region where you worked?

17       A.    Region 7?

18       Q.    Uh-huh.

19       A.    I was the only paralegal in the office.

20       Q.    And how many attorneys?

21       A.    Approximately eight that were physically

22 located in that office.

23       Q.    Any other support staff?

24       A.    There were, I believe, two or three legal

25 assistants.

1        Q.      I'm going to talk a little bit about work

2   allocation.  Who was your direct supervisor?

3                Well, I think you had a couple.  So from

4   the time you became a paralegal specialist to the time

5   you transferred, who were your supervisors in Region 7?

6        A.      My first line supervisor was Terry Wolk.

7                THE REPORTER:  I missed that.

8                THE WITNESS:  Terry Wolk -- W-O-L-K.

9   BY MR. LANTKA:

10       Q.      Was she your first line supervisor for the

11  entire time you were there?

12       A.      It was a he, male.

13       Q.      I'm sorry.  How long was Terry your

14  supervisor?

15       A.      From the time I started in 1999, I

16  believe, until the time I left.

17       Q.      Who was your second line supervisor?

18       A.      Donald Adams.

19       Q.      How long was Don Adams your second line

20  supervisor?

21       A.      The entire time of my employment with

22  Region 7 as well.

23       Q.      Terry was the first line supervisor and

24  Don was the second line supervisor.  Let's limit

25  ourselves a little to when you became a GS-12.  Can you

1   just describe your duties, what you did on a daily

2   basis?

3         A.    I primarily worked medical malpractice

4   cases.

5         Q.    What does "work" mean?

6         A.    I opened the case, I investigated the

7   allegations, and made a recommendation to the regional

8   counsel.

9         Q.    And this would be prelitigation in

10  District Court, post-litigation in District Court?

11        A.    Prelitigation, administration stage.

12        Q.    How would you describe your caseload?

13        A.    Approximately 20 to 23 case.

14        Q.    20 to 23 cases at a time.  Anything else

15  aside from 20 to 23 med mal cases?

16        A.    I also did administrative duties.

17        Q.    What were they?

18        A.    Such as writing position descriptions, any

19  overflow from the administrative officer.  And this was

20  not part of my position description, but I also served

21  as the chairperson of the Office of General Counsel

22  Paralegal Work Group.

23        Q.    So administrative duties, about what

24  portion of your, I want to say caseload, work was that?

25        A.    I would say roughly 30 percent.

1       Q.    And what was the percentage that you were

2   chairman of the paralegal work group?

3       A.    That was an ongoing -- not really it was a

4   responsibility because it was not in my position

5   description.  But I was required to train other

6   paralegals throughout the country.  I was required to

7   respond to inquiries from paralegals.  And the

8   inquiries ranged from them wanting to know information

9   about the organization as a new employee, all the way

10  up to and including what their duties were as a

11  paralegal and what they can expect in the changing of

12  those duties.

13      Q.    So describe this work group to me.  This

14  is nationwide, then?

15      A.    It was a national work group.

16      Q.    How does that work?  Is there telephone

17  calls?

18      A.    There were regular conference calls

19  initially.  Contact through the e-mail.  There were

20  questions posed on a regular basis.  It really was a

21  collaboration of networking system.

22      Q.    Sounds like a lot of work.

23      A.    It was.

24      Q.    Time period wise, how much time did that

25  take up?

1      A.    I would say overall it's really hard to

2  put a percentage on it because I just incorporated it

3  with my normal duties.  And if at any time it became

4  overwhelming, I could go to my boss and say, "Look, you

5  know, can we appoint someone else," or, "Can a co-chair

6  take on some of the responsibilities?"  So I would say

7  roughly 20 percent of my time.

8      Q.    And, I mean, these aren't accurate.  It's

9  not like we have a spreadsheet out.  So we're dealing

10  with about 30 percent of your time admin duties,

11  roughly 20 percent of your time on quasi-admin, this

12  type of chairmanship duties.  Was that chairmanship

13  appointed, by the way, or how did you get that job?

14            MR. STROJNIK:  Form.

15            THE WITNESS:  I'm not sure.  The group did

16  not exist prior to me being chairperson.  It was an

17  idea that sort of took off and I found myself appointed

18  as chairperson by other paralegals in the work group.

19  BY MR LANTKA:

20      Q.    So from the national perspective you were

21  appointed?

22      A.    Yes.

23      Q.    So we're dealing with 30 percent of the

24  time in administrative duties, chairmanship about 20

25  percent of the time.  What percentage would you

1   attribute to med mal load?

2          A.    The remaining percentage.

3          Q.    So 50 percent?

4          A.    Yes.

5          Q.    Did you have any other type of duties

6   while at GS-12 in Region 7?

7          A.    No, none that I can think of.

8          Q.    I'm going to talk a little bit about being

9   a GS-12.  As far as job title, were you considered a

10  representational paralegal in Region 7?

11         A.    My official job title was paralegal

12  specialist, but I was in a representational career

13  path.

14         Q.    What is that?

15         A.    There are two career paths.  There's

16  representational and there's program.

17         Q.    What is the difference?

18         A.    The difference is that a representational

19  paralegal can perform duties that aren't consistent

20  with handling a program, such as writing assignments or

21  legal research; whereas, a program paralegal may not be

22  educated or skilled in that particular field, or may

23  not want to perform in a representational field.

24         Q.    Is there a pay difference?

25         A.    Not to my knowledge.

1          Q.    How many paralegals -- you said you were

2     the only -- strike that.

3                You were the only paralegal in your

4     division?  Is that the right term?

5          A.    My office.

6          Q.    In your office.  How many paralegals were

7     there in Region 7?

8          A.    I believe two.

9          Q.    And how many of those paralegals were

10    representational paralegals?

11         A.    I don't know.  I really don't know what

12    the other individual was.

13         Q.    Do you recall how many representational

14    paralegals there were in the general counsel system?

15         A.    I'm not sure of that either.  I just was

16    aware of myself and another paralegal being

17    representational.  But beyond that, I'm not sure.

18         Q.    Who was this other paralegal you were

19    aware of?

20         A.    James Zeveski.

21               THE REPORTER:  Could you repeat that?

22               THE WITNESS:  James Zeveski --

23    Z-E-V-E-S-K-I.

24    BY MR. LANTKA:

25         Q.    Where was James located?

1          A.      I believe St. Louis.

2          Q.      How did you know James?

3          A.      He was actually co-chair on the paralegal

4  work group.

5          Q.      As far as people in the paralegal work

6  group, other people, were you aware of any of their

7  employment classifications?  Were they a program

8  paralegal or representational paralegal?

9          A.      No, I was not.

10         Q.      I'm going to mark an exhibit as Exhibit 1.

11         (Whereupon, Deposition Exhibit No. 1 was marked

12  for identification.)

13  BY MR. LANTKA:

14         Q.      Take all the time you need to look at

15  that.  For the record, this is a document Bates

16  numbered Hall-VA-6036 through Hall-VA-6039.  And it is

17  entitled "Performance Standards of Representational

18  Paralegal Specialist GS-12", revised August 15th, 2001.

19  Have you seen this document before?

20         A.      I have.

21         Q.      You're familiar with it?

22         A.      Yes, I am.

23         Q.      In your own words, what would you describe

24  this document as?

25         A.      The performance standards for a

1  representational paralegal specialist.

2       Q.    What are the performance -- what are

3  performance standards?  What would that be?

4       A.    That's a method or the model to measure

5  the performance of a position, an incumbent of a

6  position.

7       Q.    How is that used?

8       A.    It is used basically to identify what

9  tasks are consistent with that particular title and

10 grade.

11      Q.    Do you have to meet these performance

12 standards to become a GS-12, or are they implemented on

13 you after you become a GS-12?

14      A.    You receive the performance standards

15 after you are classified at that particular grade

16 level.

17      Q.    So were you subject to these employment

18 standards while employed as a GS-12 representational

19 paralegal in Region 7?

20      A.    Yes.

21      Q.    Is it fair to assume that performance

22 reviews that you received in Region 7 as a

23 representational paralegal were subject to these

24 performance standards?

25      A.    Yes.

1      Q.    As far as becoming a GS-12

2   representational paralegal, is there anything -- did

3   you have the go through any type of certification

4   process, any type of test, anything like that?

5      A.    No.  I believe the OGC regulations stated

6   that you had to be at a level that you would be

7   referred or recommended, and it be approved.

8      Q.    Who would refer or recommend you?

9      A.    The regional counsel had authority to

10  recommend the promotion to the representational career

11  path.  And I believe the general counsel had the

12  authority to approve or disapprove that request.

13     Q.    When we say general counsel, do we mean

14  the main boss?

15     A.    At that time Paul Hutter.

16     Q.    We're going to slash back until we covered

17  all your employment history.  Is there any other

18  employment history prior to becoming a representational

19  paralegal at Region 19 that you would like to elaborate

20  on that we didn't discuss here today?

21     A.    No.

22     Q.    These are, again, Vanessa, have-to-ask

23  questions.  Going to talk about criminal history.  Have

24  you ever been arrested for anything?

25     A.    No.

1          Q.    Have you ever received any type of

2    criminal citation?

3          A.    No.

4          Q.    Aside from traffic tickets, any type of

5    civil citations?

6          A.    No.

7          Q.    Have you ever had the police to your home?

8          A.    Yes.

9          Q.    Okay.  I don't want to go too personal,

10   but please describe in your own words.

11         A.    A neighbor actually trespassed on our

12   property.

13         Q.    Where and when was this?

14         A.    It was actually at my current residence.

15         Q.    Uh-huh.

16         A.    And it was, I believe, in October of 2009.

17         Q.    Any other times?

18         A.    No.

19         Q.    Have you ever had, aside from the current

20   case, have you ever had to file a complaint in

21   Superior, District Court, any formal legal proceedings

22   against anyone?

23         A.    Against any individual?

24         Q.    Uh-huh.

25         A.    No.

1      Q.    Have you ever had any type of legal

2  proceedings instituted against you?

3      A.    No.

4      Q.    Have you ever had any liens placed on any

5  property you own?

6      A.    No.

7      Q.    Have you ever used any illegal narcotics?

8      A.    When I was younger, I did -- and I

9  relinquished that on my application as well.  I did use

10  marijuana on a couple occasions.

11      Q.    Okay.  Since I'm sure we don't need to

12  take the Fifth since the statute of limitations has

13  well gone by, about how frequently did you use

14  marijuana?

15      A.    I was not a frequent user at all.

16      Q.    If I describe my marijuana usage, it's

17  never.  If I was describing my best friend in college,

18  he used it twice.  Where would you place that?

19      A.    Two occasions.

20      Q.    Two occasions?

21      A.    Yes.

22      Q.    And when was the last time you used

23  marijuana?

24      A.    I would say approximately 1986, somewhere

25  around there.

1          Q.    Any other drug usage?

2          A.    No.

3          Q.    We talked about that you had no other

4    litigation history according to your testimony today,

5    Equal Employment claims.  This current litigation is

6    based on two EEO claims that were merged together; is

7    that correct?

8          A.    I do not know the breakdown.  All I know

9    is how they combinated into one cause of action.

10          Q.    Have you ever sought redress -- are you

11    familiar when I use the term EEO process as a federal

12    employee?

13          A.    Yes.

14          Q.    So you watched the video we all have to

15    sit through every year, correct?

16          A.    Yes.

17          Q.    Have you ever engaged in the EEO process

18    before the basis of this current suit?

19          A.    Yes.

20          Q.    Okay.  How many times?

21          A.    I believe twice.

22          Q.    Twice.  Okay.  Please describe the first

23    time.

24          A.    Federal Aviation Administration in 1990.

25          Q.    What was that claim about?

1          A.    I applied for the position of secretary.

2    I was hired for that position of secretary.  I

3    immediately went back to Washington and packed because

4    I was hired on the spot.  I was told I would be given a

5    release date.  I never received the release date.  So I

6    called the human resources specialist and asked her

7    when I can expect a release date.

8               And she said, "I'm so sorry.  I don't

9    know."

10              And I said, "Well, I need to know so that

11   I can plan my move."

12              And her response was, "The manager is not

13   going to hire you."

14              And I said, "I don't understand.  But you

15   hired me on the spot."

16              And she said that he -- and she said,

17   "Excuse me, but I'm quoting what he said."  And she

18   said, "He told me that he does not want any niggers

19   working here."

20         Q.    I'm sorry about that.

21              Do you recall that manager's name?

22         A.    Yes, his name was Bob Otto -- O-T-T-O.

23         Q.    And he was the one who actually hired you,

24   or hired you on the spot?

25         A.    No, it was a human resources specialist.

```
 1  She had the authority to hire individuals.  He had to
 2  approve the hire.
 3       Q.   So when you filed your EEO claim, I assume
 4  you listed Bob Otto as the discriminating official?
 5       A.   I did.
 6       Q.   How did that claim proceed?
 7       A.   It settled immediately because the
 8  individual had prepared a statement and contacted the
 9  headquarters office herself.
10       Q.   The HR individual?
11       A.   The HR individual.
12       Q.   Do you recall her name?
13       A.   Paula Rhet -- R-H-E-T.
14       Q.   So you reached a settlement.  Did you
15  engage in any type of formal process, any claim filing?
16  How far did that go?
17       A.   It was at the administrative stage.  It
18  settled very rapidly.
19       Q.   What were the terms of the settlement?
20       A.   They paid my relocation cost for the
21  inconvenience.  And that's all.  I thought it was
22  something that was fair.  So that was it.
23       Q.   So that was your first unfortunate event
24  in the EEO process.  What about your second claim?
25       A.   The second claim was not officially filed.
```

1    It was a contact.

2         Q.    Okay.  What do you mean, it was a contact?

3         A.    I contacted a EEO counselor.  I asked her

4    certain questions.  She initiated a number to that

5    inquiry.  And it was never investigated nor filed by

6    me.

7         Q.    When was this?

8         A.    That was in 1996, I believe -- I'm sorry,

9    2006.

10        Q.    Where were you employed?

11        A.    Region 7.

12        Q.    Was this when you were a paralegal

13   specialist?

14        A.    Yes.

15        Q.    What was the basis of that contact?

16        A.    There was a male attorney on staff that,

17   amongst other things, he would stare at women's body

18   parts.  He would call you into the office just to stare

19   at you.  And other women complained about it as well.

20   In addition to that, when I became pregnant he began to

21   assign me tasks that weren't associated with my

22   position.

23             So I inquired about what it is that I

24   should do in that particular case.  That individual

25   initiated a number to that inquiry.  I never filed

1   anything.

2        Q.    Who was the individual who was assigning

3   you a task?

4        A.    Michael Bedell.

5        Q.    Mark this as Exhibit 2.

6             MR. STROJNIK:  Peter, I'm going to ask we

7   take a break at 11:00 o'clock.  Are you okay with that?

8             MR. LANTKA:  Sure.  How long until 11:00t?

9             MR. STROJNIK:  Ten minutes.

10            MR. LANTKA:  Totally fine.

11        (Whereupon, Deposition Exhibit No. 2 was marked

12   for identification.)

13   BY MR. LANTKA:

14        Q.    For the record purposes, Exhibit No. 2 is

15   Bates numbered Hall-VA-5927, titled "Initial Contact

16   Interview Sheet".

17            Ms. Hall, take a few moments to review

18   this document.

19        A.    Yes.

20        Q.    Have you seen this document before?

21        A.    No, this is prepared by the EEO counselor.

22        Q.    Did you read the box at the bottom which

23   says "Reason for Contact"?  Just to yourself.

24        A.    That was a part of it.

25        Q.    I'm interested in the last sentence.

```
 1              "Never communicates with her directly.
 2         Said she volunteered to help out until new
 3         program assistant hired, but her work has
 4         priority.  Said she has asked Mr. Adams over and
 5         over to talk to Mr. Bedell and she together to
 6         resolve the situation, but he has not."
 7              Could you please elaborate on that?  I
 8    know that's not your words.  It's the counselor's
 9    words.  Do you think that means?
10              MR. STROJNIK:  Form.
11              THE WITNESS:  I have no idea.  This
12    individual obviously did not capture the substance of
13    my inquiry or contact.  And I can't say.
14    BY MR. LANTKA:
15         Q.    So your testimony earlier stated that your
16    complaints -- is it Mr. Bedell?
17         A.    I believe it's Bedell.
18         Q.    I don't know why I have to be nice to him.
19    He's not even here -- Mr. Bedell -- was that he looked
20    at women salaciously and that he assigned you a heck of
21    a lot more work when you were pregnant?
22         A.    Yes.
23         Q.    From this assessment here it seems like
24    the counselor's take on your complaint was that he was
25    assigning you additional work, but you were having
```

1  problems communicating that your work had priority.

2  And you have an additional complaint that you contacted

3  Mr. Adams, who was your second line supervisor and he

4  didn't do anything.  Is it your testimony that that was

5  not part of your complaint?

6                    MR. STROJNIK:  Form.

7                    THE WITNESS:  No.  This is not an accurate

8  depiction of what my complaint was.  Mr. Adams took

9  immediate and prompt action.  I contacted this

10  individual as an inquiry.  Subsequent to that, you are

11  to get a form signed by the complainant.  That form is

12  not here today.  This is a summary of the EEO

13  counselor's contact and what she perceived was my

14  communications.

15  BY MR. LANTKA:

16       Q.    So as far as problems you had with work

17  outside of your workload, do you believe that the EEO

18  counselor's recollection or her rendition of that, that

19  is incorrect; is that your testimony today?

20       A.    Yes, it's not complete.

21       Q.    It's not complete?

22       A.    And it's inaccurate in some places.  There

23  was an incident with assignment of work.  And I did

24  actually speak to Don Adams about that.  He took

25  immediate action.  So I'm not sure where she got that

1    from.

2         Q.    What was the incident with assignment of

3    work?

4         A.    There were at that particular time three

5    legal assistants on staff that were tasked with making

6    copies, pulling files, running errands, things of that

7    nature.  For some reason, Mr. Bedell began to assign

8    those tasks to me.  And it was not consistent with my,

9    with what I was told by Don Adams my position

10   description and duties entailed.

11        Q.    So if I'm going to paraphrase, part of

12   your EEO complaint against Mr. Bedell was that duties

13   in which he was assigning you were making copies,

14   administrative duties, things like that which you

15   believe were below your position description?

16        A.    No, as I stated before, this is not an

17   accurate capturing of my contact with that individual,

18   and I never did file a formal complaint which would be

19   on a complaint form.  This is an initiated contact

20   sheet, and it's done strictly by the EEO counselor.

21   There is no formal filing by myself.

22        Q.    I understand there's no formal filing, but

23   as far as the informal contact which has to be

24   initiated 45 days after a discriminatory act, was part

25   of the basis of the contact you had with EEO counselor

1  concerning running copies?

2        A.    No, it was not running copies.  It was

3  being assigned duties that were consistent with a legal

4  assistant or program assistant job while I was actually

5  handling being the chairperson of the Office of General

6  Counsel work group and doing med mal cases.  Those

7  duties, as Mr. Adams had described them to me, were not

8  consistent with my position.

9        Q.    What duties that you complained about were

10  not -- what specific tasks did you complain about

11  because they were not consistent with your position?

12              MR. STROJNIK:  Form.

13              THE WITNESS:  I was told that if I was

14  given any assignments to pull files extensively or make

15  extensive copies when there were three legal

16  assistances on staffer to report that to Don Adams,

17  which I did.

18  BY MR. LANTKA

19        Q.    Anything else, any other specific tasks

20  that you were told to report to Don Adams?

21        A.    Anything that was not in my job

22  description but belonged in the job description of

23  legal assistant.

24        Q.    Anything else which you recall that you

25  spoke to an EEO counselor about concerning Mr. Bedell?

1          A.    No, just my actual pregnancy and

2    Mr. Bedell's treatment of me during that pregnancy

3    which resulted in a miscarriage.

4          Q.    I'm sorry.  Three things:  The assignments

5    during pregnancy, leering at women -- was that part of

6    the have complaint -- and the assignment of tasks?

7          A.    Yes, some tasks.

8          Q.    Exhibit No. 3.

9          (Whereupon, Deposition Exhibit No. 3 was marked

10   for identification.)

11              MR. STROJNIK:  Two minutes, Counsel.

12              MR. LANTKA:  Actually, let's take a break,

13   then.

14              Off the record.

15              THE VIDEOGRAPHER:  Off the record.  It is

16   10:56 a.m.

17        (Whereupon, a recess was taken from 10:56 a.m.

18   to 11:14 a.m.)

19              THE VIDEOGRAPHER:  Back on the record.

20   It's 11:14 a.m.

21   BY MR. LANTKA:

22         Q.    Ms. Hall, before the break I handed you

23   what I marked as Exhibit 3.  For the court reporter's

24   record, that is Bates No. VA005928.  This is another

25   document from the initial interview packet.  What I'm

1  interested in, first off, have you seen this document

2  before?

3        A.    No, I have not.

4        Q.    So without authenticating the document, I

5  just want to talk about some of the subject matter

6  therein, especially the impressions which were given to

7  the interviewer.  In the second section, starting,

8  "What remedy are you seeking", I have a question of a

9  couple of sentences that the interviewer wrote down,

10  whether or not you think that's accurate or what the

11  basis of it is.

12            The second sentence:  "Make it clear to

13  him" -- referring to Mike Bedell -- "what her duties

14  are and the fact that she is his peer."

15            MR. STROJNIK:  Form, foundation.

16  BY MR. LANTKA:

17        Q.    What do you think she meant by that?

18            MR. STROJNIK:  Before we proceed, what is

19  this document?  She hasn't even --

20            MR. LANTKA:  I said we're going on the

21  assumption, working on the hypothetical that this is a

22  document taken from the initial interview packet.  So

23  I'm just reading some sentences thereon and asking her

24  what she thinks the interviewer meant by that.  This

25  hasn't been authenticated, so I can't use it as am

1  exhibit at trial.  But I'm asking questions based on

2  what's here.

3            MR. STROJNIK:  Are you introducing this

4  exhibit as in relation to Vanessa Hall?

5            MR. LANTKA:  Yes.

6  BY MR. LANTKA:

7       Q.    So that the statement referring to Mike

8  Bedell -- "What remedy are you seeking?  Make it clear

9  to him what her duties are and the fact that she is his

10  peer."

11      A.    I'm not sure.  That's that individual's

12  sentence and terminology.  But also I'm confused

13  because the individual who is indicated as the

14  counselor is an individual I never spoke to.

15      Q.    Who is that individual?

16      A.    It says counselor's signature, and has

17  Sandra Oker.  The individual I spoke to was Lydia

18  Ward -- Nash, I believe her name was.

19      Q.    Do you have any reference to this

20  statement in quotes "peer"?

21            MR. STROJNIK:  Foundation.

22            THE WITNESS:  No, I have no recollection

23  of using that term "peer".  Michael Bedell was my

24  co-worker, and I was told by Don Adams that he was a

25  staff attorney and that all my assignments would come

1  through Don Adams.

2  BY MR. LANTKA:

3       Q.    All your assignments came through your

4  second line supervisor?

5       A.    Through my second line supervisor, who

6  then in turn decided who to assign it to.  He would

7  then give it to Terry Wolk for assignment.

8       Q.    Let's -- we're getting into a line of

9  questioning, for the record, which deals with

10  allocation of assignments.  So when you're saying Don

11  would decide who to assign it to, what did you mean by

12  that?

13      A.    Don Adams was the staff attorney's direct

14  first line supervisor, I believe.  He came out with a

15  method of assigning tasks.  The staff attorney was to

16  give him the particular task.  He was to determine who

17  should, it should go to, and also collaborate with

18  Terry Wolk.  The assignment would then come to me in my

19  inbox.

20      Q.    So a staff attorney in Region 7 would say,

21  "I have something I think I need support on."  Talk to

22  Don.  And then he would assign it out to --

23      A.    He and Terry Wolk would assign it out to

24  whoever was responsible for carrying out that

25  particular task.

1          Q.    What was Terry's title in the supervisory

2    change?

3          A.    Assistant Regional Counsel.

4          Q.    What was Don's?

5          A.    Regional Counsel.

6          Q.    Would Don be the same type of job as Mark

7    Romaneski, the discriminatory official in this

8    complaint?

9                MR. STROJNIK:  Form.

10               THE WITNESS:  I believe so.

11   BY MR. LANTKA:

12         Q.    Would Terry be a job description

13   equivalent to Jeffrey Stacy, who is Assistant Regional

14   Counsel in your underlying EEO complaint?

15               MR. STROJNIK:  Form.

16               THE WITNESS:  Yes, I believe so.

17   BY MR. LANTKA:

18         Q.    So since I'm just a little confused, who

19   is the guy that said, "Vanessa, you need to do this"?

20               MR. STROJNIK:  Form.

21               THE WITNESS:  Terry Wolk.

22   BY MR. LANTKA:

23         Q.    So Don would tell Terry, who would tell

24   you?

25         A.    No, Don would collaborate with Terry, who

1    would tell me.

2         Q.    Okay.

3         A.    The attorney would take the task to Don

4    Adams, place it in his inbox.  He would collaborate

5    with Terry Wolk and tell him to assign it to the

6    individual it belonged to.  And I would then get a task

7    or assignment in my inbox.

8         Q.    Was part of your problem with Mr. Bedell

9    the fact that he was going outside of this chain?

10        A.    Yes.

11        Q.    I mean, in addition to him being creepy,

12   he was giving stuff to do directly?

13              MR. STROJNIK:  Form.

14              THE WITNESS:  I was told to report that to

15   Don Adams and Terry Wolk whenever that occurred.  The

16   reason being because I was a representational

17   paralegal.  And they said they need us to be

18   knowledgeable about what types of tasks the attorneys

19   were assigning to me.

20              So it was basically for that period of

21   time after I became designated that they wanted to be

22   in the loop, so to speak, with regards to the types of

23   tasks I was being assigned and determining whether it

24   should go to an individual that was a legal assistant

25   or come to me.

1    BY MR. LANTKA:

2         Q.    Okay.  So before you were a

3    representational paralegal, you were -- I mean,

4    paralegal specialist -- you were always a paralegal

5    specialist.  The type of paralegal specialist at a

6    GS-12 was a representational paralegal; is that

7    correct?

8         A.    Yes.

9         Q.    What were you before you were a

10   representational paralegal?  What type of paralegal

11   specialist?

12        A.    Just a regular paralegal specialist.

13        Q.    So how did your duties differ when you

14   were a paralegal -- just regular paralegal specialist

15   to a representational paralegal specialist?  What would

16   the difference in your duties be?

17        A.    That was determined by a desk audit and

18   increase of duties.  So there were special duties that

19   I was performing that justified an increase in pay and

20   grade.  And as I stated before, the representational

21   career path was just that, it was a career path.

22   Paralegal specialist position branched off into two

23   separate career paths.

24              It was no longer just the general

25   paralegal specialist, but either program or

1  representational.  At the time where that regulation

2  came about, each regional counsel was tasked with

3  identifying which path their particular paralegals were

4  taking.

5       Q.    Getting back to my question, though, when

6  you get the personnel form said you were a

7  representational paralegal.  There's a new PD

8  associated with it.  From your understanding, what is

9  the difference between what you do as a

10 representational paralegal and what you did, you know,

11 the day before?

12      A.    I believe the substance of the duties were

13 pretty much the same.  I think there was maybe one or

14 two different phrases put in, or requirements.  But the

15 substance was pretty much the same, with the exception

16 of, I think, additional research, legal research, and

17 probably some writing or litigation support.

18      Q.    So is it a fair assessment of your

19 testimony, the representational paralegal is no big

20 deal, or is it somewhat of an honor to have?

21      A.    It was a distinction.  It was a position

22 of distinction from just a regular career path, if that

23 answers your question.

24      Q.    But as far as your understanding of the

25 position description, it was just a little bit more

1  nuanced than what you were the day before?

2        A.    I was already performing the duties

3  associated with that position.

4        Q.    Okay.

5        A.    So I'm saying that I was already

6  performing the legal research and writing.  And a desk

7  audit determined and confirmed that.  So it was -- I

8  made no changes in terms of my performance because the

9  grade was determined based on the outcome of the desk

10  audit.

11        Q.    Okay.  I have your testimony is you were

12  already doing all this stuff, so Don Adams, that's how

13  he justified getting you the representational paralegal

14  position.  It's your testimony Vanessa can do this

15  stuff, so he's going to make her a GS-12?

16        A.    My testimony is that the outcome of the

17  desk audit dictated the grade that I was to be

18  appointed to.

19        Q.    What is a desk audit?

20        A.    It's basically done by human resources

21  where they work in collaboration with the office in

22  determining whether under OPM standards an individual

23  was performing at a particular grade level.

24        Q.    Who initiates a desk audit?

25        A.    I would say it is initiated internally by

1  a responsible management official.

2      Q.    Is it a common practice, like a routine

3  practice, or does it have to be initiated at someone's

4  initiation?  That's a horrible sentence.

5              MR. STROJNIK:  Foundation.

6              THE WITNESS:  I'm not sure what the

7  initiation process is.  But I do know that the

8  individual who initiates the process has to be in a

9  position of authority in that particular office.

10  BY MR. LANTKA:

11      Q.    Are you aware who initiated your desk

12  audit?

13      A.    Terry Wolk or Don Adams.

14      Q.    So let's backtrack because I think we were

15  comparing apples to coffee tables.  As far as the

16  position description itself, not what you were doing,

17  but let's say I have -- I get -- there's Region 26 just

18  opened and I'm allowed to hire one paralegal specialist

19  and one representational paralegal, just out of the

20  blue.  And so I don't have any other duties.  What are

21  the differences in their duties if they just start

22  today at Page 1?

23      A.    As a brand new paralegal?

24      Q.    Well, let's say brand new, because I think

25  from your testimony, the increase of duties justified

1  with the desk audit that you could do this type of

2  work, so you got to be a GS-12.  But what is the

3  difference between the work you were doing and someone

4  who is not a representational paralegal?

5        A.    I'm not sure.  I would say that there are

6  different models of paralegal performance within the

7  Office of General Counsel.  And there are such

8  documents that actually depict the different models of

9  performance and what is required and when an individual

10 is performing within that particular model and what

11 range that they're performing at.  So I think that

12 would more accurately speak to answer your question at

13 me.  I didn't determine who gets appointed what and

14 what the requirements are.

15       Q.    But you know that making copies is not in

16 the position description of a representational

17 paralegal; correct?

18       A.    Not that I know of.  I don't believe it's

19 in any of the paralegal position descriptions.

20       Q.    But so your testimony today is you have no

21 personal knowledge of what the position description is

22 between a representational paralegal and a paralegal

23 specialist not on the representational career path?

24            MR. STROJNIK:  Form; misstates testimony.

25            Go ahead.

1              THE WITNESS:  I can only speak to the

2    representational paralegal position, because that is

3    what I was given.  And at the time I was promoted,

4    which is when career paths split.

5    BY MR. LANTKA:

6         Q.    From your testimony earlier when you

7    described the duties of the representational paralegal,

8    including the duties that you were performing during

9    the desk audit, is that a fair classification of what

10   you believe the duties of a representational paralegal

11   are?

12        A.    Yes, based on the outcome of the desk

13   audit, which HR --

14        Q.    Not based on what you were doing.

15              MR. STROJNIK:  Let her finish.

16   BY MR. LANTKA:

17        Q.    Not based on what you were doing.  Just if

18   I say, "Vanessa, I got to write a position description,

19   okay.  Let's say you got promoted or something, and we

20   need to fill your spot.  What do you do, because I got

21   to put this on USA jobs"?

22        A.    Again, there are different models of

23   paralegals within the Office of General Counsel.  You

24   can go from region to region and each paralegal,

25   whether they be representational or program, are

 1  functioning in different capacities performing

 2  different job duties.  So I can't --

 3        Q.    Just talk Region 7.

 4        A.    Okay.

 5        Q.    Region 7, if the computer just got wiped

 6  out and we have no OPM models and I have to get this PD

 7  out today.  And I'm asking you to help me write it.

 8  What do we put on the PD for a representational

 9  paralegal GS-12, Step 3?

10        A.    What is consistent probably with the

11  elements that would be a starting point, but again HR

12  is tasked with that responsibility.  That's outside of

13  my --

14        Q.    HR is on vacation.  The only people in the

15  office are you and me.  I have no idea.  You're my

16  resource.  Just, I mean, if you want to say under oath

17  you cannot tell me what the position description, what

18  your duties were as the GS-12, Step 3 representational

19  paralegal in Region 7 were, that's fine.  Or if you

20  want to say this is the best of my knowledge everything

21  that I would have been tasked with and there could be

22  more, that's fine.  But I just need you to tell me --

23  and I know it's not your position description to write

24  a PD.  But just tell me what it was that you would put

25  down.

1          A.      For representational paralegal?

2          Q.      Yes, ma'am.

3          A.      Working independently on performing

4  substantive job duties, such as working cases

5  independently, being able to provide a clear and

6  concise analysis and support of any recommendations or

7  conclusions associated with your work.  The writing

8  skills, I believe, are a very large part of being a

9  representational paralegal.

10         Q.      So the sum total of what you would put in

11  the PD is good writing skills and research and working

12  independently?

13         A.      Being able to work cases independently,

14  yes, for a representational paralegal.

15         Q.      What do you mean independently?

16         A.      For example, I was assigned a medical

17  malpractice caseload.  I work that caseload

18  independently.  I investigated the case and the

19  allegations.  I provided a clear and concise report to

20  the regional counsel in effort to support him making a

21  recommendation based on my conclusions.

22         Q.      These would have been medical malpractice

23  actions initiated under the Federal Tort Claims Act?

24         A.      That's correct.

25         Q.      And when you say independently, were you

1   working on a case that assigned to a line attorney, or

2   was it entirely your case?

3           A.     It was assigned to me.

4           Q.     Was there an a line attorney assigned to

5   it as well?

6           A.     No.

7           Q.     Just your case.  And when you say provide

8   a recommendation, what would that entail, what does a

9   recommendation entail?

10          A.     It involved writing an internal

11  administrative tort report setting forth the

12  progression of your investigation, your findings and

13  conclusions, and any legal analysis that goes along

14  with it.  Make your recommendation as to whether to pay

15  or deny a medical malpractice claim.

16          Q.     So you would have a factual rundown of

17  what happened, basis of the law?

18          A.     Yes.

19          Q.     And factual, you said yes to that?

20          A.     I'm sorry, go ahead.

21          Q.     So factual rundown would be in there,

22  correct?

23          A.     Yes, facts of the case.

24          Q.     I just had to repeat myself because you

25  nodded and I stopped being vigilant about that.  I

1    apologize.

2              You had legal analysis, correct?

3         A.    Yes.

4         Q.    You have a liability analysis, correct?

5         A.    Sometimes.

6         Q.    Okay.  And you would have some type of

7    recommendation to, as we put it in the feds, whether

8    we're dead in the water or whether we should fight this

9    one?

10        A.    That's correct.

11        Q.    About how long were these internal

12   litigation reports?  Were they big, little?

13        A.    I think the complexity of the case

14   dictated the length of the report.

15        Q.    On average, let's use a case I worked on a

16   couple of years ago.  It's closed.

17              MR. STROJNIK:  How about Rafilson?

18              THE REPORTER:  What was that?

19              MR. STROJNIK:  Rafilson.

20   BY MR. LANTKA:

21        Q.    Let's a lady goes into an Indian health

22   facility.  Let's call it the VA.  And they're supposed

23   to extract some teeth.  They extract the wrong row of

24   teeth, and now she's suing.  How would you approach

25   that hypothetically?  How would you work that up?

1      A.    Well, that sounds pretty much like it's

2  one of the easier claims to work given the fact that

3  any x-rays and identifying of bad teeth should be

4  support in whether or not the VA in this case erred in

5  the treatment of that individual.  So that in from the

6  outset, I would say that that would be a case that

7  would be one of the easier ones, and the report

8  wouldn't be that lengthy.

9      Q.    What's a not lengthy report?  One page?

10      A.    I would say -- this is just an estimate

11  because this question is kind of hypothetical -- one to

12  three pages.

13      Q.    Okay.  And how long would it take you to

14  work up that case?  Days?

15      A.    I don't know.  That is dictated also by

16  priorities.

17      Q.    Uh-huh.

18      A.    So it depends on what the priorities at

19  that particular time were.

20      Q.    Who dictates your priorities, or how are

21  your priorities dictated?

22      A.    As a representational paralegal, you

23  basically have to have the ability to prioritize, or a

24  responsible management official can, of course,

25  prioritize a task that is one that should be dealt with

1   immediately.

2          Q.     So part of working independently is able

3   to say I get X, Y and Z done by the next deadline; is

4   that correct?

5          A.     Correct.

6          Q.     But the boss can always say, "Vanessa, I

7   need this done by Friday"; is that correct?

8          A.     Uh-huh.

9          Q.     And would the boss's "I need this done by

10  Friday" tend to take precedence?

11         A.     Yes.

12         Q.     I know it does for me.  Okay.

13                Anything else you would like to add to our

14  hypothetical position description, because you're

15  leaving, you got promoted, and I need to hire a new

16  representational paralegal.  Anything else you want to

17  add to your job duties before we post it on USA jobs?

18                  MR. STROJNIK:  Form.

19                  THE WITNESS:  Again, I state that it's

20  very difficult for me to actually answer these

21  questions because there's an entire component that's

22  tasked with that responsibility.

23  BY MR. LANTKA:

24         Q.      I understand.  Remember, they're in the

25  Bahamas right now, right?  So if we're going through

1    and -- I'm a little flip, but it's important to your

2    case what you believe your job to be.  It's working

3    independently, being able to do tasks, being able to

4    prioritize.  Anything else that you would put in your

5    job description, your GS-12 Step 3 representational

6    paralegal job?

7                    MR. STROJNIK:  Form.

8                    THE WITNESS:  Again, I think I already

9    covered that.

10                    MR. LANTKA:  Move on to mark it as Exhibit

11   4.

12         (Whereupon, Deposition Exhibit No. 4 was marked

13   for identification.)

14   BY MR. LANTKA:

15         Q.    Not being selfish by taking mine first,

16   but I get confused.

17                    For the record, Exhibit 4 is a single page

18   document marked Hall-VA-5948 as Bates number.  Entitled

19   "Notice of Withdrawal of EEO Complaint", dated May 26,

20   2005.  Take a second to look this over.

21                    Do you recognize this document?

22         A.    Yes, I do.

23         Q.    Is it fair to say that is your signature

24   at the bottom?

25         A.    That is.

1        Q.     What is this document?

2        A.     It is a notice of withdrawal of EEO

3   complaint.

4        Q.     Which EEO complaint is this withdrawing?

5        A.     I contacted Ms. Ward after speaking to her

6   and told her that I was not going forward with a formal

7   informal complaint.  She at that time informed me that

8   I would have to sign a notice of withdrawal even though

9   I never filed an initial complaint so that it could be

10  closed out in her system.  And this is what I signed.

11       Q.     She marks, "Resolution:  Harassment to

12  cease and desist and duties clarified with Michael

13  Bedell."  Did you read this document before signing it?

14  I know it's a couple of years ago.

15       A.     Yes, I did.

16       Q.     What do you, based on your knowledge, what

17  do you think is meant by that phrase I just read, the

18  resolution sentence there?

19       A.     I told her it was not necessary to proceed

20  because Don Adams had spoken to Michael Bedell and made

21  it clear how assignments were to be forwarded.  So that

22  is cease and desist harassment and duties clarified.

23       Q.     When you say "assignments to be

24  forwarded", is it your understanding that the

25  assignment of duties is part and parcel with

1   harassment, or is that a separate claim altogether?

2        A.    That was a separate more general terms of

3   what was going on at that particular time, the

4   environment itself.

5        Q.    So do you believe that the assignment --

6   I'm sorry, scratch that.

7             This informal complaint, did you make it

8   in your capacity as a woman, an African-American, or a

9   Christian?  What capacity did you make it?

10       A.    The bases is sex, and the claim is

11  harassment.  So I made the claim based on my gender,

12  female, and harassment.

13       Q.    And do you believe that Mr. Bedell -- or

14  was it your allegation at the time that Mr. Bedell was

15  giving you duties outside your position description

16  because you were a woman?

17       A.    No, Mr. Bedell was not in a position to

18  assign me to these at that particular time.  He was

19  deviating from what the arrangement was in the office

20  as far as protocol.  And he continued to do it even

21  though he was asked to stop.

22       Q.    So not counting the current complaint, the

23  one against the FAA in 1990, the claim against

24  Mr. Bedell, any other EEO action?  And not even

25  official complaint.  Any filings, any contact with

1  counselors, anything like that in your federal service?

2      A.    Yes.

3      Q.    And what were they?

4      A.    It was one, I believe, against a coworker

5  who sent me somewhat of a disparaging e-mail.  And that

6  was actually at the U.S. Attorney's Office in

7  Pittsburgh.

8      Q.    When was this?

9      A.    Approximately 1996, maybe.

10     Q.    Let's talk about that a little bit.  Who

11 was the coworker?

12     A.    Susan Dymerski.

13     Q.    What was her position within the USAO?

14     A.    She was a paralegal specialist.

15     Q.    Since I can't even read my notes, what was

16 your job classification in 1996?

17     A.    I was a financial litigation agent.

18     Q.    And what was your job as a financial

19 litigation agent in relationship to Susan?

20          MR. STROJNIK:  Form.

21          THE WITNESS:  There basically was no

22 relationship.  She was a paralegal specialist.  She had

23 her independent duties, and I was a financial

24 litigation agent.

25 BY MR. LANTKA:

1      Q.    What division, were you both in the same

2    division, different divisions?

3      A.    We were both in the civil division.

4      Q.    What was the, not verbatim, what was the

5    contents of this e-mail?

6      A.    The contents of the e-mail basically

7    stated that she had reviewed cases and decided that

8    individuals would get -- one individual would get some

9    cases, the other individual would get some other cases,

10   and I would get everything else to clean up.  And that

11   was her terminology.

12     Q.    How did you perceive the term "clean up"?

13   What did you think that meant?

14     A.    That's what I asked her.  And she said you

15   get all the stuff that no one else wants to do.

16     Q.    Okay.  So was it distribution of cases was

17   the basis of the e-mail and you were given this other

18   crap?  I didn't mean to say that on the record,

19   unfortunately.

20     A.    Well, if you want to phrase it like that.

21     Q.    Anything else regarding that complaint?

22   Anything -- I mean, did you file -- strike that.

23         Did you file in your capacity as, again, a

24   woman, African-American, religion, disability?  What

25   was the basis of the claim?

1        A.    I was the only African-American in the

2   office, so it was disparate treatment through the race.

3        Q.    Distribution of work that you felt was

4   disparate treatment based on your race?

5        A.    Yes, because she was not in a position of

6   authority either.

7        Q.    What was the outcome of that EEO?

8        A.    I can't remember.  I basically just agreed

9   to let it go after going through an EEOC hearing.

10  Basically just kind of -- I let it go.

11       Q.    When you say "hearing", what do you mean

12  by hearing?  Was there a formal hearing?

13       A.    There was a formal hearing, and the

14  outcome of it, I believe, was not favorable to me.

15       Q.    Uh-huh.

16       A.    And I can't recall the details.

17       Q.    Okay.  So, and I don't need specific

18  details since we're not a walking version of Westlaw.

19  So I assume you met with an EEO counselor, and after

20  the counseling session ended you actually filed an

21  informal complaint, correct?

22       A.    Yes.

23       Q.    And after that complaint it actually went

24  to a hearing then?

25       A.    I believe so.  It's been awhile.  So

1  forgive me if I can't remember the exact progression.

2      Q.    It's over ten years ago.  So the hearing,

3  was that held before some type of arbiter, informal

4  person?

5      A.    It was an informal hearing.

6      Q.    And you said the end result was in favor

7  of, I guess in favor of Susan?

8      A.    I'm not sure.  I can't recall.  Because at

9  that point in time I was willing -- everything had been

10  resolved.  So I'm not sure of the exact disposition.

11  So I'm kind of hesitant to say.  But I believe at the

12  hearing it was determined that there was not enough

13  evidence to support that I had been discriminated

14  against on the basis of my race, if my recollection is

15  correct.

16      Q.    So it didn't proceed to District Court,

17  then?

18      A.    No.

19      Q.    That's fine.  Anything else you want to

20  tell me about that?

21      A.    No.

22      Q.    So we have the FAA, we have Mr. Bedell,

23  the USAO, the current case.  Any other EEO claims?

24      A.    No.

25      Q.    While at the Region 7, aside from

1    contacting the EEO counselor with regard to Mr. Bedell,

2    did you ever tell your supervisor that you were

3    contemplating filing an EEO claim for any reason?

4         A.    I don't recall.

5         Q.    Did you ever tell a coworker that you were

6    contemplating filing an EEO claim for any reason?

7         A.    No, I don't believe so.

8         Q.    Did you ever tell Terry, the ARC, that you

9    were contemplating filing an EEO for any reason?

10        A.    Not that I can recall.

11        Q.    You had classified your career in federal

12   service as stellar up until the discipline issue in the

13   spring of 2008.  Is that the year we're dealing with?

14        A.    Yes, March of 2008.

15        Q.    Did you have any type of discipline in

16   your federal service prior to the discipline issue in

17   Region 19?

18        A.    No.

19        Q.    Did you ever file any type of union

20   grievance as a federal employee?

21        A.    No.

22        Q.    Did you ever engage in any type of

23   informal conflict resolution process aside from union

24   grievances, EEO, anything like that in your federal

25   employment?

1        A.    No.

2        Q.    Anything else you would like to contribute

3  regarding your employment at Region 7 in Cleveland that

4  you believe relates to this case?

5                MR. STROJNIK:  Form.

6                THE WITNESS:  No.

7  BY MR. LANTKA:

8        Q.    We talked a little bit about your current

9  husband.  And what was his name again?

10       A.    Thomas.

11       Q.    Thomas.  About Thomas being when he

12  relocated to Phoenix.  When did you first become aware

13  of a position opening in Region 19?

14       A.    December of 2007.

15       Q.    And how did you become aware of that?

16       A.    I'm sorry, December of 2006.

17       Q.    That would make much more sense.

18       A.    Wrong year.

19       Q.    How did you become aware of that?

20       A.    We actually visited Phoenix in

21  contemplation of his possible move.  I visited the VA

22  Regional Counsel's Office on that day.

23       Q.    Uh-huh.  So in December '06 you physically

24  visited the VA Regional Counsel's Office.  What did you

25  do there?

1    A.    I spoke to Norma Kaping who was the

2  paralegal on staff.  She was the only individual in the

3  office that day.  I actually stopped by to visit Greg

4  Ferris, who is the regional counsel.

5    Q.    Did you have an appointment with him, with

6  Greg?

7    A.    No, but the regional counsel in Phoenix

8  said that if I was going to be in the area to stop by

9  the regional counsel's office and say hello from him.

10  So I didn't have an appointment.

11    Q.    So you stopped by.  Norma was manning the

12  fort.  What did you two talk about?

13    A.    I asked if Greg Ferris was there.  She

14  informed me he was not.  He was actually at an EEO

15  hearing, I believe, in Las Vegas.  And then at that

16  time she asked me who I was.  And I told her my name.

17    Q.    She should have asked it first.  Security.

18    A.    Yeah, I know.  Someone else answered the

19  door.  I believe Maria Worth was there.  She asked me

20  what my name was and if I wanted to leave a message.

21  And when I said my name, she said, "I know who you are.

22  You're the paralegal chairperson."  And that initiated

23  a discussion.  And I told her that I was possibly

24  looking into relocating to Phoenix.  And she had

25  advised me that the paralegal that was on staff was

1   scheduled to retire.

2        Q.    Who was that paralegal that was retiring?

3        A.    Vicky Holbrock.

4        Q.    So Norma knew who you were because of your

5   duties?

6        A.    With ODC Paralegal Work Group.

7        Q.    Thank you.  Talked a little.  Gave you a

8   heads up.  Something is opening up.  What happened

9   after that?

10       A.    Pretty much ended the conversation.  We

11  were scheduled to fly out.  So we didn't have a lot of

12  time, and we left.

13       Q.    When did you next make contact with

14  general counsel's office in Phoenix?

15       A.    I believe January of 2008.

16       Q.    How was that --

17       A.    I'm sorry, 2007.  I'm getting my years

18  mixed up.

19       Q.    That's okay.  How did -- how was that

20  contact initiated?

21       A.    I spoke to Greg Ferris, who was the

22  regional counsel, about possibly relocating to Phoenix.

23       Q.    Did you initiate the contact with Greg?

24       A.    As a matter of fact, no, he had spoken to

25  Don Adams, who was at that time aware that I was

1  possibly going to relocate.

2        Q.    So you and Greg spoke on the phone.  What

3  was the substance of that conversation?

4        A.    He basically told me that a position would

5  be opening up in the near future.  He couldn't say

6  when.  And that if I was interested, then I could

7  apply.

8        Q.    Did anything else happen?  Send a resume

9  along?

10        A.    I can't recall.  I can't recall, to be

11  honest with you.

12        Q.    That was some time in January 2007.  When

13  was the next contact you had with the regional

14  counsel's office?

15        A.    I believe the next contact was from

16  Jeffrey Stacy.

17        Q.    When was that?

18        A.    Probably around March, February or March

19  of 2007.

20        Q.    What happened during that conversation?

21  Who initiated the conversation and what happened?

22        A.    I believe Jeffrey Stacy phoned me.

23        Q.    Okay.

24        A.    And I'm not sure about that.  But we spoke

25  briefly about what he was doing.  He said that there

1  was the regional counsel slot was opening up and he

2  heard that, you know, I was interested in the paralegal

3  specialist position.  We spoke a little bit about, you

4  know, him not actually making a decision about whether

5  or not he wanted to vie for the position of regional

6  counsel because he said that he was more comfortable

7  staying in Albuquerque.

8          And then he actually stated the same thing

9  that Greg Ferris said to me:  "We have a paralegal

10 position that is coming open if you want to, you know,

11 consider that knowing we would be basically happy to

12 have you."  So I think that that was even prior to Mark

13 Romaneski coming on board, obviously because the

14 regional counsel slot had not been filled.

15      Q.    Is it a true statement of fact that

16 Jeffrey Stacy was the assistant regional counsel based

17 out of Albuquerque, New Mexico at all operative times

18 in your complaint?

19      A.    When you say all operative times --

20      Q.    When you were working, when you were

21 employed in Region 19 was Jeff Stacy the assistant

22 regional counsel?

23      A.    Yes, during my employment.

24      Q.    Did -- in your conversation in March of

25 2007 with Jeff, did he explain or make any

 1  representation to you as to whether he would be excited

 2  to have you?

 3      A.    No, he just made a statement.  And I

 4  didn't ask for his reasoning.

 5      Q.    Same question related to Greg.  Did he

 6  make any representation as to why he would be excited

 7  to have you?

 8      A.    No, but Mr. Ferris was aware I was the ODC

 9  paralegal chairperson, and he made reference to that.

10  But he didn't elaborate any further.

11      Q.    Why do you believe they were excited to

12  have you?

13      A.    I believe Jeffrey Stacy indicated that

14  they were excited to have me on board.

15      Q.    That was a horrible question on my part.

16  Aside from them being excited, what do you believe,

17  just from your interaction with them caused their

18  excitement?

19          MR. STROJNIK:  Form.

20          THE WITNESS:  I can't speak to that.

21  BY MR. LANTKA:

22      Q.    If it was me, I'd say because I'm so darn

23  handsome.

24          All right.  So, we talked in January of

25  2007 you spoke with Greg.  And Christmas time you spoke

1  with Norma.  March of 2007, Jeff called you, or there

2  was at least conversation on the phone.  When was the

3  next time you talked to someone at Region 19?

4       A.    I believe -- I may have spoken to Jeffrey

5  Stacy twice.  And subsequent to that, it would have

6  been Mark Romaneski.

7       Q.    When did you first make contact with Mark?

8       A.    Mark Romaneski, I believe, either called

9  me or someone else initiated the call.  I'm not sure.

10      Q.    When was that?

11      A.    That would have been after he was

12  appointed as Regional Counsel, which was approximately

13  in or around April, May of 2007.

14      Q.    What was the substance of that phone call?

15      A.    He basically said that he was aware that I

16 had spoken to Jeffrey Stacy and that Jeffrey Stacy had

17 expressed an interest in me applying for the position

18 of paralegal specialist.

19      Q.    Anything else said, or was it, "I know you

20 talked to Jeff.  Bye"?

21      A.    Actually he asked if I was still

22 interested.  And at that particular time, my personal

23 arrangements were unknown.  My husband had not yet

24 transferred or was about to transfer.  And I was in the

25 position where I was speaking to Don Adams about if I

1  did take that position, like when could I transfer?

2  And working around all those issues to making a very

3  comfortable move to everyone involved.

4        Q.    So what did you tell Mark in response his

5  question:  Are you still interested in the job?

6        A.    I said I am, but I said right now I can't

7  commit to any dates.  I'm not sure of when I will be

8  available for transfer.  And I asked if I can give him

9  a call back when I had more information.

10        Q.    When did you next make contact?

11              MR. STROJNIK:  Form.

12              THE WITNESS:  I'm not sure if I contacted

13  Mr. Romaneski or if he contacted me, but we spoke, I

14  believe, maybe a month or two later.

15  BY MR. LANTKA:

16        Q.    Okay.

17        A.    At that particular time I told him I was

18  not sure of the date again, but that my husband would

19  be transferring out.  Don Adams would be retiring in

20  September, so I was trying to work out something that

21  would be comfortable with everyone.  And we had a house

22  that was on the market to be sold.  So it was a lot of

23  different issues.

24        Q.    So would that May 2007 conversation with

25  Mark, would it be fair to say the job wasn't a done

1  deal yet, correct?

2       A.    The job had not yet been presented to the

3  Office of General Counsel as me being definitively

4  available for a transfer.  So at that particular time,

5  it was just the two of us working together, and Jeffrey

6  Stacy, I believe, was involved as well.  I don't even

7  think that Don Adams at that point was involved in it.

8       Q.    So the May conversation was just more of

9  the same I'm interested but I got a house and okay?

10      A.    Uh-huh.

11      Q.    I want to follow through the progression.

12  And I'm just going to ask you for a narrative that I

13  would object to at trial.  But I'm going to ask you to

14  tell me about the conversations you had with regional

15  counsel's office up until the time you lock in the job

16  in your own words starting after this conversation?

17      A.    I believe it was just two conversations

18  with Mark Romaneski prior to me contacting him and

19  saying this is the date I'll be available for transfer.

20  And him saying that he had to vet it up, of course,

21  with his superiors for approval.  So that's what I

22  recall after that time.

23      Q.    When did that conversation take place?

24      A.    After our house actually, the government

25  purchased our house.  It was a PCH move.  So after that

1   occurred, I signed on to a lease for 90 days.  After

2   speaking to Don Adams and him telling me that he wanted

3   me to help him tie up the ODC Paralegal Work Group

4   materials, because there was an actual study to

5   determine the duties involved in paralegal positions.

6           So what I did was I talked to him.  He

7   said he would be retiring at the end of September.  I

8   agreed to stay on as long as that period of time to

9   work on all of these incomplete tasks with him, in

10  addition to taking care of my assigned workload.

11      Q.   So I'm sorry, what date did we say that

12  conversation with Mark, the "I need to vet it up"

13  conversation took place, or what month?

14      A.   I'm going to say probably around August to

15  September, somewhere.

16      Q.   Late summer?

17      A.   Yeah.

18      Q.   So when did you next hear from Mark that

19  he had vetted it up and that everything was good to go?

20      A.   Probably, I would say, the beginning of

21  September, end of August, beginning of September maybe.

22      Q.   Okay.  When did you tell him -- what date

23  did you tell him you were available to start duty?

24      A.   Actually, I believe it was October 1st.

25      Q.   When did Don Adams, when did you first

1  make Don Adams aware of your desire to relocate to

2  Phoenix?

3       A.    I think it was probably around March of

4  2007.

5       Q.    What was his reaction?

6       A.    He was disappointed, but then he said, at

7  that particular time he informed me that he would be

8  retiring at the end of September.  And he had not yet

9  informed anyone of that.  He, you know, wished that I

10  would stay on long enough to complete the paralegal

11  work group study he was working on.

12       Q.    With that paralegal work group study, you

13  said it was a study to determine the duties of what

14  paralegals do?

15       A.    Somewhat.  It was a study of duties across

16  the board.  Even involved U.S. Attorney's Office

17  participation in that particular study and several law

18  firm.

19       Q.    So, I'm sorry.  Duties of a paralegal in

20  the context of what paralegals do?

21       A.    Yes, what paralegals do and in different

22  models that paralegals were functioning under.

23       Q.    Did that study result in any type of

24  publication?

25       A.    Several publications.

1    Q.    Do you have any authorship credit in any

2    of that?

3    A.    No, I believe Don Adams, because he is an

4    attorney and it did involve something at a management

5    level, actually signed off on all the of those things.

6    Q.    I guess in a nutshell, what was the result

7    of that study?

8    A.    The representational paralegal spots.

9    Q.    I don't understand.  The result of that

10   study was representational paralegal.  What do you mean

11   by that?

12   A.    Early on the study was initiated, I

13   believe, back in 2006.  And it involved different

14   phases of analyzing paralegal duties, and private

15   sector in the federal government.  The U.S. Attorney's

16   Office in Cleveland, Ohio participated.  And it was

17   determined that the paralegals were functioning at a

18   higher grade level after segmenting off those duties

19   and comparing them to OPM standards.

20   Q.    So this was a study, an internal VA study?

21   A.    Office of General Counsel study.

22   Q.    VAOGC?

23   A.    Yes.

24   Q.    And the result of that was the

25   classification of different levels of paralegal, one of

1  which is a representational paralegal?

2       A.    That's correct.

3       Q.    What is the highest classification if I

4  had to rank them of paralegals?

5       A.    Within VA, representational.

6       Q.    Is there any mention of duties as they

7  relate to different classifications of a paralegal in

8  that study?

9       A.    I'm sorry, I have to go back.  There is

10 just a general paralegal specialist title within VA,

11 because I did say within VA, where the paralegals are

12 GS-13s.  So it's no representational, just paralegal

13 specialist GS-13.

14      Q.    Okay.  In the hierarchy, how would a

15 representational paralegal fit in?

16      A.    I would say because I'm aware that there

17 is at least one GS-13 paralegal within VA, that that

18 still is not the top tier, representational paralegal,

19 because full performance level is GS-12.

20      Q.    The top current tier is GS-12?

21      A.    For Office of General Counsel, within VA

22 there are GS-13 paralegals.

23      Q.    So there are people working at GS-13

24 within OGC VA?

25      A.    In Department of Veteran Affairs.  Not

1  necessarily OGC that I'm aware of.  I'm just aware of

2  one individual at a GS-13 within VA.

3          Q.    Who is that individual you're aware of?

4          A.    Actually, her name is Laura McGeary.

5          Q.    Where is she based out of?

6          A.    Washington, D.C.

7          Q.    What division within the VA is she?

8          A.    National Cemetery.

9          Q.    Are you aware how her duties differ from a

10  GS-12?

11         A.    She specialized in FOIA.

12         Q.    F-O-I-A.  How do you know of her?

13         A.    She is actually my sister.

14         Q.    There you go.

15               So what you're saying, classification, if

16  I was going to do a hierarchy of paralegals it would be

17  more fair to classify them by GS level as opposed to

18  title?

19         A.    Yes, if you want to get an accurate

20  accounting of salary and title.  Representational

21  program is something that's unique.

22         Q.    Can you be a paralegal and not be a

23  representational or program paralegal?

24         A.    Yes.

25         Q.    Which, out of the representational program

1  paralegal career tracks, based on your personal

2  knowledge, which one is more involved, involves more

3  independent workload?  Which is a harder job?

4        A.    I would say representational paralegal

5  requires, calls for more independence and actually

6  involves more independence.

7        Q.    Did you ever actually interview for the

8  job in Region 19 with Mark or Jeff?

9        A.    No.

10       Q.    Did you ever go through a formal

11  application process?

12       A.    No.

13       Q.    Before traveling, before relocating to

14  Region 19 did you have any type of understanding of

15  differences in office culture between Region 19 and

16  Region 7?

17       A.    No.

18       Q.    Did you have any discussions with anyone

19  regarding the use of GC Laws in Region 19?

20       A.    No.

21       Q.    Did you utilize GC Laws in Region 7?

22       A.    Yes and no.

23       Q.    Okay.  Yes and No.  First let's start.

24  What is, from your understanding, what is GC Laws?

25       A.    GC Laws is a method in which your time is

1    tracked with regard to your workload.  I say yes and no

2    because when I first started with regional counsel in

3    Region 7, there was no such thing as GC Laws.  GC Laws

4    came about, I think, within the last two years prior to

5    me transferring.

6        Q.    Did Don Adams have any conversation with

7    you concerning the use of GC Laws in Region 19 prior to

8    your transfer?

9        A.    Not that I'm aware of.  He said that

10   because it was a tool that was recently introduced,

11   basically everyone was in a status where they were

12   trying it out to determine the effective use of GC

13   laws, if at all any.

14       Q.    You say it records your time.  How does it

15   record?  I mean, from a lawyer world, when I was in

16   private practice, my time was recorded on a piece of

17   paper.  But some people have it on a Blackberry like a

18   stopwatch so they get in the shower and think about a

19   case and time it.  How does GC Laws track your time?

20       A.    GC Laws is somewhat similar to what you

21   mentioned as writing your time down, but it requires

22   transferring of those same tasks and the time you

23   allotted for each into GC Laws.

24       Q.    So it's a computer based system?

25       A.    Yes.

1      Q.    Who inputs your time into GC Laws?

2      A.    The individual who is performing the

3  particular tasks that they are inputting.  So you track

4  your own, place it in there.

5           MR. STROJNIK:  We need to take a break.

6  Let's take a break.  Two minutes.

7           THE VIDEOGRAPHER:  Off the record.  And

8  the time is 12:06.

9      (Whereupon, a recess was taken from 12:06 p.m.

10  to 12:09 p.m.)

11           THE VIDEOGRAPHER:  Back on the record

12  12:09 p.m.

13  BY MR. LANTKA:

14      Q.    Ms. Hall, Vanessa, before we left we

15  started talking about the GC Laws system and how people

16  input their time.  And you said it was user generated;

17  correct?

18      A.    Yes.

19      Q.    So if I was an employee at the VA, I would

20  put in my own time?

21      A.    Yes.

22      Q.    Are there different classifications of

23  time:  Case work versus admin versus water cooler talk,

24  or how is it classified?

25      A.    I'm not really sure about all of the

1  classifications, but you either had case time or legal

2  support time.

3        Q.    Okay.  What constitutes case time?

4        A.    Assignment of a case.  For instance, I was

5  assigned by my own medical malpractice cases in Region

6  Cleveland, and I entered time or tracked my time with

7  regard to those cases.  And they were -- that credit

8  was given to me.

9        Q.    So case time is a case that you are

10 independently working on?

11       A.    Yes.

12       Q.    What would be a situation where you were

13 working on an assignment for a line attorney?  If you

14 were helping her out with a case, what category would

15 you classify your time under that circumstance?

16       A.    I think that would be a support time.  I'm

17 not really sure about the terminology.  Either task or

18 legal support time.

19       Q.    And you said case time, legal support

20 time.  Is there another classification that you stated?

21       A.    None that I can recall right now.

22       Q.    Okay.  We're going to talk a little bit

23 about telecommuting, but is GC Laws accessible for --

24 first off, let's lay foundation.  At some point during

25 your career at Region 19 you telecommuted; correct?

1      A.    Yes.

2      Q.    Did you input time in GC Laws while you

3  telecommuted?

4      A.    I believe so.

5      Q.    So it's accessible through a computer

6  system even if you're at home?

7      A.    I'm not sure if it was in my particular

8  case.  I can't recall that because I actually wrote my

9  time down on a legal pad and entered it toward the end

10  of the month before the 30th of the month or the 31st.

11      Q.    Okay.  So you kept track of your time?

12      A.    Right, so I'm not sure if I entered it

13  while I was telecommuting.  At some point I entered the

14  time.

15      Q.    It's a fair statement, you kept track of

16  your time for GC Laws while you were telecommuting?

17      A.    Yes.

18      Q.    In Region 19 did you keep a -- did you do

19  your best to keep an accurate record of time for the GC

20  Law system while you were working there?

21            MR. STROJNIK:  Form.

22            THE WITNESS:  Well, I attempted to, but I

23  probably did not, you know, wasn't accurate at all

24  times.  I think everyone made errors with regard to

25  their time entries.

BY MR. LANTKA:

    Q.    And when you say errors, there's nothing deliberate, or you don't recall six weeks where I just didn't give a crud and didn't enter my time?  You just mean theres probably administerial errors or something?

        MR. STROJNIK:  Form.

        THE WITNESS:  There could be some errors or incomplete omissions, or sometimes individuals forgot what they were working on and forgot to jot it down and captured it somewhere else to have it be the accurate amount of hours.

BY MR. LANTKA:

    Q.    When we say capture it somewhere else, is the system set up so it has to account for a 40-hour week?

    A.    Yes, I believe so.

    Q.    So if you're on leave, that would be a category as well?

    A.    I'm not sure if it's captured in there accurately.  That would be Vista, the time keeping system.  That would be a more accurate program to go to for that.

    Q.    But Vista doesn't keep track of -- Vista is more time and attendance as opposed to work on tasking matters?

1      A.    Right, but you mentioned if you took

2  leave.  So I would say Vista is a more accurate program

3  to go to to get an accurate accounting of the leave

4  that an individual took.  That is the time keeping

5  system.

6      Q.    So now we get to Phoenix.  Your first

7  start date, October 1, 2000 ---

8      A.    2007 was the official start date.

9      Q.    2007.  And just so we have a statement

10  together when I read the transcript, when was the last

11  date, when was the date that you resigned?

12      A.    There isn't -- not a resignation if your

13  employment is continuous.  It was a transfer.

14      Q.    I mean when you left Region 19.  How long

15  were you at Region 19?

16      A.    From October -- my official start date,

17  October 1st, 2007, until June 7th of 2008.

18      Q.    I'm going to talk a little bit based on

19  your knowledge, composition of the, of Region 19.  So

20  this is in addition to the Phoenix office.  How many

21  offices are in Region 19?

22      A.    That would be Las Vegas office, of course

23  the Phoenix core office, the Albuquerque, New Mexico

24  office.  So those three locations.

25      Q.    For all these questions rather than me

1   hurting our court reporter's fingers, I just want the

2   time frame is going to be from October 1, 2007, through

3   June 7, 2008.  Is that acceptable?

4        A.    That is the duration of my employment

5   there.

6        Q.    So within that time about how many

7   individuals were employed within the general counsel

8   system of Region 19?

9        A.    Including the out station offices?

10        Q.    Uh-huh.

11        A.    I never counted, but I would say -- I had

12   never been to the Albuquerque, New Mexico office or Las

13   Vegas office, so I'm not sure.  But I would speak to an

14   approximate number of individuals that were employed in

15   Phoenix.

16        Q.    How many people were employed in Phoenix?

17        A.    Approximately eight, I would say.

18        Q.    Approximately eight?

19        A.    Eight or nine.

20        Q.    How many paralegals were employed in

21   Phoenix?

22        A.    Two.

23        Q.    And who were those paralegals?

24        A.    Myself and Norma Kaping.

25        Q.    Were there any other paralegals that you

1   were aware of that worked in Region 19?

2          A.    Yes.

3          Q.    And who would those be?

4          A.    An individual by the name of Davina Hughes

5   was functioning under a paralegal specialist title.

6   I'm not sure whether or not she was an employee.

7          Q.    Anyone else?  Anyone in Albuquerque?

8          A.    Bonita Ortiz.

9          Q.    And anyone else?  Anyone in Las Vegas?

10         A.    I believe that was all during my

11  employment.

12         Q.    Full time paralegals are you, Norma

13  Kaping, Bonita Ortiz?

14         A.    Uh-huh.

15         Q.    And Davina Hughes, who is a paralegal

16  specialist, but you said possibly an unpaid transition

17  position while you were there?

18         A.    Some sort of transition or transitory

19  position, I should say.

20         Q.    Keeping to the Phoenix office, how many

21  support staff are employed there?

22                MR. STROJNIK:  Form.

23                THE WITNESS:  Maria Worth, to the best of

24  my knowledge.

25  BY MR. LANTKA:

1    Q.    So one?

2    A.    One.

3    Q.    How many attorneys were employed at the

4  Phoenix office?

5         MR. STROJNIK:  Can I just clarify?  Every

6  question you're asking unless you state otherwise is

7  for the time frame between October 1, 2007, through

8  June 7, 2008?

9         MR. LANTKA:  Correct.  That was my

10 statement on the record.

11        MR. STROJNIK:  Okay.

12 BY MR. LANTKA:

13   Q.    How many attorneys were employed at just

14 the Phoenix office?

15   A.    Okay.  With that clarification I must go

16 back to clarify that Davina Hughes was a paralegal

17 during my employment.

18   Q.    So it as your testimony that Davina Hughes

19 was a full-time employed paralegal during your

20 employment from October 1, 2007, to June 7, 2008?

21   A.    Yes.

22   Q.    You cannot testify if she was on any type

23 of work transfer program or work study program as and

24 ex-Veteran and in an unpaid status during any of these

25 times?

1    A.    No, my understanding is that she was a
2  paralegal specialist during the time of my employment.
3  The position posted in or around March of 2008.  I
4  actually pulled that posting off of USA Jobs myself.
5    Q.    Let's go back.  Let's clarify this, then.
6  So Davina took a job that was posted in March 2008?
7    A.    The position was posted for Office of
8  Regional Counsel Region 19 in March of 2008.
9    Q.    Was Davina Hughes physically present in
10 the office at any time up to and including March of
11 2008 in any capacity?
12   A.    Yes, I am aware that she began in the
13 office approximately the beginning of March of 2008.
14   Q.    Was that, from your knowledge, was that in
15 an unemployed status?
16   A.    From my knowledge, her initial employment
17 with the office was in an unemployed status, voluntary
18 status.  I'm not sure whether paid or unpaid.
19   Q.    So when you say during the time of your
20 employment, you just mean that the two of you would
21 have crossed paths, that she would have entered the VA
22 regional counsel office Region 19 in March of 2008,
23 whereas you had been there since October of 2007?
24   A.    I had began my employment in October of
25 2007.  Ms. Hughes came into the office through, I

1 believe, the vocational rehabilitation program with VA

2 at the beginning of March.  Subsequent to that, a

3 position posted on USA Jobs, which was a paralegal

4 position.  I have to say I brought it to the attention

5 of Office of General Counsel because there were only

6 two designated paralegal slots in that particular

7 office.

8       Q.    What do you mean "brought it to the

9 attention of Office of Regional Counsel"?

10       A.    I e-mailed Michael Hogan and asked him if

11 he was aware that my paralegal position was posted and

12 I was still employed with the office.

13       Q.    Oh, I understand your testimony now.

14 You're referring to towards the end of your employment

15 that a USA Jobs posting was put on when you believed

16 that you had one of two allocated slots within the

17 office?

18       A.    March.  My employment ended in June.

19 We're speaking about the time frame of March of 2008

20 when a position was posted.

21       Q.    So is it your testimony that at some point

22 during your employment there were 3 full-time paid

23 paralegal positions?

24       A.    No, that was the purpose for my inquiry

25 with Michael Hogan.  There were only two designated

1  paralegal slots in the core office of Phoenix, Region

2  19.

3       Q.    Okay.  I think we're talking over each

4  other.  And I just want to get what your perception is.

5            MR. STROJNIK:  Why don't you start from

6  October 1, 2007, and proceed forward?

7  BY MR. LANTKA:

8       Q.    It seems to me that Davina Hughes, you

9  said, began in March of 2008, correct?

10      A.    Yes.

11      Q.    And you were still on the payrolls as

12  Region 19 in March of 2008?

13      A.    Yes.

14      Q.    So at some point, then, in the Phoenix

15 regional office, working there, irregardless of pay

16 status because we'll get that from payroll, were you,

17 Davina, and Norma Kaping?

18      A.    Yes.

19      Q.    Let's go back.  I had earlier asked how

20 many attorneys were employed in the Phoenix office

21 during your time period.  How many attorneys were

22 employed?

23      A.    Including Mark Romaneski, I believe five.

24      Q.    Who were the five?

25      A.    Bron Steinmetz.  Rona Lige.

```
 1               THE REPORTER:  Could you spell that?

 2               THE WITNESS:  Bron -- B-R-O-N --

 3    Steinmetz -- S-T-E-I-N-M-E-T-Z.

 4    BY MR. LANTKA:

 5        Q.    So we have Ron Steinmetz, Rona Lige --

 6        A.    Lige -- L-I-G-E -- Dana Heck, Maxine

 7    Romero, and Mark Romaneski.

 8        Q.    And paralegals, we have you and Norma.

 9    And I don't need to get into colloquy about Davina --

10    is it Davina or Davina?

11        A.    I believe Davina.

12        Q.    And support staff, we have Maria Worth?

13        A.    Maria Worth.  Also there's Rachel

14    Spelghatti.

15        Q.    What is Rachel's job?

16        A.    Administrative officer.

17        Q.    Anyone else?

18        A.    And Janet.  I'm not sure of what her last

19    name is.  She's the IT person.

20        Q.    Is January employed by regional counsel's

21    office or simply officed in the regional counsel

22    building?

23        A.    I believe she's an employee of regional

24    counsel's office.

25        Q.    On what do you base that belief?
```

1       A.    Or at least general counsel.  General

2   counsel's IT department operates out of Washington,

3   D.C.  So she may be classified as a General Counsel

4   employee stationed at the Regional Counsel office.  But

5   she's a Regional Counsel employee.

6       Q.    And on what do you base that belief?

7             Did she tell you that?  Did you have

8   access to her personnel file?

9       A.    It's consistent across the country.  In

10  Cleveland, Ohio, Paula was the IT person.  She was an

11  employee of Regional Counsel.

12      Q.    You said Paula.  I thought this lady's

13  name is Janet?

14      A.    I'm saying it was consistent across the

15  country.  I was aware of Paula, the individual in

16  Region 7.  Her status was a regional counsel employee

17  working in the IT department.

18      Q.    I'm sorry for not making eye contact with

19  you.

20      A.    That's okay.

21      Q.    Since this is a Title 7 case, I asked you

22  what is your perceived, what is your perception of the

23  racial identity of each person.  I'm going to ask you

24  and ask you their name.  Bron?

25      A.    I'm not sure -- I'm not sure.  Probably

```
 1   white.

 2           Q.    Okay.  Male?

 3           A.    Male.

 4           Q.    Rona?

 5           A.    White female.

 6           Q.    Dana Heck?

 7           A.    White male.

 8           Q.    Mark Romaneski?

 9           A.    I believe white male.

10           Q.    Maxine Romero?

11           A.    I believe Hispanic female.

12           Q.    We know you.

13                 Norma Kaping?

14           A.    White female.

15           Q.    Maria Worth?

16           A.    I believe white female.

17           Q.    Rachel?

18           A.    I believe white female.

19           Q.    And Janet?

20           A.    I believe white female.

21           Q.    With regard to the paralegals -- and I

22   want to talk about the entire region -- you, Norma,

23   Bonita -- is that her name?

24           A.    Bonita, yes.

25           Q.    And Bonita and Davina, do you have any
```

1    knowledge of their particular GS levels?

2         A.    No, I do not.

3         Q.    You do not?

4         A.    No.

5         Q.    Do you have any knowledge of Maria Worth's

6    GS level?

7         A.    No, I do not.

8         Q.    Do you have any knowledge of the position

9    title for Maria Worth?

10        A.    I believe legal assistant, but I do not

11   have any firsthand knowledge of that.

12        Q.    Again, position title, I assume you were a

13   representational paralegal?

14        A.    Yes, that's correct.

15        Q.    What was Norma?

16        A.    I'm not sure.

17        Q.    What was Bonita?

18        A.    I'm not sure.

19        Q.    What was Davina?

20        A.    I'm definitely not sure.

21        Q.    I'm going to talk about work allocation.

22   Similar line of questioning as we talked about in

23   Region 7.  Remember how we talked how Don would work

24   with Terry.  And I'm interested in how that happened in

25   Region 19.  So let's start with, you know, the triangle

1  working down.  In your own words, how was work

2  allocated among attorneys and paralegals in Region 19?

3          A.    Jeffrey Stacy was responsible for the

4  allocation of duties.

5          Q.    Just for the record, Jeffrey Stacy is?

6          A.    The assistant regional counsel.

7          Q.    So how would you describe, what's the

8  allocation of duties?

9          A.    Basically clarifying what your duties are

10 and making sure that the work is facilitated in an

11 efficient and effective manner.

12         Q.    When you refer to the term "duties", are

13 you speaking to types of types of tasks to which a

14 particular individual is assigned, or specific tasks?

15 For instance, you know, I work on med mal cases versus

16 this particular case.  When you say duties, what do you

17 mean, duties?

18         A.    I'm speaking in more general terms.  For

19 instance, I was aware that my duty was to work on

20 medical malpractice cases.  That is what I understood

21 my duties to be from the outset.  Jeffrey Stacy made

22 that clear.

23         Q.    Did you ever understand your duties to

24 work on any personnel issues?

25         A.    Not initially.  Prior to transferring.

1  But after I began my employment with Region 19, I

2  understood that I would have some involvement in labor

3  cases.

4       Q.    Is there any other type of materials that

5  you came to understand you would be involved in, any

6  type of tasks?

7       A.    Medical malpractice and labor is the two,

8  I think, main categories of tasks.

9       Q.    What about confidential disclosure,

10  confidential financial disclosures?

11       A.    Yes, that is another, that is a program

12  which I was also informed that I would be responsible

13  for.

14       Q.    Anything else?

15       A.    Basically anything that stemmed off of all

16  three of those programs.

17       Q.    Okay.  How many hospitals are the General

18  Counsel's office in Region 19 responsible to support?

19       A.    How many hospitals?

20       Q.    Uh-huh.

21       A.    From my understanding, three.  Three or

22  four.

23       Q.    Where are they?

24       A.    Of course VA Medical Center in Phoenix.  I

25  believe they have some involvement with VISN facility.

1              THE REPORTER:  What was that?

2              THE WITNESS:  VISN -- V-I-S-N.  Las Vegas

3    and also Albuquerque.

4    BY MR. LANTKA:

5         Q.    Is there one in Tucson?

6         A.    Yes, I'm sorry.  There is one in Tucson.

7    That was not my area.  So, again, I was only employed

8    for a few months, actually eight months.  That was not

9    my area.  There is a facility in Tucson I believe that

10   was assigned to Maxine Romero.

11        Q.    When you say "my area", that is a

12   excellent segue.  I could have passed you a note.

13              What do you mean by my area?  During the

14   time of your employment with Region 19 were attorneys

15   and paralegals assigned to particular hospitals or

16   particular duties?  How were things divvied up?

17        A.    On paper that was supposed to be the idea,

18   but --

19        Q.    What was supposed to be the idea?

20        A.    There was supposed to be a

21   paralegal/attorney assignment.  A paralegal was to be

22   assigned to at least two attorneys in support of

23   facilities.

24        Q.    So each hospital for all the junk coming

25   out of that hospital was supposed to get two attorneys

1  and one paralegal?

2          A.    Yes.

3          Q.    Which hospital were you assigned to?

4          A.    To VA Medical Center in Phoenix.

5          Q.    What attorneys were assigned to that

6  hospital?

7          A.    Dana Heck.  And also I was assigned to Las

8  Vegas, which a Bron Steinmetz.

9          Q.    So Phoenix and Vegas were one group?

10         A.    Well, Vegas is a small facility so it was

11  lumped together, and Bron Steinmetz actually covered

12  that particular area.

13         Q.    Phoenix/Vegas were Dana and Bron.  And you

14  were their paralegal?

15         A.    Yes.

16         Q.    Where did Norma and Maxine fit in?  Where

17  were they assigned?

18         A.    I'm not sure where Norma fit in, but

19  Maxine was assigned to Tucson.

20         Q.    Were there any other attorneys assigned to

21  Tucson?

22         A.    No.

23         Q.    You had stated in Region 7 you were

24  working independently being that you would handle med

25  mal cases by yourself.  Did you have -- how was work

1  allocated in Phoenix?  Was it independent work,

2  attorney support work?  How was that?

3        A.    I took on more or was assigned a support

4  role.  So I was operating more in a support capacity.

5        Q.    What kind of tasks were given to you in a

6  support capacity?

7        A.    Basically I worked with an attorney to

8  complete any assigned tasks that were given to me by

9  that attorney.  And that was unofficial.  Officially, I

10 was -- as I understand it, I was not supposed to be

11 working, taking on that individual's duties or

12 completing tasks that were assigned to that attorney.

13 But I was to complete tasks in a support role.

14        Q.    Let's talk about officially and

15 unofficially.  What is your basis, what do you mean

16 officially your duties were?

17        A.    From what is in writing, from what I

18 understood, I would be operating in a support role but

19 actually handling my own cases as well.

20        Q.    What writing are you referring to?

21        A.    There was a minutes, there were minutes of

22 a meeting that occurred during the time I was in new

23 employee orientation during which time there was

24 somewhat of a reorganization of the structure of

25 paralegals and attorney assignments.

1        Q.    So what was put in writing was there was a

2   meeting when you started?

3        A.    Uh-huh.

4        Q.    In which they -- who is they?

5        A.    Jeffrey Stacy and Mark Romaneski, I

6   believe.  I was in new employee orientation.  I was not

7   afforded the opportunity to be present because I was

8   scheduled to be out of the office that week.

9        Q.    So your knowledge of it is through the

10  minutes?

11       A.    Through the minutes.

12       Q.    And is that the meeting where they divvied

13  up hospital/attorney classifications?

14       A.    Apparently.

15       Q.    So you said officially you had your own

16  work and being a support role?

17       A.    Uh-huh.

18       Q.    What constitutes your own work?

19       A.    Assigned cases, cases that were

20  specifically assigned to me.  That would be my

21  caseload.

22       Q.    And then the support role, your official

23  duties would be supporting Dana and Bron?

24       A.    That's what I understood it to be.

25       Q.    Anything else?

1        A.    The Confidential Financial Disclosure
2   program, which is a program in and of itself, and one
3   that is normally and consistently handled by a program
4   paralegal.
5        Q.    What is the confidential disclosure
6   program?
7        A.    It is basically the ethics reporting
8   program for the Department of Veteran's Affairs.
9   Individuals are identified who are required to file
10  during the ethics filing season.  And they are required
11  to report any conflicts, things of that nature.
12       Q.    Is it a -- is it more or less your assets,
13  mutual funds, things like that?
14       A.    Yes.
15       Q.    And does it come to you on a form?
16       A.    At that time it did.
17       Q.    What do you do with the form once you get
18  it?
19       A.    Actually start a case file and indicate
20  that that individual has filed, and also follow up as
21  to any deficiencies in their form filing, and also make
22  clear like a counseling.  I would give them what was
23  required of them if they weren't clear as to what was
24  required under the ethics rules and regulations.
25       Q.    So in the entirety, though, its the

1    full -- I mean, there's people at the VA that aren't

2    required to do CFDs, of course.  So out of the people

3    that are in Region 19, you would get their form.  What

4    would you do if it was hundred percent correct?

5            A.    They would actually be marked as filing

6    and complete.  If there were any conflicts that I

7    identified, I would send out the form to them as to

8    what those conflicts were and what they needed to

9    supply in order to clear up the issue.

10           Q.    How big is this form?

11           A.    It varied.  Some people were required to

12   complete the short form and others had to do the long

13   form.

14           Q.    How big is the long form?

15           A.    Approximately four or five pages.

16           Q.    When you say if it's a hundred percent

17   complete and you close the file, what does that consist

18   of?

19           A.    It consisted of making an entry into the

20   case tracking system, and closing out that filing.

21           Q.    Okay.  How long would that take?

22           A.    I'm not sure.  In connection with my other

23   duties since that was a stand alone program that could

24   have been a full time job, it basically took, could

25   take a day, could take sometimes an hour depending on

1  what the priorities were.

2      Q.    I asked a poor question.  Nothing else to

3  do.  You have perfect file right here.  Enter it and

4  close it.  Go.  How long would that take?

5      A.    You mean from the time it hits my desk?

6  The review process was done by myself as well.  So

7  we're not just talking about mechanically closing a

8  file.  I had to analyze the information.

9      Q.    Would it take eight hours to analyze a

10  CFD?

11      A.    Again, in connection with my other duties

12  and tasks, which were voluminous, it could take, vary,

13  it was based on varied time.

14      Q.    I understand prioritizing and my phone

15  rings off the hook and e-mail.  In a vacuum, how much

16  time would it take you to read a CFD and check it for

17  errors?

18              MR. STROJNIK:  Form.

19              THE WITNESS:  Again, it depended on the

20  form.

21  BY MR. LANTKA:

22      Q.    Long form, just on average.  How long do

23  you believe on average it would take you to read a long

24  form and check it for errors?

25      A.    I would say -- this is just approximately

 1  because I don't even know if I was able to do it from

 2  beginning to end without interruption.

 3      Q.    We're pretending no interruptions.

 4      A.    I would say depending on the information,

 5  which this is all hypothetical because we don't know

 6  how many assets the individual is reporting, it could

 7  take 15 minutes, half hour to review the long form.

 8      Q.    So 15 minutes to a half hour.  And if it

 9  was perfect, how long would it take, hypothetical on

10  average, no interruption, how long would it take to

11  enter it into GC Laws and close the file?

12      A.    I would say approximately another 15

13  minutes to close it out.

14      Q.    Okay.  If you founder errors in that long

15  form, hypothetical, no interruptions, if you found some

16  errors, how long would it take you to send out a form

17  to the individual to say, you know, "Hey, Larry, you

18  need to tell me about your mutual funds."

19      A.    It depended, because a lot of times I

20  would actually initiate a telephone call to the

21  individual and/or an e-mail.  So it, of course,

22  depended upon their timeliness in getting back to me.

23  Sometimes the filers did not respond quickly.  And it

24  stayed at that status for approximately a week until

25  they can get back to me.

1        For example I know one individual that

2   comes to mind who was a contact person.  He was tasked

3   with gathering all the forms.  He basically took about

4   a week to two weeks to get back to me any time there

5   was a problem.

6        Q.    Now, when I used to bill time, I wouldn't

7   be billing time for that week that it took Larry to get

8   back to me.  I would bill time for the time it took me

9   to do my e-mail or phone call, and I would stop my

10  clock.  And when he got back to me, I'd start the clock

11  again.  So would GC Laws reflect the time you started

12  and stopped the clock, or would GC Laws reflect that

13  week period you were waiting for Larry to call you

14  back?

15       A.    Since that's a hypothetical question, I

16  can tell you there were periods of time where the block

17  was longer depending on where I was roped off, if that

18  answers your question.

19       Q.    No, it doesn't.  I understand that GC Laws

20  enters a date, you know, file opened, file closed.

21  Does GC Laws reflect the amount of time spent working

22  on a file, or does it just reflect open/closed?

23            MR. STROJNIK:  Form.

24            THE WITNESS:  It should reflect the time

25  actually worked on the file or on the program.

1   BY MR. LANTKA:

2        Q.    And to clarify that, when I say reflecting

3   the time worked on it, does it reflect the time, you

4   know, you're reading it, you're making that e-mail, or

5   when I say reflect the time does it reflect the time

6   you're waiting for that e-mail to get back?  How would

7   that look on a GC Laws entry?

8        A.    This is my memory.  We're talking about

9   roughly 180 filers.  So it depends on whether I had a

10   stack of CFD filers or if I just had one individually.

11        Q.    Again, you're writing out your GC Laws on

12   a pad -- are you okay, Pete?  Going to have a

13   conniption fit or something?  Are you okay?

14             MR. STROJNIK:  Proceed, Counsel.

15   BY MR. LANTKA:

16        Q.    You're writing out your GC Laws on a pad.

17   And so I haven't done this.  When I was an associate I

18   wanted to bill as much time as I could, so I would say

19   phone call, ten minutes, e-mail, five minutes.  Done.

20   And then he calls me back.  Received phone call, 5

21   minutes.  Is that how would you keep track of it, or

22   would you just write "working on file" and nothing

23   else?  How would you keep track of it on your pad?

24        A.    I would keep track of it on my pad based

25   on whether or not I was working on a program that

1 entire day.  I would keep track of how many entries

2 that I made so the blocks of time will be different.

3 There are some days I devoted four hours to CFD

4 program.  There are some days I worked entirely and

5 exclusively on the CFD program.

6      Q.    When you devoted four hours to the CFD

7 program, about how many cases would you work on in

8 those four hours?

9      A.    Approximately -- it depends, because we're

10 talking about providing reports to the facilities.

11 Following up with them on status of their filers.  It's

12 not limited to the actual form filings themselves.  But

13 it's limited to follow-up conversations and

14 coordination of the program.

15      Q.    About how many cases -- so we're talking

16 some will take five minutes, some will take 45 minutes.

17 On average in a four-hour time span, how many names,

18 how many files would you run across?

19           MR. STROJNIK:  Asked and answered.

20           Move on, Counsel.

21 BY MR. LANTKA:

22      Q.    How many names would you run across?

23      A.    I'm not sure.  Again, it depends.  It's

24 very difficult to gauge if they were long and short

25 filers if I was dealing with -- and I had all the

1  facilities.  So it was not based on paralegal

2  assignment.  I was responsible for all facilities.

3       Q.    I understand --

4            MR. STROJNIK:  Let her finish, Counsel.

5  You're becoming visibly frustrated.  Let her finish,

6  please.

7  BY MR. LANTKA:

8       Q.    I'm going to withdraw that question.  I

9  just want to know, on average, how many individuals in

10  an individual file you would have touched in a

11  four-hour period.

12            MR. STROJNIK:  That's a ridiculous

13  question.

14            MR. PHILLIPS:  (Indiscernible).

15            THE WITNESS:  Again, I'm not sure how to

16  answer that.  There were numerous filers.  I was

17  responsible for the entire region for CFD.  It was not

18  separated by paralegal/attorney assignment.  I handled

19  every one.  So it was voluminous in nature.  I can give

20  you an estimate, but there are so many different duties

21  that are involved.

22  BY MR. LANTKA:

23       Q.    I just want an estimate.

24       A.    Within four hours, approximately with

25  follow-ups and just give me a scenario of what is

1  involved.  Follow-ups, coordination.

2        Q.    Let's say in four hours, there's a handful

3  that could be cut and dry.  Yesterday I worked on 16

4  different cases.  I spent eight hours preparing for

5  this.  I went home.  I wrote a Motion to Dismiss, and I

6  handled phone calls in multiple other matters.  My time

7  pad reflected, I think, 16 different cases.

8             So if you asked me what I worked on

9  yesterday, I'd say 16 things.  One took eight hours and

10  one took less time.  So I would say 16.  And I would

11  average that out.  The next way I worked on one case,

12  and the next day I worked on 32 cases.  So within a

13  month I average I work on nine a day.  I can't give you

14  statistical evidence of that.  That's what I'm looking

15  for.

16        A.    With all due respect, Mr. Lantka, we're

17  talking over two years ago, not yesterday.  So it's

18  hard for me to actually pinpoint what it is you're

19  talking about what is involved in me handling a number

20  of cases.  It can range from me coordinating with the

21  appointment agency official.  It can range from me

22  actually touching each and every ethics filing.  It can

23  range with me doing follow-up e-mails.  So I don't want

24  it to, you know --

25             MR. STROJNIK:  Let her finish, Counsel.

1              THE WITNESS:  I don't want to put a number

2     on it when it may not be accurate because we're dealing

3     with so many variables.

4     BY MR. LANTKA:

5          Q.    So we're going to move on.  But for your

6     deposition testimony we're going to use at trial, you

7     cannot give me an average number of CFDs that you would

8     work on in a work day?

9          A.    No, because it was not just for Phoenix.

10    The facility that I was assigned to --

11         Q.    I mean everything.  When I say CFDs, I

12    don't care.  I know where it's from, so I don't care

13    where they're from.  And so for your deposition under

14    oath, you -- it is impossible for you to tell me on

15    average how many CFD cases you would have worked on?

16              MR. STROJNIK:  Asked and answered.  And

17    Counsel, if you continue to interrupt my client I'm

18    going to pull her and we're going to walk out and we'll

19    file a motion.  Let her finish.  I know you're becoming

20    frustrated.  I can tell.  I can tell.  Let her finish.

21              MR. LANTKA:  Would you read back my last

22    question?

23         (Whereupon, the requested portion of the record

24    was read.)

25              MR. STROJNIK:  Asked and answered.

1  Unintelligible.

2  BY MR. LANTKA:

3      Q.    I'm going to try one more time.  Well, I'm

4  going to try it until we get a yes or no, and then

5  we'll go to lunch.

6              For your testimony today, you -- is it

7  that you cannot tell me an average number of CFD files

8  for all facilities that you would have worked on in a

9  day because of the variances in what you stated

10  earlier?

11             MR. STROJNIK:  Asked and answered,

12  harassing.

13             THE WITNESS:  I cannot.  I cannot

14  accurately answer that question.  I'm not sure.

15             MR. LANTKA:  Okay.  Let's go to lunch.

16             What time is it?  I don't have my watch.

17             THE VIDEOGRAPHER:  Off the record at 12:47

18  p.m.

19        (Whereupon, a recess was taken from 12:47 p.m.

20  to 1:53 p.m.)

21             THE VIDEOGRAPHER:  Back on the record at

22  1:53 p.m.

23  BY MR. LANTKA:

24      Q.    Okay.  We're back from lunch.  We were

25  talking a little bit about duties in Region 19.  And

1   again, Vanessa, for this next series of questions,

2   unless I state otherwise, the time frame we're talking

3   about is always going to be from October 1, '07, to

4   June 7, '08, unless you want to talk about otherwise.

5   We'll clarify that.  Is that acceptable?

6        A.    Yes.

7        Q.    I want to talk a little bit about

8   telecommuting.  Did you have a telecommuting

9   arrangement in Cleveland when you were at Region 7?

10       A.    Yes, I did.

11       Q.    Could you tell me a little bit about that?

12       A.    From my recollection on two separate

13  occasions and at my request or if my schedule dictated,

14  I telecommuted.

15       Q.    When you say two separate occasions, what

16  do you mean?

17       A.    Well, I telecommuted sort of as a

18  reasonable accommodation when I was bed ridden with

19  pregnancy.

20       Q.    And what was the other time?

21       A.    I actually broke my foot,

22  nonweight-bearing break, and I telecommuted during that

23  period of time.

24       Q.    So as far as telecommuting in Cleveland,

25  it was more couldn't come to work; is that fair?

1     A.    Well, actually it was available.  I did

2 not take advantage to that because I live so close to

3 the office.  So I was available to telecommute, but I

4 did not take advantage of that Work Life program.

5 Okay.

6     Q.    Now you telecommuted in Phoenix for a

7 time; correct?

8     A.    Yes.

9     Q.    Again, this is a big, you know, upside

10 down triangle question.  If your own words, how did the

11 telecommuting arrangement come about?  Who brought it

12 up?  What time, just in general?

13     A.    Norma Kaping had already been

14 telecommuting for quite some time, I understood.  From

15 a conversation I had with Mark Romaneski prior to my

16 transfer, she was telecommuting because she lives in

17 Sun City, I think, he mentioned.  And she began

18 telecommuting prior to my transfer.  At that particular

19 time he said to me you will also be eligible for

20 telecommuting.

21     Q.    And was that one of the conversations on

22 the phone before you started?

23     A.    Yes.

24     Q.    Was any agreement between you and Mark

25 entered into verbally in those conversations that you

1    actually would telecommute?

2           A.    No, as a matter of fact, that was the last

3    conversation I had with Mark Romaneski regarding

4    telecommuting.

5           Q.    When did you enter into an agreement with

6    a management official at Region 19 regarding

7    telecommuting?

8           A.    From my recollection, I had a conversation

9    with Jeffrey Stacy.  We were discussing my performance

10   over the telephone.  It was approximately in late

11   October, early November.  He was pretty much going over

12   my caseload, what he saw in the time entries, and

13   discussed with me options that would be available to me

14   and the Work Life.  Program, telecommuting was one of

15   those things we discussed.

16          Q.    And when you say October, that would be

17   after you started?

18          A.    Yes, beginning of October, end of

19   November.

20          Q.    So when you came into the VA Region 19,

21   you were -- is it a fair statement until a

22   telecommuting arrangement was reached, you were at the

23   general counsel's office five days a week?

24          A.    I was at the Phoenix Regional Counsel's

25   Office five days a week.

1          Q.    I'm going to mark this as Exhibit 5.

2          (Whereupon, Deposition Exhibit No. 5 was marked

3     for identification.)

4                MR. STROJNIK:  Is there a question

5     pending?

6                MR. LANTKA:  I'm waiting for your client

7     to read the document.

8                THE WITNESS:  I read it.

9     BY MR. LANTKA:

10         Q.    Do you recognize this?  This is, for the

11    record, this is an e-mail Bates numbered Hall-VA-471.

12    It is a printout of an e-mail from Vanessa Hall to

13    Jeffrey Stacy.  The subject:  "Request".  The date on

14    the document is Monday, November 19th, 2007, 12:46,

15    p.m.

16               Ms. Hall, do you recognize this e-mail?

17         A.    I have to say I do not recall this exact

18    e-mail.  And this is -- I don't recall this exact

19    e-mail, I have to say.

20         Q.    Do you have any reason to believe that

21    this was not from you to Jeffrey Stacy?

22         A.    I do not recall this exact e-mail.

23         Q.    Then aside from talking about when you

24    sent the e-mail, I just want to talk a little bit about

25    the contents of it referenced in.  And, again, as

1  before this would be a hypothetical, then, assuming if

2  you made these statements.

3          In the second paragraph you state that,

4  "Jeff, my schedule will become increasingly erratic in

5  January as I registered for college again."  This would

6  be, I assume, January of '08.  Is this the Phoenix

7  College?

8          A.    No, actually this was Rio Solado, which I

9  did not actually go to, start classes there.  I

10  registered.  There was a registration problem.  I did

11  not attend.

12          Q.    What classes were you trying to take at

13  Rio Solado?

14          A.    I believe the class was either history or

15  something to that effect.  I can't recall.

16          Q.    Why did you want to take a history class

17  in 2008?

18          A.    I still was attempting to complete my

19  degree in legal studies.

20          Q.    The unsuccessful registration, was that

21  for an online class or traditional class?

22          A.    I believe I contemplated physically going

23  to the college, and then they said they had limited

24  online courses available.  So at this particular time

25  it was tentative, but I recognized there would be some

1  difficulties in my schedule.

2       Q.    In addition to Rio Solado College during

3  your employment at Region 19, did you attempt to sign

4  up for any other college classes at any other

5  institution of higher learning?

6       A.    No.  I'm not -- I can't recall.  Like I

7  said, I did Phoenix University at one particular time.

8  But I'm not sure if it fits into this time frame.

9       Q.    Okay.  Well, then let's just -- let's

10 break out of the time frame.  We talked before when I

11 asked any place you had attended.  You said you

12 partially completed the class at Phoenix.  This Rio

13 Solado that you applied to but didn't go in.

14            Any other classes?  I just want since you

15 moved to Phoenix up until the present time irregardless

16 of time frame, any other institutions of higher

17 learning, institutions, colleges that you applied to?

18      A.    I contemplated taking another class at

19 University of Phoenix.  And I recall that because I

20 recall the individual's name I spoke to.  I'm not sure

21 how far got in the registration of that, but I never --

22 if I initiated a course or if I was accepted, I never

23 completed that course due to the demands of my

24 position.

25      Q.    So that's a second course you may have

1  started at Phoenix, the Rio Solado.  Anything else?

2       A.    No, nothing.

3       Q.    After you read this, you said you didn't

4  recall.  Did this refresh your recollection in any way?

5       A.    Well, with regard to the schooling, yes,

6  it did refresh my recollection with regard to

7  registering online and trying to complete a course at

8  South University.  Of course, there were registration

9  difficulties and I did not even start that class.  But

10 there was also an attempt to register at University of

11 Phoenix.  Again, it's because of the demands of my

12 position I was not able to commit to course work.

13      Q.    You said South University.  What college

14 are you referring?

15      A.    That's Rio.  I believe they go by South

16 University, Rio Solado.  I'm not sure.  I may have

17 botched the name.

18      Q.    The next document we're going to mark as

19 Exhibit 6.

20      (Whereupon, Deposition Exhibit No. 6 was marked

21 for identification.)

22 BY MR. LANTKA:

23      Q.    For the record, this is a document Bates

24 stamped Hall-VA-6032 through 6034.  Document entitled

25 "Flexiplace Work Agreement".  Ms. Hall, just take a

1    second to review it.  You don't have to devour the

2    text.  I just have a few limited questions.

3         A.    Okay.

4         Q.    Just to verify the document, last page

5    Bates No. 6034.  Do you recognize, is that your

6    signature?

7         A.    Yes, it is.

8         Q.    Is it fair to say this was signed by you

9    on February 7, 2008?

10         A.    Yes.

11         Q.    Do you recall signing this document?

12         A.    Yes, I do.

13         Q.    Can you tell me the context in which you

14    signed this?

15         A.    I believe this was an increacion (sic) of

16    days of telecommuting.

17         Q.    My review of the record, and I just want

18    to talk about this.  Generally, I believe -- strike

19    that.

20              How many telecommuting agreements did you

21    enter into while working at Region 19?

22         A.    This was the second.

23         Q.    Tell me about the first.  When was that

24    entered into?

25         A.    I believe November or December of 2007.

1      Q.    And what were the terms of that?

2      A.    I believe I was to telecommute two days

3   per pay period.

4      Q.    And a pay period is 15, 14-day period?

5      A.    It's actually 10 business work day period.

6      Q.    What days did you telecommute during that

7   period?

8      A.    I'm not sure.  I think they kind of were

9   flexible, Tuesday or Wednesday.  And this is just by my

10  recollection.

11     Q.    So you entered into that, started in

12  October.  Late October you talk with Jeff about

13  telecommuting.  And then November was the first

14  agreement.  Is that a fair recollection?  Am I correct?

15     A.    That's my recollection.

16     Q.    Okay.  And then this one, February of '08,

17  how was this different?  In what ways is this agreement

18  different than the initial agreement?

19     A.    This agreement was per Jeffrey Stacy's

20  request.  He stated that at that particular time I was,

21  my productivity was high.  He had no issues with my

22  performance, and an additional day telecommuting was

23  not a problem for him.

24     Q.    So you went from two days to three days?

25     A.    That's correct.

1    Q.    Did you request at any time, did you

2  request four or five days telecommuting?

3    A.    No.

4    Q.    So it's your testimony today that Jeffrey

5  Stacy by himself initiated the idea to increase your

6  telecommuting to three days?

7    A.    I believe I spoke to him about it.  He

8  said he had no problem with increasing the

9  telecommuting days.  He reviewed it.  He looked at my

10  productivity, and actually initiated the change.

11    Q.    How did you and Jeff reach the decision at

12  three days?

13    A.    That's Jeffrey Stacy's decision, not mine.

14    Q.    Now this has Mark Romaneski's signature on

15  it.  To your knowledge, what is Mark's capacity with

16  regard to telecommuting agreements?

17    A.    He is required to sign off on all

18  telecommuting agreements.

19    Q.    Negotiations, your discussions were with

20  your direct supervisor?

21    A.    First line supervisor.

22    Q.    So this is February.  At some point there

23  were issues related to your working at home.  When do

24  you first recall any problems being identified by

25  either you or management regarding telecommuting?

1          A.     When I brought to management's attention,

2     being Mark Romaneski specifically, that there were

3     disparities in my workload.

4          Q.     Okay.  Get a time line.  When did that

5     happen?

6          A.     February 15th of 2008.

7          Q.     And believe it or not, I'm aware of that

8     date.  We're going to talk about it.  But I just want

9     to talk about telecommuting right now.  So on February

10    15th, what was your discussion with Mark regarding

11    telecommuting?

12         A.     I had no specific discussion with Mark

13    regarding telecommuting.  On February 15th, that is the

14    first day that I made management aware that there were

15    glaring disparities in my workload as compared to Norma

16    Kaping, the other paralegal in the office.

17         Q.     And trust me, we're going to beat that

18    like a dead horse.  That's a horrible analogy.  But I

19    want to talk about any problems with telecommuting.

20    February 15th was the first discussion about your

21    alleged work disparity.  But when did you first discuss

22    problems with telecommuting?

23         A.     February 19th, upon receipt of a memo

24    entitled "Paralegal Duties", I believe, and termination

25    of my telecommuting agreement.

1        Q.    Who terminated your telecommuting

2   agreement?

3        A.    Mark Romaneski.

4        Q.    Since we don't have the memo in front of

5   us, do you recall roughly the substance of that memo?

6        A.    Roughly.  He basically responded to my

7   e-mail, identifying disparities between mine versus

8   Norma Kaping, the other paralegal's duties, in that he

9   said that she was not required to provide support, even

10  thought it was clear from the minutes of the meeting

11  that occurred in October -- I believe October 15th of

12  2007, and ongoing discussions that we were all expected

13  to provide paralegal support.

14            So in that memo I recall that he addressed

15  that in saying that she was not required to provide

16  support because she had no time to do such.  And also

17  he went on further to terminate my telecommuting

18  agreement.

19        Q.    So from February 19th, 2008, until your

20  cessation of work on June --

21        A.    June 7th.

22        Q.    -- 7th, 2008, you did not telecommute at

23  all?

24        A.    I'm sorry.  What was the beginning date?

25        Q.    From 2/19/08 when you got the memo

1    terminating till your cessation in June, you did not

2    telecommute at all?

3          A.    No, telecommuting I get to input in Vista.

4    It goes by pay period.  So I had to complete those

5    rotations for which I was identified in the system as

6    telecommuting.  So I had to finish that rotation.

7    After the completion it was terminated.

8          Q.    How long was that rotation?

9          A.    I think it was input into the system as me

10   being an individual who was participating in a Work

11   Life program of telecommuting probably 1st or 2nd week

12   of March.

13         Q.    So you continued to telecommute until

14   March?

15         A.    Because it could not be terminated in the

16   system, yes.

17         Q.    Correct.  And you separated, again, in

18   June?

19         A.    Yes.

20         Q.    The telecommuting, it took place until

21   March.  Was that still three days a week, pursuant to

22   the agreement?

23         A.    Yes, it was entered into Vista again that

24   I was already designated as telecommuting.  On those

25   particular days it could not be backed out from the

1  system, so I had to complete those days as was entered

2  into Vista.

3       Q.    Were you ever prevented from telecommuting

4  until the termination of the current, of the second

5  agreement?

6       A.    It terminated itself upon completion of

7  the rotation.  As I stated, he believed he could

8  terminate my telecommuting February 19th by that memo,

9  but after discussions with the time keeper, it was

10 already put into the Vista system that I was

11 telecommuting and enjoying that Work Life privilege.

12 So I stayed on the telecommuting status per the entries

13 in Vista.

14      Q.    Is it your testimony that Mark's memo

15 stated he wanted to terminate it immediately, but he

16 couldn't because the time entry system reflected your

17 participation?

18      A.    In the Work Life program, yes.

19      Q.    All right.  Now we're going to go through

20 your current case.  And we're going to do a huge upside

21 down pyramid.  So I just want to ask for another brief

22 narrative.  In your own words, what is the basis of

23 your current case against the VA in Federal District

24 Court right now?

25           MR. STROJNIK:  Form, legal conclusion.

1            THE WITNESS:  Again, my case culminated in

2     several, from several complaints.  My complaints are

3     initially filed was based on disparate treatment and

4     retaliation for having engaged in protected activity.

5     BY MR. LANTKA:

6          Q.    So we have disparate treatment and

7     retaliation.  Anything else?

8          A.    Which was the termination of

9     telecommuting, to start with.

10         Q.    Anything else?

11         A.    And also the adverse actions.

12         Q.    Okay.  That's a term of art.  And that

13    scares me.  What adverse actions?

14         A.    Specifically the denial of within-grade

15    increase, and also the reprimand.

16         Q.    All right.  I'm going to list them:

17    Disparate treatment, which is telecommuting.  Is

18    workload included in disparate treatment as well?

19         A.    Work is an aspect of the disparate

20    treatment.

21         Q.    So disparate treatment constitutes a

22    workload, telecommuting.  Anything else that makes up

23    disparate treatment?  Anything else that you feel that

24    non-African-American paralegals --

25         A.    I was held to a different standard in

1  terms of performance and treatment.

2      Q.   Anything else?

3      A.   No, but if I can reserve the right to go

4  back if I think of additional.

5      Q.   You can always do that.

6      A.   Because, as I stated, there is a lot of

7  different claims that culminated in us being here

8  today.

9      Q.   Good.  And I'm going to ask an awesome

10 question at the end of the day to add anything else,

11 too.  So don't worry about it.

12        We have disparate treatment so far that

13 you constitute as being held to a different standard

14 than non-African-American paralegals; workload, which

15 I -- is that part and parcel to different standard?

16     A.   It's part of the disparate treatment.

17 It's not independent.

18     Q.   And also within disparate treatment is the

19 telecommuting.  You believe you have a claim for

20 retaliation.  And you believe the other adverse action

21 included the denial of your within-grade increase?

22     A.   Yes.

23     Q.   And the reprimand issue?

24     A.   Yes.

25     Q.   Anything else?

1          A.    Constructive discharge.

2          Q.    Okay.

3          A.    And interference with perspective

4    employment, not limited to the FBI.

5          Q.    Okay.  Anything else?

6          A.    That's all that comes to mind.

7          Q.    We're not going to go through this piece

8    by piece.

9               MR. STROJNIK:  We are, or we're not?

10              MR. LANTKA:  50/50.  This is a copy of the

11   Complaint.  We're going to mark it as No. 7.

12         (Whereupon, Deposition Exhibit No. 7 was marked

13   for identification.)

14   BY MR. LANTKA:

15         Q.    Vanessa, again, you don't have to read

16   this, don't have to read it with a fine toothed comb.

17   But just keep it separately because I'm going to refer

18   to separate paragraphs in this for the rest of the dep.

19              Have you seen this document before?

20         A.    Yes, I have.

21         Q.    Now, this was filed by your prior counsel,

22   Mr. Simms, correct?

23         A.    Yes.

24         Q.    Did you take any part in drafting or

25   review of this document?

```
 1                    MR. STROJNIK:  Objection; attorney/client
 2    privilege.
 3                    MR. LANTKA:  I'm not asking any
 4    communications between you and Blake.
 5    BY MR. LANTKA:
 6         Q.    Did you draft this document or review any
 7    drafts physically.
 8                    MR. STROJNIK:  Attorney/client privilege.
 9                    Do not answer that question.
10    BY MR. LANTKA:
11         Q.    Outside of Mr. Blake, did you write this
12    document?
13                    MR. STROJNIK:  Objection; attorney/client
14    privilege.
15                    Do not answer that question.
16                    MR. LANTKA:  Could you please mark that in
17    the record?
18                    THE VIDEOGRAPHER:  22:55.
19                    MR. LANTKA:  We're going to meet and
20    confer right now in case I file a Motion to Compel.
21                    Mr. Strojnik, could you please --
22                    MR. STROJNIK:  Off the record.  Off the
23    record.
24                    THE VIDEOGRAPHER:  Can we go off the
25    record?
```

1            MR. LANTKA:  Sure.

2            THE VIDEOGRAPHER:  Off the record at 2:16.

3        (Whereupon, a recess was taken from 2:16 p.m. to

4   2:17 p.m.)

5            THE VIDEOGRAPHER:  Back on the record at

6   2:17 p.m.

7            MR. LANTKA:  Just went off the record.  I

8   had asked a question regarding the capacity that

9   Ms. Hall engaged in in drafting the complaint.  She was

10  instructed not to answer.  Mr. Strojnik has informed me

11  that he will not meet and confer pursuant to Rule 37.1

12  on the record, informing me in summary that my question

13  is an indirect attempt at obtaining a privileged

14  attorney/client communication.  And we have marked it.

15            MR. STROJNIK:  That's an inaccurate

16  statement.  We did meet and confer, and you did not

17  accurately reflect the content of our meet and confer

18  off the record.

19            MR. LANTKA:  Would you care to clarify,

20  Counsel?

21            MR. STROJNIK:  Not on the record.

22            MR. LANTKA:  We're going to move on,

23  Vanessa.

24  BY MR. LANTKA:

25        Q.    I just have one more question not

 1  regarding communication.  Why did you terminate your

 2  relationship with Mr. Simms?

 3              MR. STROJNIK:  To the extent that calls

 4  for communications between you and your former counsel,

 5  do not answer the question.

 6              THE WITNESS:  I sought other legal

 7  counsel, which was my right.

 8  BY MR. LANTKA:

 9      Q.    Okay.  Not worth the fight.

10              I want to turn to Paragraph 205 -- 204

11  through 205 at Page 16.  These paragraphs relate to a

12  request for transfer that Mr. Hogan, Mike Hogan, you

13  state, denied.  First off, let's talk about this.  Who

14  is Mike Hogan?

15      A.    Michael Hogan is, I believe, deputy

16  general counsel.

17      Q.    And where is he -- again, we're still

18  always in that time period.  Where was he within the

19  supervisory food chain?

20      A.    I believe he was, he is Mr. Romaneski's

21  direct first line supervisor.

22      Q.    We talk about transfer.  Why did you ask

23  Mr. Hogan for a transfer?

24      A.    After -- and I have to speak about this

25  chronologically so that there won't be a gap in leading

1    up to this point.  On March 21st, after receiving a

2    reprimand that was baseless and having my within-grade

3    increase denied and experiencing health issues as a

4    result of the stress that culminated from the

5    environment, I went on leave, which commenced close of

6    business March 21st, 2008.

7         Q.    What leave did you go on?

8         A.    I used a combination of leave due to the

9    fact that I was undergoing treatment by a cardiologist,

10   had for the first time in my life experienced

11   hypertension while previously been hypotensive.  And I

12   went out of the office on leave.  I had to use my leave

13   and a combination of leave in order to do that.

14        Q.    After 3/21/08, okay.  So we have that in

15   context.  Next?

16        A.    Okay.  I was out of the office, had

17   applied -- and there is a disconnect here, so bear with

18   me.  I had applied for a position at the FBI, was

19   extended a conditional offer of appointment.  I was

20   hired as a conditional offer by the FBI, and was told

21   that pending my background I would, you know, be

22   receiving work from them whether or not I would have a

23   start date.

24             In the interim I asked how long would that

25   take.  And the individual responded, "Should take maybe

1  a couple of weeks to a couple months before we know.

2  You previously had a top secret clearance.  We don't

3  anticipate any problems."  That's what I was told.

4           Your question, again, focusses on what --

5  I'm sorry.

6       Q.    No, no, no.  Well, nothing exists in a

7  vacuum aside from my prior questions before lunch.  I'm

8  kind of breaking down your claims.  So one is failure

9  to transfer.  And so I asked the context in which you

10  and Mike were conversing, whether e-mail or phone or in

11  person about a transfer.

12       A.    Actually both, telephonically and via

13  e-mail we conferred regarding a possible transfer or

14  detail to another office versus going back to Region

15  19.

16       Q.    Right.  So as of 3/21/08, you were having

17  health issues?

18       A.    Uh-huh.

19       Q.    And you did not want to return to Region

20  19.  Who approached who about requesting a transfer:

21  You or Mr. Hogan?

22       A.    I believe that in my discussions with

23  Mr. Hogan I posed it as a possibility.  After having

24  requested an internal reassignment to another team of

25  attorneys, which would have been a solution internally

 1  without having to approach Michael Hogan, and that not

 2  being properly pursued, I approached him with regard to

 3  a possible detail or reassignment to Washington, D.C.

 4  temporarily.

 5       Q.    Had you already initiated an EEO action at

 6  this point in time?

 7       A.    Yes, as a matter of fact, I believed that

 8  Mr. Romaneski was aware on February 15th that I visited

 9  the EEO manager at the VA Medical Center in Phoenix,

10  and he became aware on that date that I had engaged in

11  protected activity.

12       Q.    Again, you're fantastic because I have a

13  whole slew of questions on that as well.  Now prior to

14  discussions with -- I'm going to call him Mike.  Is

15  that easier?  Prior to discussions with Mike regarding

16  a transfer, you had issued, you had instituted the EEO

17  action; is that chronologically correct?

18       A.    Months prior to that particular instance.

19  But there was another request for an internal

20  reassignment to another team of attorneys that preceded

21  that request.

22       Q.    Okay.  Did -- was Mike aware of your

23  pending EEO action at the time you were discussing the

24  transfer with him?

25       A.    Yes.

1      Q.    Was the transfer -- not the internal

2  one -- was the transfer out of Region 19 discussed in

3  the terms of settling your administrative claim?

4      A.    It was discussed in the contents of

5  settlement at an earlier date.  I believe it was around

6  May of 2008.  And then ultimately after the offer was,

7  the conditional offer of appointment was rescinded, I

8  engaged in further discussions with Michael Hogan

9  regarding a possible temporary detail to his office

10 until I can secure other employment.

11     Q.    So I talked about that.  I want to talk a

12 little bit -- go back four seconds.  So since this was

13 talked about with regard to the EEO claim, you never

14 did a formal request for transfer or anything like

15 that, did you?

16     A.    There is no such thing as a formal request

17 for transfer.  I sent an e-mail to Michael Hogan with

18 regard to the internal transfer.  I sent an e-mail to

19 Mark Romaneski and also Jeffrey Stacy requesting

20 reassignment to another team of attorneys.

21     Q.    With regard to the external transfer, the

22 Mike Hogan transfer, how were you availed to the fact

23 that the transfer was denied?

24     A.    He said, "I wouldn't impose you on any

25 other office."

```
 1          Q.     Who is he?

 2          A.     Michael Hogan.

 3          Q.     And how was this information relayed to

 4    you?

 5          A.     Via telephone.

 6          Q.     Do you recall what day?

 7          A.     Yes, approximately June 4th of 2008.

 8          Q.     June 4th, 2008.  Who initiated that call?

 9          A.     We kind of went back and forth.  He sent

10    me an e-mail saying that he would like to discuss some

11    matters with me at one point.  So I'm not sure on that

12    particular day who initiated the call.  But we had been

13    going back and forth discussing possible resolutions.

14          Q.     And within the discussion of possible

15    resolutions, he stated, "I will not impose you on

16    anyone"?

17          A.     That's correct.

18          Q.     Were there any discussions of a transfer

19    afterwards?

20          A.     No.

21          Q.     With Mike?

22          A.     As a matter of fact, that conversation, I

23    believe he made it clear that he was not going to

24    transfer me or detail me anywhere.

25          Q.     This is going to be marked No. 8.
```

```
 1        (Whereupon, Deposition No. 8 was marked for
 2   identification.)
 3   BY MR. LANTKA:
 4        Q.    For the record, the Bates number on this
 5   document is Hall-VA-4524 through 4527.  And a brief
 6   description.  It's an e-mail string.  There's multiple
 7   e-mails, but the top page of the document is dated May
 8   23, 2008, at 2:51 from Vanessa Hayes at a yahoo.com
 9   account to Michael Hogan.  Subject: "RE: Settlement
10   Agreement".
11             MR. STROJNIK:  I don't see where it says
12   Vanessa Hayes.
13             MR. LANTKA:  V. Hayes.
14   BY MR. LANTKA:
15        Q.    And, again, we're not going to go through
16   this page by page, Vanessa.  So just briefly look it
17   over.
18        A.    Okay.
19        Q.    I just have a quick question.  I want to
20   turn to Page 3, which is Bates No. VA-4526.  And just
21   for me, since I just stumbled on this the other day,
22   first off, do you recognize this e-mail string?
23        A.    Yes, I do.
24        Q.    Is that your yahoo.com e-mail address?
25        A.    Yes.
```

1      Q.    And I assume Michael Hogan, OGC is the

2   Michael Hogan we're talking about?

3      A.    Yes, it is.

4      Q.    Do you recall this e-mail string just

5   roughly?

6      A.    I haven't looked through the entire

7   string.  Yes.

8      Q.    Is it a fair characterization that this

9   back and forth colloquy discusses terms of a settlement

10  agreement for your EEO claim?

11     A.    Yes.

12     Q.    That's it.  Told you it would be easy.

13           I want to talk a little bit about --

14  scratch that.  Before we move on, aside from Mike not

15  "not imposing you on anyone else", did he give you any

16  other reasons for the inability to reassign you?

17           MR. STROJNIK:  Pete, just for the purposes

18  of a very clean record, could you refer to everyone by

19  their full name?  For example, Mike Hogan?

20           MR. LANTKA:  I will do my best to do that,

21  Mr. Strojnik.

22           MR. STROJNIK:  Strojnik.  There you go.

23           MR. LANTKA:  Feel free to butcher my

24  Pollock name, too.

25           MR. STROJNIK:  It's Lantka, right?

1            MR. LANTKA:  Lantka, from Chicago.

2    BY MR. LANTKA:

3        Q.    I want to talk about the internal request

4    for reassignment.  I'm going to guess this is between

5    the two working groups between Phoenix and Tucson.  But

6    in your own words, just tell me about that.

7        A.    I expressed an interest in moving to

8    another team of attorneys.

9        Q.    Let's use time.  When?

10       A.    On February 15th, I believe, of 2008.  I

11   sent the e-mail to Mark Romaneski and also Jeffrey

12   Stacy.  That was the team that Norma Kaping was

13   supposed to be assigned to, but was not functioning in

14   the role of a paralegal.  Maxine Romero had stated that

15   her workload was extensive.  She could use the help in

16   labor law.

17            And I thought it would be a great

18   opportunity to provide the support in the area that I

19   was also interested in.  And I think that it would have

20   made, it would have been a solution to some of the

21   things that were going on in the office.  So I sent --

22   and within the e-mail on a different topic, I posed

23   that as a possibility and proposed it to management.

24       Q.    Was this in the context of settling an

25   administrative claim, or was this independent of your

1    EEO action?

2          A.    No, I believe it was in the context of

3    settling my administrative EEO claim.

4          Q.    If you would have transferred -- I'm going

5    to call it Maxine Romero's group, okay -- from your

6    present group, from the Phoenix Hospital group to the

7    Tucson group, was your immediate supervisor still have

8    been Jeffrey Stacy?

9          A.    Yes.

10         Q.    And would your secondary supervisor still

11   have been Michael Hogan?

12         A.    Mark Romaneski.

13         Q.    I'm sorry.  Mike Hogan is the next one.

14   Is that correct?

15         A.    Yes, that's correct.

16         Q.    Why did you want to transfer from the

17   Phoenix group to the Tucson group?

18         A.    Obviously, just looking at the situation,

19   it was, would have been better for me because I was

20   subjected to different terms and conditions in my daily

21   working, whereas the individual who was assigned to

22   Tucson was not subjected to those same terms and

23   conditions.  And also, she did not supply support to

24   Maxine Romero and, I believe, Rona Lige.  But I was

25   willing to do that.  And I thought it would have been a

1  better working situation for me.

2      Q.    So the other individual, is that Norma

3  Kaping?

4      A.    Yes.

5      Q.    Was your proposal to switch you and Norma,

6  or just for you to go to Tucson?

7      A.    I did not even speculate on what, you

8  know, they would do with Norma.  That was for

9  management to decide.  But my proposal was to switch

10  teams of attorneys and provide Maxine Romero and Rona

11  Lige with labor support.

12      Q.    And it was because you felt you had a

13  disproportionate workload working in the Phoenix group?

14      A.    There were a number of factors involved;

15  one being the workload.  But also at that particular

16  time I was subjected to a hostile work environment in

17  that I could not have contact with the attorney that I

18  was assigned to, not even to get guidance from that

19  attorney.

20          I picked up my assignments that were

21  transferred into a hutch.  I was not to go into his

22  office.  I was not to have any contact with that

23  individual.  So in my thinking, when a relationship

24  gets to that point of working relationship, then you

25  should explore other options.  It was not comfortable

1  to me, and seemingly not comfortable to him, having to

2  transfer assignments and no collaboration between a

3  paralegal and attorney.

4        Q.    Which attorney are you referring to?

5        A.    Dana Heck.

6        Q.    So one reason:  Disparate workload; two,

7  not getting along with Dana.

8        A.    I would say there was disparate treatment

9  in that I had no relationship with Dana at that

10  particular time.  I had no contact with Dana Heck at

11  that particular time.  All my assignments were

12  transferred into a hutch which I was supposed to check

13  periodically with no contact and no collaboration with

14  an attorney, which as a paralegal made me very

15  uncomfortable.

16       Q.    When you say "disparate treatment", whom

17  are you comparing yourself to?

18       A.    Norma Kaping, the white paralegal in the

19  office.

20       Q.    How would you describe her contact with

21  attorneys?

22       A.    She had none.  She was not required to

23  provide support to attorneys.  She worked

24  independently, much like a representational paralegal

25  is supposed to.

1      Q.    So we had the disparate treatment in

2  context with attorneys, we have the workload.  You said

3  hostile work environment.  When -- now that's a term of

4  art.  We're going to hound on that later.  Is that in

5  reference to Mr. Heck?

6      A.    In reference to Mr. Heck and also Norma

7  Kaping and Mark Romaneski.

8      Q.    If you would have transferred from the

9  Phoenix group in which you had worked with Mr. Heck, to

10  the Tucson group, would you have avoided all

11  interaction with, I guess as a hypothetical, but do you

12  believe you would have avoided interaction with

13  Mr. Romaneski and Ms. Kaping, then?

14            MR. STROJNIK:  Form.

15            THE WITNESS:  Simply due to the fact that

16  Mr. Romaneski was regional counsel, there was no

17  avoiding contact with Mr. Romaneski.  I had to respect

18  and recognize his position, his position of authority

19  within the office.

20            With regard to Norma Kaping, no, I don't

21  think that it would have removed me from her access,

22  but definitely would have provided, I think, a work

23  environment that was conducive to work where

24  individuals actually wanted me to contribute my skills

25  and work product versus a situation where I was not

1    even allowed to collaborate with an attorney that I was

2    assigned to.

3    BY MR. LANTKA:

4        Q.    Let's talk about Norma a little since you

5    weren't transferred within groups.  Could you please

6    describe your working relationship with Norma Kaping?

7        A.    Basically I had no working relationship

8    with Norma Kaping.  And I say that because we did not

9    collaborate together on any work product.  She would

10   make comments to me, which I ignored.  Almost from the

11   time of my transfer to Phoenix.

12              She would say things like, "You're not

13   Miss Important now, are you?"  And I believe that was

14   in November of 2007.  And I guess she was referring to

15   me no longer being chairperson of the national work

16   group.  And also that came, that comment came on the

17   heels of her delivering numerous files that resulted

18   from the retirement of an individual in the office by

19   the name of Charles Latchem.

20       Q.    Okay.  I'm going to go through problems

21   with Norma.  We have, "You're not Miss important now."

22   I'm going to talk about the files from Charlie Latchem

23   at length later.  What other comments do you recall

24   from Norma?

25       A.    One case in particular she was aware that

 1   my husband was picking me up from work and taking me

 2   out to lunch.  And she made a comment when I returned

 3   that, "How did you end up with him, and my daughter

 4   can't get a decent man?  How did you end up with your

 5   husband?"

 6        Q.   Do you recall when that happened?

 7        A.   Approximately December of 2007.

 8        Q.   Okay.  Any other comments?

 9             MR. STROJNIK:  By Ms. Kaping?

10             THE WITNESS:  Not directly, no.

11   BY MR. LANTKA:

12        Q.   Not directly.

13        A.   Not that I can recall.

14        Q.   We have:  "You're not Miss Important; "How

15   did you end up with him".  The disparaging fact that

16   her daughter is closely becoming an old maid,

17   apparently.  Now, we talk about files from -- can I

18   call him Charlie Latchem?

19        A.   I wasn't really familiar with him.  That's

20   my recollection as to what his name was, but I believe

21   he went by Charlie.

22        Q.   Mr. Latchem, what was his position in the

23   office?

24        A.   He was a staff attorney.

25        Q.   And was he employed there -- did his

1  employment overlap your employment, or was he gone by

2  the time you got there?

3      A.   He was not present in the office

4  frequently.  I believe that he -- and this is just from

5  one of my observations where he was expected in the

6  office, but he would not report.  So I'm not sure as to

7  what his status was.  But there were days I was told he

8  would be in.  I would respond to callers and inform

9  them he was expected in, and he would not be in that

10  day.

11      Q.   Do you have any personal knowledge of the

12  medical condition affecting Mr. Latchem towards the end

13  of his employment, or if there was a medical condition

14  affecting Mr. Latchem towards the end of his employment

15  at VA?

16      A.   I have no knowledge.

17      Q.   Do you have any personal knowledge

18  concerning the basis for Mr. Latchem leaving the VA?

19      A.   I have no knowledge.

20      Q.   When you talk about cases being

21  transferred from Mr. Latchem to you, again -- first

22  off, just please elaborate on that.

23      A.   I arrived at work and there was --

24      Q.   Date?

25      A.   Approximately November.  There was

1    numerous case files on my desk.  Also there were

2    numerous medical records under my desk.  Norma Kaping

3    then came over.  She was laughing and she said, "You're

4    not Miss Important now.  You got everything I didn't

5    want."  That's what she said.  That's how she completed

6    the statement that she made.  And she took certain

7    medical malpractice cases and, I guess, put the other

8    ones on my desk.

9         Q.    Do you recall about how many med mal cases

10   were placed on your desk?

11        A.    I would say approximately 30.

12        Q.    And do you recall how many med mal cases

13   Ms. Kaping would have received?

14        A.    No, I have no knowledge of that.  The

15   distribution was done without me being presented.

16        Q.    By having a Y chromosome makes it nearly

17   impossible to understand sarcasm from women.  But can

18   you please explain the tone in Ms. Kaping's voice when

19   she said, "You got what I didn't," or that statement?

20        A.    She wasn't smiling.  She was almost

21   sneering.  Her tone was almost like she was agitated

22   with me and there was nothing leading up to it.

23        Q.    These 30 med mal files, were they -- I'm

24   just going to make a statement.  Were they

25   administrative actions under the Federal Tort Claims

1  Act?

2          A.    Yes, they will all FTCA claims.

3          Q.    Were any of them in district litigation at

4  the time?

5          A.    I'm not certain.

6          Q.    Was it the perception that you would work

7  on these individually in the manner we talked before,

8  or were they assigned to an attorney?

9          A.    I believe they were assigned directly to

10  me.

11          Q.    Did you get anything else from Charlie

12  Latchem?

13                I guess you didn't get anything from

14  Charlie.  Did you get any other work related to Charlie

15  Latchem when he separated from the VA?

16          A.    Not to my knowledge.

17                Excuse me.  If we could just back up.  I

18  recalled something with regard to Charlie Latchem's

19  separation from the Department of Veteran's Affairs.  I

20  subsequently had occasion to visit the regional office

21  and stumbled upon Mr. Latchem working at the regional

22  office.

23          Q.    What's the regional office?

24          A.    It's the VA regional office that's

25  directly across the street on North Central from where

 1  I am at now, EEOC.  They handle things like loan

 2  guarantee benefits, things of that nature.

 3          Q.    And you say in the context of that was an

 4  interaction with Mr. Latchem after he separated?

 5          A.    It was not an interaction.  He had a sign

 6  posted on the door that he was expected in at a certain

 7  time, and I subsequently learned that he was working

 8  for the Veteran's office located at the regional

 9  office.

10          Q.    When did you see this sign?

11          A.    That would have been approximately January

12  of 2008.

13          Q.    And the Veteran's office, is that --

14  that's separate from the regional counsel's office?

15          A.    Separate from the regional counsel's

16  office, but it's a component of Department of Veteran's

17  Affairs.

18          Q.    We're on Exhibit No. 8.

19              THE REPORTER:  Exhibit 9?

20              MR. LANTKA:  I have 8.  Where did I screw

21  up?

22              THE REPORTER:  This is 8.

23              MR. STROJNIK:  9?

24              MR. LANTKA:  9.

25          (Whereupon, Deposition Exhibit No. 9 was marked

1  for identification.)

2  BY MR. LANTKA:

3       Q.    For the record, this is a single page

4  document Bates stamped Hall-PLA-000870.  Appears to be

5  an e-mail printout from Hall, Vanessa, dated Tuesday,

6  February 26th, 2008, 11:52 a.m., to Mark Romaneski,

7  Jeff Stacy, carbon copy Paul Hutter.  Subject:

8  "Proposed resolution of EEO complaint."

9            Ms. Hall, just take a few seconds and look

10  this over.  Do you recognize this e-mail?

11       A.    Yes, I do.

12       Q.    Is it fair if I assume that you drafted

13  and sent this e-mail?

14       A.    Yes, it is.

15       Q.    And the second paragraph to the bottom, is

16  that a fair summary of your belief that the internal

17  transfer would be a possible settlement to your EEO

18  claim?

19       A.    Yes, I believe that, that that would be a

20  part of it, would be an attempt.

21       Q.    Mr. Hutter is the general counsel for the

22  entire VA, correct, at that time?

23       A.    At that time.

24       Q.    Remember, we're stuck in that time.

25            Okay.  Next I want to turn -- are we okay

 1  on breaks?

 2              MR. STROJNIK:  Yeah.

 3              Vanessa, are you okay?

 4              THE WITNESS:  I'm fine.

 5  BY MR. LANTKA:

 6      Q.    I want to turn to Paragraph 220 within

 7  your complaint-- you know, whoever wrote this thing

 8  loved paragraphs, I know that much.  220 is on Page 17.

 9  And I want to talk about the interference with the

10  employment opportunity related to the job at the FBI.

11              Again, Ms Hall, this is a mongoloid topic,

12  so I want you to characterize -- it's called the FBI

13  claim.  Is that acceptable?

14      A.    No, it's an interference for perspective

15  employment.

16      Q.    Your interference with perspective

17  employment claim regarding the FBI, could you please

18  nutshell summarize that for me?

19      A.    I believe that Mark Romaneski due to the

20  fact that he became aware of my conditional offer of

21  employment with the FBI on or about March 7 of 2008,

22  during which time he proceeded five days later to

23  issue, attempt issuance of a reprimand and also

24  subsequently deny my within-grade increase, interfered

25  in and of itself with my initial processing.  I was

1  requested to divulge information about recent

2  disciplinary actions.  And I had none leading up to

3  that point.

4        Q.    When did you first apply to the FBI?

5        A.    I believe it may have been December or

6  January, December of 2007 or January of 2008.

7        Q.    So pretty soon after you started at the

8  VA, correct?

9        A.    Approximately three months.

10       Q.    What prompted your application and why did

11 you want to go to the Bureau?

12       A.    I actually applied to several places, not

13 just the Bureau, to make it clear.  Recognizing

14 disparities in my workload and the environment, I chose

15 to apply for other positions versus attempt, you know,

16 resolution of a situation that I saw was worsening.

17       Q.    Where else did you apply at this time?

18       A.    I applied, I believe, a position with the

19 Department of Veteran's Affairs.  And I may have even

20 applied --

21       Q.    Before we go to the next one, VA, I need

22 to know where, what.

23       A.    Loan guarantee.

24       Q.    Okay.

25       A.    I believe.  I'm not sure on that.  It was

1  Department of Veteran's Affairs.  And I believe it was

2  a position in Washington, D.C.

3         Q.    And where else?

4         A.    I believe the FBI position was the second

5  position.  And then I began applying --

6         Q.    FBI in D.C. as well?

7         A.    No, FBI in Phoenix.

8         Q.    Okay.  Sorry.

9         A.    And then with the worsening of the

10 environment, my applications increased in frequency.

11 So I just began sending applications to every vacancy

12 in Phoenix and also outlying areas, as well as

13 Washington, D.C. toward March of 2008.

14        Q.    We're going to talk about the FBI quite a

15 bit.  As far as the other ones, say ballpark figure

16 before separation in June, how many applications do you

17 think you sent out?

18        A.    Probably in the neighborhood of 40, maybe.

19 And I can't recall all of them.

20        Q.    Were they all to federal agencies?

21        A.    Federal agencies.  I did not apply to any

22 private sector employment.

23        Q.    Probably good considering the economic

24 environment.

25               MR. STROJNIK:  Hey.

1            MR. LANTKA:  Those guys in private

2    practice.

3    BY MR. LANTKA:

4        Q.    About 40 applications.  Aside from the

5    FBI, did you move along positively in the application

6    process in any other of those 40?  That's a horrible

7    question.  Do you understand what I mean?

8        A.    Yes, if I received any call backs or

9    favorable feedback.  I believe I had one interview, and

10   that was with Department of Veteran's Affairs in

11   Washington, D.C.

12       Q.    That was the loan guarantee program?

13       A.    No, I'm not sure.  I did apply

14   subsequently to loan guarantee.  I'm not sure if that

15   one was loan guarantee as well.  I believe I even have

16   the contact individual's name somewhere.

17       Q.    Do you recall -- when was that interview?

18       A.    It would have been January, possibly, of

19   2008.

20       Q.    And was it in D.C. or was it --

21       A.    No, it was telephonically.

22       Q.    Were your supervisory chain aware of the

23   interview at the VA?

24       A.    I wrote it on my calendar on my desk.  Me

25   telling them personally, I'm not sure if I did.  I

1  believe I told Jeffrey Stacy that I was applying for

2  other positions.  That one specifically, I cannot speak

3  to.

4         Q.    And were they aware -- well, you said

5  Jeffrey Stacy was aware you were applying for

6  positions?

7         A.    Yes.

8         Q.    When did you first make him aware of that?

9         A.    Probably was about -- it was in February,

10  when I became very aware of the disparities in

11  workload.  The assignments were increasing in frequency

12  and volume.  And I spoke to him on the phone with

13  regard to that.

14         Q.    Before we get back talking about the

15  FBI -- and I had asked the court reporter to please put

16  a "G" every time I clip my I-N-Gs -- any other jobs,

17  any other interviews or call backs, things like that?

18         A.    I'm not sure.  My recollection is that I

19  began applying in November of 2007.  At that particular

20  time from November to, I believe, January, I may have

21  applied for in the neighborhood of five to ten

22  positions.  Throughout that time to the duration it may

23  have been an additional 30.

24         Q.    30 applications?

25         A.    Yes.

1        Q.    Out of those 30 or 40, aside from the one

2   at the VA and FBI, did any others progress just beyond

3   the application?

4        A.    Yes, I received a call back for a writing

5   sample.  I believe that was with Department of Army or

6   Navy.

7        Q.    And where was that at?  Army is all over.

8        A.    I believe that was in Virginia.

9        Q.    Did it go beyond the request for the

10  writing sample at all?

11       A.    No.

12       Q.    So we've got the military one.  Anything

13  else?

14       A.    I can't recall anything else.

15       Q.    We've been going for an hour.  I actually

16  need to use the facilities.  Can we go off?

17            THE VIDEOGRAPHER:  Off the record at 2:53

18  p.m.

19       (Whereupon, a recess was taken from 2:53 p.m. to

20  3:00 p.m.)

21            THE VIDEOGRAPHER:  Back on the record at

22  3:00 o'clock.

23  BY MR. LANTKA:

24       Q.    Ms. Hall, before we broke we started

25  talking about your job application with the FBI.  What

1    kind of position was that for?

2         A.    Paralegal specialist.

3         Q.    And, again, was a paralegal specialist in

4    Phoenix; is that correct?

5         A.    Yes, that's correct.

6         Q.    And you mention the term conditional

7    offer.  When was the conditional offer from the FBI

8    extended to you?

9         A.    Approximately February, late February of

10   2008.

11        Q.    And how was that offer extended?

12        A.    By telephone call from Betty Robbins --

13   R-O-B-B-I-N-S.

14        Q.    Do you recall what Ms. Robbins' job title

15   was?

16        A.    She was calling from Washington, D.C., I

17   believe the human resources office.

18        Q.    And what was your understanding of the

19   terms of this conditional offer?

20        A.    She expressed that it was a conditional

21   offer of employment, and that contingent upon a

22   satisfactory completion of a background investigation I

23   would receive a call with a start date.

24        Q.    This was before the background check, et

25   al.  This was before the background check?

1          A.     It was at the outset.

2          Q.     You mentioned the name Betty Robbins.

3     Could you just list the other individuals you

4     interacted with in the application process?

5          A.     I can list some of the individuals.  I

6     don't recall all the names.  But the other individual

7     was Mary, first name was Mary.  She is with human

8     resources in the Phoenix office.

9          Q.     Okay.

10         A.     Also, Lynn Poindexter.  She is with the

11    suitability determination office in Washington, D.C., I

12    believe.

13         Q.     Fantastic government name.

14                Anyone else?

15         A.     I'm trying to recall.  No, not after the

16    conditional offer was extended.

17         Q.     Okay.  Mary in HR in Phoenix, just briefly

18    describe your interaction with her.

19         A.     I spoke to her.  She initiated the process

20    of gathering information for the background

21    questionnaire.  She assigned me a password to the

22    system that is used to complete that background

23    questionnaire.  And I had contact with her after

24    experiencing technical difficulties with that program.

25                I also spoke to her with regard to where,

1   what my ranking was in the selection process.  She

2   stated to me that I was the primary candidate.  I asked

3   her to further elaborate what that meant.  And she said

4   I was the only individual selected for appointment to

5   that position.

6        Q.    When did you have that conversation with

7   Mary?

8        A.    That would have been in March of 2008.

9        Q.    And was that conversation by phone,

10  e-mail?

11       A.    It was by phone.

12       Q.    Any other interactions with Mary?

13       A.    Yes, we had interactions on an ongoing

14  basis with regard to my completion of the background

15  questionnaire.

16       Q.    Anything else?

17       A.    I'm thinking.  Not that I can recall right

18  now.

19       Q.    We're going to just jump ahead here and do

20  person by person.  Did you have any contact with Mary

21  after the conditional offer was withdrawn?

22       A.    I believe so.

23       Q.    Could you describe that?

24       A.    I asked her where the letter came from

25  because it was unsigned.  And Lynn Poindexter denied

1  that it came from the suitability determinations

2  office.  She was unable to respond to that question.

3       Q.    When you say "unable to respond" --

4       A.    She did not know.

5       Q.    Any other contact with Mary?

6       A.    Not that I can recall, no.

7       Q.    You don't recall Mary's last name?

8       A.    No, not offhand.  I think Ceger --

9  C-E-G-E-R, I think, but I can't be sure.

10       Q.    Talk about Lynn Poindexter in the

11  suitability office.  Could you describe your

12  interactions with her?

13       A.    I contacted Ms. Poindexter upon receipt of

14  the rescinding of conditional offer of appointment

15  letter.  She expressed to me that she tracks those, the

16  rescinding of the offers.  She had nothing in her

17  system that would indicate the offer was rescinded, and

18  I was showing up as a "green light".

19       Q.    And that was after you received the

20  rescission letter?

21       A.    After I received the letter.

22       Q.    Any other contact with Lynn?

23       A.    Basically she informed me after she

24  responded, she had said within her, I believe, eight

25  years working in that particular position, she had

1  never seen a letter issued that did not have her

2  superior's signature on it.  And I believe that the

3  individual's name was on the letter, but there was no

4  signature.  And she had no record of it coming out of

5  that office.

6          Q.    So let's just get the date on the record.

7  When did you receive the rescission letter?

8          A.    On or about March 25th, 2008.

9          Q.    You called Lynn and she didn't have an

10 answer for you?

11         A.    No.

12         Q.    Called Mary.  Did you call anybody else?

13         A.    Yes, I contacted the individual who was

14 identified as the person who would have been my

15 supervisor.  And I asked her if she had any knowledge

16 of a letter coming out of the suitability

17 determinations office.  She said she had no knowledge.

18 And she suggested that I file a FOIA, or something to

19 that effect.

20         Q.    Anyone else?

21         A.    No, not that I recall.

22         Q.    Did you file a FOIA?

23         A.    I did.

24         Q.    Did you get anything back?

25         A.    I received -- it took approximately one

1  year to receive any information back.  I received

2  correspondence that went forward, my background

3  questionnaire, some notes that were taken, but nothing

4  that would give me an indication as to why the offer

5  was rescinded and why it did not go to the suitability

6  determination office, which is the process.

7          Q.    Did you pursue the reasons behind the

8  rescission of the offer in any other way?

9          A.    No, I stayed within the confines of the

10  FBI because I thought someone there would have the

11  answers.  So I constantly sought advice, or I should

12  say answers from the suitability determinations office

13  because they're tasked with making a final

14  determination as to conditional offers of employment.

15          Q.    Do you have any personal knowledge as to

16  the reason your conditional offer was withdrawn?

17          A.    No, I was never given a response.

18          Q.    Going back, I talk about the background

19  check process and things like that, did you undergo any

20  interviews with FBI personnel pursuant to your

21  application?

22          A.    Yes, I did.  And I was requested by VA to

23  inform them of every single interview that I

24  participated in, as well as the process that was

25  involved.

1      Q.     Who requested you to inform them of every

2  single interview?

3      A.     Mark Romaneski made the request through

4  Michael Hogan that every time I went for processing he

5  wanted to be aware of what I was going to be processed

6  for.  And also where, and what dates.

7      Q.     Okay.  Let's talk about those interviews.

8  When you say "processing", what do you mean by that?

9      A.     That was a term that was used by Michael

10  Hogan in directing me to provide information.  He said

11  with regard to any processing that occurs for your

12  employment with the FBI, you need to supply information

13  to Jeffrey Stacy and Mark Romaneski about what that

14  processing is and the dates of the processing, as well

15  as the process that you have completed.

16      Q.     Talk about the process itself.  I mean,

17  what did that process consist of?

18      A.     An initial interview by a special agent at

19  the FBI.  He gathered information from me.  One of the

20  questions that he asked was whether or not I had been

21  subjected to any disciplinary actions.  At that

22  particular time I had to respond in the affirmative

23  that I had in a sense been subjected to a disciplinary

24  action recently.

25              And I told him within the last five days

1   because it had just occurred.  Although it was not

2   definite, it was an attempt to issue me a reprimand.

3   And I was aware of the possible denial of my

4   within-grade increase at the time.

5        Q.    What date was this, approximately.

6        A.    Second week of March.

7        Q.    So we had that interview.  Any other

8   interviews?

9        A.    There was the actually lie detector test.

10       Q.    Any other interviews?

11       A.    The initial interview, which was a panel

12  interview which resulted in my conditional offer of

13  employment.

14       Q.    So the panel interview, the initial agent

15  raking you over the coals interview, the polygraph.

16  Anything else?

17       A.    The drug testing and -- I think that was

18  it.  Urinalysis drug testing.

19       Q.    So initial interview.  Got the conditional

20  offer and waited until March.  Had the background

21  interview with the special agent?

22       A.    Yes.

23       Q.    Polygraph test.  And at some point you

24  submitted a urinalysis?

25       A.    Actually, the urinalysis was second.

1       Q.    Anything else than those four interactions

2  with the FBI?

3       A.    No, but I do have a comprehensive list at

4  home if you want me to be more exact.  That's from my

5  recollection.

6       Q.    What do you recall anymore?  Is that

7  comprehensive list seven pages long?

8       A.    No, no, it's every time I had to report to

9  VA I have an e-mail indicating what I went for, who I

10  reported to, what it involved.  So that's the

11  comprehensive list.

12       Q.    With regard to the polygraph, what types

13  of questions did they ask you?

14       A.    They started off with the most obvious,

15  asking my name, and progressed into questions that were

16  more to establish character and reputation.

17       Q.    Did they ask any questions about drug

18  usage?

19       A.    Yes, they did.

20       Q.    Were your answers regarding drug usage

21  consistent with the answers you gave today under oath

22  earlier?

23       A.    I believe so.  On two occasions, I think.

24  There were some follow-up questions by the agent, but

25  two occasions.

1    Q.    Any other types of questions?  You have
2  some character, some background criminal activity?
3    A.    Of course I responded in the negative.
4    Q.    Right.  Any other types?  Anything about
5  employment?
6    A.    I don't recall specific questions, but
7  there were questions whether or not I received any
8  disciplinary action, I believe, at that level as well.
9    Q.    I assume you were truthful?
10    A.    Yes.
11    Q.    Typically the FBI wants to talk to all
12  your friends and neighbors.  Are you aware if they
13  engaged in that portion of the background check?
14    A.    They did not get that far, from my
15  understanding.
16    Q.    Are you aware -- do you have any personal
17  knowledge if they contacted -- "they", meaning the
18  FBI -- contacted Jeffrey Stacy?
19    A.    I have no personal knowledge of such.
20    Q.    Any personal knowledge if they contacted
21  Mr. Romaneski?
22    A.    No, I have no personal knowledge of such.
23    Q.    Any personal knowledge if they contacted
24  Mike Hogan?
25    A.    No, I have no personal knowledge of such.

1      Q.    Any personal knowledge if they made

2  contact with VA Region 19 human resource office?

3      A.    No, but I signed an authorization for them

4  to go look at my human resources file.

5      Q.    We're on No. 10.

6      (Whereupon, Deposition Exhibit No. 10 was marked

7  for identification.)

8  BY MR. LANTKA:

9      Q.    For the record, what's been marked as

10 Exhibit No. 10 is a document, letterhead U.S.

11 Department of Justice, Federal Bureau of Investigation,

12 dated 5/21/08, addressed to Vanessa Hall, signature

13 line Bonnie K. Adams.  Take a moment and review that.

14          Do you recognize this letter?

15     A.    Yes, it's the one I inquired about because

16 it has the signature is absent.

17     Q.    Okay.  And is this the letter that you

18 were discussing the denial, the withdrawal of

19 conditional offer?

20     A.    Yes, it is.

21     Q.    And just so I'm clear, this does not

22 explain why they withdrew the conditional offer, does

23 it, anywhere in the document?

24     A.    No.

25     Q.    Do you have any personal knowledge as to

1   why they withdrew the conditional offer of employment?

2       A.    No.

3       Q.    Not barring the objection as to form, do

4   you have anything additional you would like to add with

5   regard to the basis of your claim on interference with

6   an employment opportunity for a job at the FBI?

7       A.    Yes.  One of the reasons that I was told

8   that I was a primary candidate is due to the fact that

9   I previously held a top secret clearance.  And this is

10  just my belief.  FBI did not see any problems with

11  giving me such a short turnaround due to the fact that

12  I had previously been through those clearances, and all

13  of my neighbors including relatives and all of my

14  associates had been interviewed with a favorable

15  outcome.

16      Q.    You stated earlier that it was your belief

17  that the FBI did not get to the stage where they

18  interviewed friends and relatives?

19      A.    I was told that by Ms. Poindexter.

20      Q.    And you stated right now that all your

21  friends and relatives gave a favorable impression.

22      A.    In connection with the previous top secret

23  clearance.

24      Q.    When was that previous top secret

25  clearance?

1          A.     I held that clearance from approximately
2   1986 until 1990.
3          Q.     1990.  And -- strike that.  That's fine.
4                 Anything else aside from the top secret
5   clearance?
6          A.     No.
7          Q.     And you testified earlier as to when that
8   statement was made, didn't you?  Or if you want to tell
9   me right now.  Who told you about the top secret
10  clearance, again?
11         A.     I believe it was Mary Ceger informing me
12  what a primary candidate meant.
13         Q.     That's what happens when you don't take
14  notes.
15                Paragraph 208 of your complaint goes
16  through constructive discharge, which is the other item
17  left open by Judge Martone with order on my Motion to
18  Dismiss.  I'm going to mark as Exhibit 11 your answers
19  to, supplemental answers to the United State's first
20  set of interrogatories.
21         (Whereupon, Deposition Exhibit No. 11 was marked
22  for identification.)
23  BY MR. LANTKA:
24         Q.     My esteemed co-counsel has brought up
25  something I actually wrote down.  In your earlier top

1  secret clearance did you have to take a polygraph test

2  for that?

3          A.    No, no, I did not.

4          Q.    This is Marked No. 11. Do you recognize

5  this document?

6          A.    Yes, I believe so.

7          Q.    And I want to turn quickly to the last

8  page, the final number, Page 21. This is affixed after

9  that. Is that your signature on the verification

10 sheet?

11         A.    Yes, it is.

12         Q.    Did you have a chance when you signed this

13 verification to review this document before signing

14 that?

15         A.    I believe so.

16         Q.    I'm not going to go through everything. I

17 want you to set this aside, because what I want to use

18 is your supplemental answers to Interrogatory No. 8, in

19 which I asked you to state separately in chronological

20 order each and every act and omission you allege

21 constitutes discrimination.

22              And so you and I can stay on the same page

23 we're going the use this as an outline for the rest of

24 our discussion. Starting on Page 4. I'm going to go

25 in date order, you supplied. The first instance from

1  discrimination, you list October 1st, 2007:

2  "Transferred from Cleveland Regional Counsel's Office

3  to Phoenix Regional Counsel's Office, GS-12 to GS-12

4  with official start date of October 8, 2007."

5           I'm assuming this statement is just by way

6  of background, and this isn't considered a

7  discriminatory act?

8       A.    It's chronology, time line of events.

9       Q.    Was your first day October 1st or October

10  8th, 2007?

11      A.    My official start date, or official

12  transfer date was October 1st.  My start date was

13  October 8th.

14      Q.    Following down, next we get to November

15  2007.  You state, "Identified disparities between

16  paralegal positions, mine versus Norma Kaping's

17  position, and began applying for federal jobs."  Is

18  this consistent with your prior testimony from today?

19      A.    Yes, I believe it is.

20      Q.    Go a little bit more into Norma Kaping.

21           MR. STROJNIK:  Thank you.

22  BY MR. LANTKA:

23      Q.    What was her title in Region 19?  You were

24  representational paralegal.  What was she?

25           A.    I'm not sure.  Again, she's a paralegal

1  specialist.

2      Q.    Again, you don't recall her GS level?

3      A.    No.

4      Q.    We went through this a little, but since

5  we're talking about the specific claim, please

6  elaborate on what you entered as disparities between

7  paralegal positions?

8      A.    After the designation of paralegal and

9  attorney assignment, I became aware she was not

10 functioning consistent to the minutes of the meeting of

11 October 15th of 2007, in that she was not required to

12 provide support.

13     Q.    Support to whom?

14     A.    Support to her assigned facility

15 attorneys, being Maxine Romero and Rona Lige.

16     Q.    How did you become aware of that?

17     A.    Any time she received assignments from

18 Maxine Romero, she basically said she was not doing it.

19 She would never work in labor law.  She would make

20 comments openly about what she was not going to do.

21     Q.    Did you perceive this happening, or how

22 did you become aware of these comments?

23     A.    I sat, even though my grade was higher and

24 I had more tenure, I was placed in a hallway and was

25 outside of Norma Kaping's office.

1      Q.    When you say "placed in the hallway", you

2  and I have both been to the regional counsel's office.

3  Were you placed in the hallway like I used to get stuck

4  out after I talked out in class?  Or what do you mean,

5  placed in a hallway?

6      A.    Actually, it was an open hallway where

7  there was two cubicles.  So I was right outside Norma

8  Kaping's office.  And I could hear her conversations if

9  her door was opened.  Prior to her moving into the

10  office she was sitting in the next cubicle.

11      Q.    Was that cubicle that Norma moved out of

12  occupied or unoccupied after she moved out?

13      A.    Davina Hughes subsequently moved into that

14  cubicle.

15      Q.    Are you aware as to the reasons that Norma

16  was able to move into an open office?

17      A.    I was called into Mark Romaneski's office,

18  and Norma Kaping was as well.  He proceeded to inform

19  me that, and Norma Kaping that she would be moving into

20  Charlie Latchem's old office because of her longevity.

21  And they began laughing.  I then congratulated

22  Ms. Kaping and returned to my cubicle.

23      Q.    And Charlie Latchem was the attorney that

24  separated?

25      A.    Yes.

1        Q.    So your knowledge of disparities between

2   paralegal positions, you said it comes from your

3   physical proximity to Norma Kaping's office.   What

4   other basis do you have for this?

5        A.    I had occasion to hear Maxine Romero

6   become upset that she was not getting the type of

7   support that was consistent with the other attorneys

8   because Norma refused to provide support.

9        Q.    When you say "heard from Maxine", did you

10  have personal conversations with Maxine Romero, or did

11  you simply overhear outside of Maxine's office?

12       A.    I would say both.   On one occasion I did

13  speak to her about the type of support that Norma

14  Kaping provided, which she stated was none.   And that's

15  why I believe she was open to accepting me on her team.

16       Q.    Where was Maxine Romero's office in

17  physical relationship to your cubicle?

18       A.    At the time I was there, her office was on

19  the other end of the office.   Actually was the first

20  office that you would come to when you walk into the

21  main entrance.

22       Q.    And would you consider -- it's difficult

23  to ask these questions since I know what I'm asking.

24  Would you consider that office within earshot of your

25  cubicle?

1        A.      No, I did not overhear the conversation

2   coming from her office.  Norma Kaping's office was

3   right by my cubicle.

4        Q.      So disparity in work.  You have

5   discussions with Maxine, overhearing Norma.  Do you

6   have any discussions with Norma Kaping?

7        A.      On one occasion she told me she would

8   never provide labor support.

9        Q.      What was the basis of that conversation?

10       A.      We were talking about employment law

11  cases.  A couple had came into the office that day.

12  She put them on my desk and said that she believed they

13  needed to be opened, that they had not been opened.

14  And I told her -- I thanked her for putting them on my

15  desk, and I told her how I enjoyed labor law.  And she

16  said, "I'll never work labor cases.  Never."

17       Q.      Do you recall what facility those labor

18  cases originated from?

19       A.      They originate from all facilities.

20       Q.      Those two cases, did they originate from

21  the Phoenix or Las Vegas facility?

22       A.      I'm not sure.  At one point I was opening

23  all labor cases.

24       Q.      When you say open a case, what does that

25  mean?

1        A.    It means when it comes to the office, you

2   need to open and respond and acknowledge receipt of

3   that with the Equal Employment Opportunity Commission

4   or MSPB.  So I opened it and proceeded to send out the

5   appropriate correspondence and acknowledgement of

6   receipt of each of those cases.

7        Q.    So opened, I assume you make an entry into

8   DC Laws?

9        A.    Yes.

10        Q.    And sent out a letter to whoever sent it

11   to you, correct?

12        A.    Yes.

13        Q.    What happens then?

14        A.    Then that particular case is assigned to

15   the attorney.

16        Q.    In your brief tenure with Region 19, did

17   you work on any labor cases originating out of the

18   Tucson Medical Center?

19        A.    No.

20        Q.    So is it safe to say all of your labor

21   cases originated out of Phoenix or Las Vegas Medical

22   Centers?

23        A.    Yes, it is safe because I was the only

24   paralegal providing that type of support.  So there was

25   the Tucson facility, being Maxine Romero.  She did not

1  have paralegal support.

2       Q.     Any over bases of your personal knowledge

3  of disparities between paralegal's positions?

4       A.     The disparity, again, lied in the fact

5  that I was held to a different standard.  I was

6  required to perform differently than the paralegal

7  specialist in the office, Norma Kaping.

8       Q.     What standard?  Describe the standard you

9  were required to perform to.

10       A.     I was required to support attorneys,

11  where, in fact, the representational paralegal by means

12  of the position description and elements is required to

13  perform at a more independent level.  On the other

14  hand, Norma Kaping enjoyed what was supposed to

15  accompany my position, and she enjoyed working

16  independently and not providing support to attorneys.

17       Q.     I think that was more of a comparison, but

18  we got into a problem when I asked you about your

19  duties earlier.  So the different standards, it's your

20  testimony that the standard you were held to was

21  providing support to attorneys, and you don't believe

22  that Norma Kaping was required to support to attorneys?

23       A.     That was one identified disparity, is the

24  fact that she was not required to perform as a

25  paralegal, a program paralegal, if she was one, or even

1    as a representational paralegal, as I was performing.

2    Which I was required to provide support to attorneys.

3        Q.    Any other differences between you two that

4    represents the disparity between paralegal positions?

5        A.    Actually, just in terms of treatment

6    overall by management, including Mark Romaneski.  On

7    one particular occasion she was advised that she may

8    have to give up her office because a new attorney was

9    coming on staff.  She began to cry.  She abruptly left

10   the office, and Mark Romaneski called her on her cell

11   phone frequently.

12            And that's another thing that she would do

13   is tell me that, "He cares about me so much.  He calls

14   me on my cell phone when I'm agitated or upset."  So on

15   that particular occasion he called her on the cell

16   phone and told her to come back to the office, that she

17   would not lose her office.

18            Just in response to things like that

19   compared to the issues that I was bringing to

20   management's attention that affected my work

21   environment in and of itself was a disparity.  I never

22   made waves about the office.  To me that was something

23   that was trivial.  But I brought more substantive

24   issues to management's attention, if I can compare.

25   Those are disparities.

1      Q.     Are you aware whether Norma Kaping ever

2   made any complaints to management regarding working

3   conditions at the general counsel office?

4      A.     She would complain about individuals on an

5   ongoing basis.  On one particular case, she asked me if

6   I needed -- I'm sorry.  I asked her if she can open a

7   file for me.  She said, "Sure, if you need assistance

8   opening a file, I'll be glad to do it."

9             I told her I was going to be off the

10  following day, had a doctor's appointment.  And I would

11  appreciate if she could actually open it.  I had

12  already logged out of the system and it needed to be

13  opened.

14            She said, "Sure, I'll be glad to do it."

15            I came in the following day that I was

16  scheduled for duty and I had an e-mail from Jeff Stacy

17  saying, "You're not to give any of your work to Norma

18  Kaping."

19      Q.     So that's one instance where she

20  complained.  Any other instances?

21      A.     None that I really know of or I'm aware

22  of.  I recently found out that she is the individual

23  who reported me as saying a statement I never said.  I

24  believe something to the effect:  "You can kiss my

25  black A-S-S."  So she has a history of reporting me.  I

1    can't speak to other individuals.

2         Q.    So with regard to this statement, "Someone

3    can kiss your black ass", is it your testimony that

4    those words never left your mouth?

5         A.    Never left my mouth.

6         Q.    So it's yours testimony under oath today

7    that Norma Kaping fabricated that statement?

8              MR. STROJNIK:  Argumentative.

9              THE WITNESS:  Yes, it's not true.  If

10   she's the one that reported it, she fabricated it.

11   BY MR. LANTKA:

12        Q.    Okay.  Any other complaints that you're

13   aware of that Norma made to management?

14        A.    No.

15        Q.    Who was Norma's direct supervisor?

16        A.    Jeffrey Stacy.

17        Q.    And was she under the same supervisory

18   chain that you were, then?

19        A.    Yes, she was.

20        Q.    We talked at length both successfully and

21   unsuccessfully about CFD assignments.  Was Norma Kaping

22   responsible for any CFD work?

23        A.    She was not responsible for any CFD work.

24        Q.    Was Norma Kaping, to the best of your

25   knowledge, responsible for any types of work that you

1  were not assigned to?

2              MR. STROJNIK:  Form.

3              THE WITNESS:  No, not to my knowledge.

4  BY MR. LANTKA:

5      Q.    Are you aware if Ms. Kaping was assigned

6  to work up medical malpractice administrative claims?

7      A.    I believe during my time in the office she

8  was assigned non med mal personal injury claims.

9      Q.    Were you assigned non med mal personal

10 injury claims?

11     A.    I had several, yes.

12     Q.    Were you aware if Ms. Kaping was assigned

13 to provide drafts of litigation reports?

14     A.    No, she was not.

15     Q.    Do you have any personal knowledge whether

16 Ms. Kaping handled any personnel issues?

17     A.    She stated that she had not worked in

18 personnel and she would not work in personnel.

19     Q.    Do you have any personal knowledge as to

20 whether Ms. Kaping handled anything to do with ethical

21 claims at the Veteran's Administration?

22     A.    Are you referring to the CFD program?

23     Q.    No.  Other ethical claims, doctor

24 malpractice, things of that nature?

25     A.    No, I don't have any knowledge of that.

1      Q.    Are you aware if Ms. Kaping entered her

2  time into GC Laws?

3      A.    No, I have no personal knowledge of that.

4      Q.    Since you handle personnel issues you're

5  aware that the basis of the claim has to be premised on

6  race or race/gender, etcetera.  Is your current claim

7  based on race or gender?

8      A.    Race.

9      Q.    Okay.  What leads you to believe that the

10 disparate treatment was based upon your race as an

11 African-American?

12     A.    I am African-American and Norma Kaping is

13 not.  As I stated to you, when bringing to management's

14 attention things that were affecting my work

15 environment that were substantive, I did not receive

16 any response, or received retaliation as a result.

17             Specifically, what brought to mind it is

18 based on race is when I became aware of the letter

19 containing the word "nigger", and the response to that

20 was not of concern for me or my feelings in finding

21 that and reading that word.  It was more how I came

22 about it and how I attempted to discredit the author of

23 that letter.

24     Q.    We're going to get to that letter in eight

25 pages.  Talk about that at length.

1         Any other reasons you believe it was based

2    on your race?

3         A.    I have no reason not to believe it is

4    based on my race.

5         Q.    So you believe that every action taken

6    against you which is adverse is based on your race as

7    an African-American?

8         A.    I believe that some of the actions taken

9    against me were in retaliation from me engaging in

10   protected activity, in filing a claim based on race.

11        Q.    The third paralegal, Bonita Ortiz, she's

12   based in Albuquerque, correct?

13        A.    Yes.

14        Q.    Did you have any interaction with her

15   whatsoever?

16        A.    Very limited.

17        Q.    Do you have any basis for comparison with

18   your workload to hers?

19        A.    I'm not aware of her workload.

20        Q.    Do you have personal knowledge of what her

21   job title was?

22        A.    No.

23        Q.    Any personal knowledge of GS level?

24        A.    No.

25        Q.    Move on to Page 5, top of the page.  We're

1  going to go out of order because some of your instances

2  went a little out of order.  Try to refer to page

3  numbers to help try to guide you along.

4            Page 5, you date January 10, 2008.  You

5  received and exceeds evaluation and recognition of high

6  performance from Cleveland Regional Counsel's Office.

7  Again, is this just entered by means of chronology and

8  not evidence of discrimination?

9       A.    This is chronologically.

10      Q.    Why did you receive an evaluation in

11  January after you left Region 7.  Or do you know?

12      A.    I don't know.  It's Region 7 would be able

13  to speak to that.

14      Q.    You said in late November, early December

15  you began the work disparity between you and

16  Ms. Kaping, correct?

17      A.    Yes.

18      Q.    When did you first alert management as to

19  any feelings that you were overworked or had too much

20  work to do?

21      A.    Officially the first time was in writing,

22  was February 15th, 2008.

23      Q.    I'm going to lead a little here.  There is

24  a notation in the documents disclosed that Jeffrey

25  Stacy actually flew out to meet with you on February

1    14th, 2008, Valentine's Day, to discuss these matters.

2    Does that jog your recollection at all?

3          A.    Yes, I did speak to Jeffrey Stacy.

4          Q.    So would he have been alerted about that

5    before the 15th if he would have physically come to

6    Phoenix on the 14th to discuss it with you?

7          A.    I believe he showed up to discuss things

8    that were going on with Dana Heck.

9          Q.    When you say "things going on with Dana

10   Heck", is that Dana in relation to you or, I mean, Dana

11   had a birthday party?

12         A.    No, it was Dana Heck's reference to

13   Phoenix being a white city, and also some things that

14   came up with regard to the duties and tasks that I was

15   being assigned by Dana Heck.

16         Q.    So Jeffrey Stacy's trip from Albuquerque

17   to Phoenix on Valentine's Day 2008 was to deal with the

18   interrelationship between you and Mr. Heck with regard

19   to the statements Dana Heck made:  One, that you found

20   offensive; and two, workload problems?

21         A.    Primarily the workload difficulties.  And

22   that's when it was established that the assignments

23   given to me would be provided me in a hutch.  I was to

24   pick them up.  No collaboration with Mr. Heck.

25         Q.    So were you aware that Jeffrey Stacy was

1  flying to Phoenix from Albuquerque prior to the 14th,

2  prior to this meeting?

3       A.    Yes, I was.

4       Q.    Do you recall calling in sick that

5  morning?

6       A.    No, I did take some time off that morning,

7  I believe, for an appointment.  I called in -- no, I

8  did not call in.  I e-mailed and then called in.  So I

9  actually have an e-mail which states I will be one hour

10 late, which preceded his arrival in the office.

11      Q.    Do you recall what time of leave you had

12 to take to be that hour late?

13      A.    No, I do not recall.

14      Q.    Did you give anyone at the VA prior notice

15 of that leave prior to that morning via e-mail.

16      A.    Via e-mail and call.  Yes, I did.  It was

17 approved, I believe, through the e-mail system.

18      Q.    Do you recall when that was approved?

19      A.    The day prior.

20      Q.    You mean February 13th?

21      A.    The day prior to his arrival in Phoenix.

22      Q.    That would have been the 13th if he

23 arrived on Valentine's Day, the 14th?

24      A.    I believe so.  He okayed it from

25 Albuquerque.  So he was still in Albuquerque.

1    Q.    So Jeff gets there, Jeff Stacy gets to

2  Phoenix, and there is a meeting.  Who is present at

3  this meeting?

4    A.    Jeffrey Stacy, myself, and also Mark

5  Romaneski.

6    Q.    Was Dana Heck present?

7    A.    He was called in later.

8    Q.    Was anyone else present?

9    A.    No.

10    Q.    We're going to do the triangle again.

11  What was discussed at this meeting?

12    A.    At that meeting we basically discussed the

13  duties that I was required to perform for Dana Heck.

14  Also how those duties were to be transmitted to me and

15  how they were to be given back to Dana Heck.

16    Q.    Anything else?

17    A.    We also -- we did not discuss the comment

18  Dana Heck made in his presence.

19    Q.    Did you discuss it outside of Dana's

20  presence?

21    A.    With Mark Romaneski.  Jeffrey Stacy, I

22  don't believe, was present.

23    Q.    When you discussed it with Mark Romaneski,

24  was that at the meeting on February 14th or was that on

25  a different occasion?

1          A.      It was on a different occasion.

2          Q.      Getting back to the meeting on February

3    14th, what you discussed there were your duties?

4          A.      Uh-huh.

5          Q.      And how your duties were in relationship

6    to Dana Heck?

7          A.      Uh-huh.

8          Q.      And how Dana Heck was to transmit requests

9    for assistance to you, and you to return them to him;

10   correct?

11         A.      Right.  And also what developed out of

12   that meeting was the roped off time concept.  When time

13   was roped off, I was to devote all my time and

14   attention to Dana Heck's assignments.  That roped off

15   time was changed upon notification by Jeffrey Stacy to

16   me, indicating that your roped off time focus has

17   changed.  Focus on this now.

18         Q.      So let's talk about rope off time.  My

19   understanding is whereas this amount of time is "roped

20   off" X amount of hours for Dana Heck.  And another X

21   amount of hours is to do what?

22         A.      Perform whatever task -- if CFD was the

23   focus, I was to perform CFD.  During that period of

24   time and shortly thereafter I realized I was not able

25   to devote any time or attention to my assigned cases.

1    The roped off time ended up being a hundred percent

2    time roped off for attention to Dana Heck's cases.

3         Q.    Wasn't that the idea, that you were to

4    rope off a certain amount of hours for Dana Heck cases

5    and only work on Dana Heck cases, and then another

6    group of time was roped off for your cases and only

7    your cases?

8         A.    I believe that was how it was intended to

9    work, but that is not how it materialized.

10        Q.    Why didn't it materialize that way?

11        A.    I was constantly told, "You can't work on

12   your cases.  You still have to work on this.  Dana has

13   this writing assignment that is due.  You cannot work

14   on your cases."  In fact, I ended up working on Dana

15   Heck's cases after this roped off time concept was

16   implemented.

17        Q.    Who constantly told you you can't work on

18   your own cases?

19        A.    Jeffrey Stacy indicated you need to finish

20   this writing assignment for Dana Heck.

21        Q.    What is this writing assignment?

22        A.    On one occasion it was a litigation

23   report, a closing arbitration brief.  So it went from

24   one assignment to the next where the roped off status

25   concept was not working.  And I brought that to

1  management's attention as well.

2      Q.   At that meeting on February 14th, before

3  Dana came in the room and it was just you,

4  Mr. Romaneski, and Mr. Stacy, did you discuss what

5  pending tasks you had from Mr. Heck at that time?

6      A.   Yes, I believe that it was a request made

7  for me to provide a list of pending tasks.

8      Q.   And did you?

9      A.   Yes, I did.

10     Q.   Do you recall what tasks were on that

11  list?

12     A.   I believe it was three tasks:  The CFD

13  program, which is a full-time program, and also the

14  closing arbitration brief, as well as the litigation

15  report.

16     Q.   The litigation -- Mr. Strojnik blurted out

17  the term Rafilson report.  Refers to a District Court

18  case Ned Rafilson versus United States.  Is that the

19  litigation to which you're referring?

20     A.   I believe so.

21     Q.   So you had to complete -- what was the

22  assignment with regard to that case?

23     A.   If I may, I believe I'm mixing the March

24  5th meeting in with the February 15th.  The tasking of

25  the litigation report, I believe occurred later; not

1  during the February 14th meeting.  So I was required to

2  identify tasks that I was working on at February 14th.

3  I did that.

4              I was supposed to be focussing on the CFD

5  program.  The closing of that program was, I believe,

6  February 15th.  So that was my primary focus.  My roped

7  off time was a hundred percent to the confidential

8  filers program.

9        Q.    Since we overlapped two dates I want to

10  get it straight.  At the February 14th meeting, if you

11  had the list generated on that, what were you working

12  on for Dana as of February 14th?

13        A.    I believe it was the tasking of a closing

14  arbitration brief.  I'm not for certain sure.  And also

15  the confidential filer financial disclosure program,

16  which is a full-time program.

17        Q.    When you say it's a Confidential Filer

18  Disclosure program is under Dana Heck, is that because

19  an attorney has to be assigned to it somehow?  Or what

20  was Mr. Heck's role in the CFD program?

21        A.    He was tasked with the responsibility of

22  handling the Confidential Financial Disclosure program.

23        Q.    Right.  What did he do?

24        A.    He was supposed to counsel individuals on

25  their ethical obligations and financial disclosures

1  with regard to the filing season.

2      Q.    And how did his tasking with regard to the

3  CFD program differ from your tasking with regard to the

4  CFD program?

5      A.    His tasking was my tasking.  I did the

6  consultations.  I did the follow-ups.  I did the

7  computer entries.  I did the full program.

8      Q.    So I want to make sure I get your

9  testimony correct.  Are you saying that you were doing

10  Mr. Heck's work, or you were -- that he was assigned a

11  task delegated to a paralegal, and you performed it?

12      A.    I can't speak to that, but I can tell you

13  on the last day of the financial disclosure program,

14  usually an attorney is present to facilitate any

15  problems, respond to any problems with regard to

16  filing, and also offer advise and consultations.  Dana

17  Heck was not there that day.  I took the program on and

18  handled it.

19      Q.    So the last day, the day they are all due,

20  when the excrement hits the proverbial fan, usually an

21  attorney -- and when you say "usually", you only worked

22  there a couple of months.  You said it's your belief

23  that an attorney should have been there to handle last

24  minute problems?

25      A.    It constitutes legal advice.  I just have

1    to say that.  The Confidential Financial Disclosure

2    program involves providing advice to individuals about

3    the law and their requirements with filing.  I did

4    that.  So with respect to how I feel about it, that is

5    within the responsibility of an attorney because I'm

6    not authorized to provide legal advice.

7         Q.    You're uncapable of providing advice for

8    deficiencies in the CFD forms?

9         A.    I feel I'm not authorized to provide legal

10   advice simply by the nature of my title.  I'm not an

11   attorney.

12        Q.    So the two things for Mr. Heck, we have

13   CFD, arbitration brief.  Anything else as of the 14th?

14        A.    Not that I can recall.

15        Q.    As of the 14th, what were your independent

16   tasks you were working on?

17        A.    I had, of course, a full medical

18   malpractice caseload.  And in addition to that, I was

19   working labor cases, which involved inputting and also

20   responding to new filings of cases.

21        Q.    Do you recall what your caseload was,

22   number of cases?

23        A.    No, I cannot recall.

24        Q.    We're going to kind of go through.

25   Hundred cases?

1          A.     No, I wouldn't think.

2          Q.     Fifty?

3          A.     Probably somewhere around that

4    neighborhood.  And, again, this is if they don't count

5    Confidential Financial Disclosure program, because each

6    one of those filers was a case.

7          Q.     Well, I'm talking about your own stuff,

8    non-Dana Heck stuff.  So you had your own

9    administrative files for med mal FDCA claims and labor

10   claims.  And so you think you had roughly about 50 of

11   those going on at that time?

12         A.     No, I had no labor cases at all.  All

13   those were assigned to an attorney and I was provided,

14   to provide the substantive writing and legal research

15   on those cases.

16         Q.     Who were those assigned to?

17         A.     Dana Heck and Bron Steinmetz.

18         Q.     So what you had, your independent cases,

19   your non-Dana Heck cases were just med mal

20   administrative FDCA investigations; right?

21         A.     Yes, approximately 20.  And in addition to

22   that, I have personal injury, which probably was in the

23   neighborhood of ten.

24         Q.     So had about 30.  And they're both FDCA

25   cases, right?

1      A.    Yes.  There is a distinction made

2   non-medical malpractice and medical malpractice.

3      Q.    So you had all FDCA, 30; 20 of which are

4   med mal; 10 of which slipped on the hospital floor; and

5   for Dana we talked about.  Is that a fair assessment?

6      A.    And the Confidential Financial Disclosure

7   program, yes.

8      Q.    Exhibit No. 12.

9      (Whereupon, Deposition Exhibit No. 12 was marked

10  for identification.)

11  BY MR. LANTKA:

12     Q.    For the record, this is Bates Nos.

13  Hall-VA-6030 through 6031.  It is an e-mail string, two

14  pages long.  Top e-mail dated February 8th, 2008, 9:52

15  a.m. from Jeffrey Stacy to Alfred Steinmetz, Dana Heck,

16  Vanessa Hall, CC Mark Romaneski and Maria Worth

17  regarding a conference call.

18          Do you recognize -- and I don't want to

19  talk about the e-mail at all after Jeffrey Stacy's

20  signature block on the first page.  So we're going to

21  talk about the top.  Do you recognize this e-mail?

22     A.    Yes.

23     Q.    Second paragraph.  I guess this must have

24  been disclosed in an administrative proceeding so I am

25  going to presuppose that the D and B are Dana and Bron,

1    hypothetical.  Is that paragraph a fair assessment of

2    the roping off agreement that was entered into between

3    you and Jeff?

4         A.    Yes, this is what was articulated.

5         Q.    And the top paragraph, is that a fair

6    assessment of your telecommuting time allocation as of

7    those dates?

8         A.    Yes, I believe so.

9         Q.    Still on Page 5, Ms. Hall.  Now we're up

10   to, we're off my caveat and up to your statement on

11   February 14th.  You state you, "Received numerous time

12        sensitive substantive assignments from staff

13        attorney Dana Heck.  Mr. Heck was not a

14        supervisor, so providing him authority which he

15        misused, resulted in inability to work on own

16        tasks and assignments, diminished work

17        performance and decreased ability to meet own

18        deadlines."

19             Is this paragraph in your supplemental

20   response to the United States' interrogatories a

21   summary of the discussion that we just had?

22        A.    It's a part of what was going on during

23   that relevant time frame, yes.

24        Q.    When you say "same day as the meeting I

25   got numerous time-sensitive substantive assignments",

1  what were the numerous time-sensitive substantive

2  assignments?

3       A.    I was presented with a list that was not

4  captured in the tasking in Outlook.  It was written on

5  a Post-it note.  And it involved numerous tasks

6  associated with different labor cases that Dana Heck

7  was working on.

8       Q.    Who did you receive this Post-it note

9  from?

10       A.    I came back from lunch and the Post-it

11  note was stuck to my desk.  I brought it to the

12  attention of Mark Romaneski.

13       Q.    Did you recognize the handwriting on the

14  Post-it note?

15       A.    Yes, I did.

16       Q.    Whose handwriting did you believe it was?

17       A.    It was Dana Heck's.

18       Q.    Was this Post-it note place on your desk

19  before or after the February 14th meeting?

20       A.    It was around the same time frame.

21       Q.    Well, did your meeting take place before

22  lunch?

23       A.    This -- I'm not sure of the date of the

24  Post-it note.  But this was all during that relevant

25  time frame.

1    Q.    So could this have very well happened

2    before the meeting and prompted, one of the things that

3    prompted the meeting?

4    A.    I don't believe so.  I believe it happened

5    after the meeting.  And as I stated, I arrived back to

6    lunch and it was a Post-it note with Dana Heck's

7    handwriting.  And it listed numerous assignments and

8    tasks that I was to complete.

9    Q.    So it's your testimony that after the

10   meeting which included you, Mr Heck, and Mr. Romaneski

11   in which you discussed time being roped off, that Dana

12   then decided by himself to place a Post-it note in your

13   office?

14   A.    It was around the same relevant time

15   frame, and I brought it to Mr. Romaneski's attention.

16   Q.    Just to the best of your knowledge and

17   before and after.  One of the things we talked about at

18   this meeting -- and remember, this is for my time line

19   purposes.  At this meeting you said Dana was supposed

20   to give you assignments in an inbox, and you return

21   them in an inbox and you're not supposed to go back.

22   So if he did this after that meeting, if

23   your recollection is correct, then it puts the onus on

24   him.  If he did it before the meeting, this would have

25   been something that should have been talked about at

1  the meeting.  So we kind of need to know when it

2  occurred.

3       A.    I would have to say it was part of the

4  multiple taskings that led to the meeting, and I'm not

5  sure of the exact date.

6       Q.    I don't care about the exact date.

7            THE VIDEOGRAPHER:  Excuse me.  We have

8  about two minutes left.

9            MR. LANTKA:  Let's stop, then.

10           THE VIDEOGRAPHER:  Off the record at 3:56.

11       (Whereupon, a recess was taken from 3:56 p.m. to

12  4:22 p.m.)

13           THE VIDEOGRAPHER:  Back on the record.

14  It's 4:22 p.m.

15           MR. LANTKA:  We are advised by counsel and

16  Ms. Hall that due to child care needs she has to leave

17  at the latest of 5:30/5:45.  So if we are not done with

18  the deposition at that time, we will recess.  Peter and

19  I have agreed that if that event occurs, we will

20  reconvene on Friday at 2:30.  We will already be at the

21  office of the plaintiff for Norma Kaping's deposition,

22  and we will resume there.  The United States will

23  secure court reporting services as necessary.

24           Is that a fair statement, Counsel?

25           MR. STROJNIK:  Yes, and we'll reconvene at

1  approximately 2:30ish on Friday, yes.

2            MR. LANTKA:  Let's get back to this and

3  get as much done as we can before you have to leave.

4  BY MR. LANTKA:

5       Q.    So we were going through the numerous time

6  sensitive assignments you stated that Mr. Heck gave you

7  with the Post-it note.  Do you want to add anything to

8  your testimony before the break?

9       A.    No.

10      Q.    The other phrase that caught my eye was

11  misuse authority with reference to Mr. Heck.  Could you

12  elaborate what you meant by that?

13      A.    Probably was not a good word choice

14  because he had no authority, as far as I knew of, in

15  the chain of command.  I was told that he was a

16  coworker and a peer and nothing more.  So I believe

17  that he continued to give me tasks that weren't

18  accounted for, weren't properly vetted for Jeffrey

19  Stacy.

20      Q.    Page 5, we're still on Valentine's Day,

21  the 14th.  I assume this takes place after the meeting

22  with Mark Romaneski and Jeff Stacy.  You state in the

23  paragraph, "Romaneski and Stacy met my husband

24  (Caucasian), at which time my husband expressed that

25  Mark Romaneski made a grimacing face at him."

1          Could you describe the circumstances

2    surrounding this grimacing face?

3          A.    Actually, this was the day of the meeting,

4    I belive.  My husband actually took me to lunch for

5    Valentine's Day.  He showed up in the office in the

6    morning to deliver my case that I actually transported

7    files back and forth.  At which time an attorney on

8    staff, Rona Lige, identified him and turned to Mark

9    Romaneski and said, "That's Vanessa's husband.  Did you

10   meet him?"

11         And my husband walked over.  I proceeded

12   to walk towards my cubicle.  And I didn't witness the

13   event, but my husband said that Mark Romaneski grimaced

14   at him, made a grimacing face at him.

15         Q.    Did your husband say -- did your husband

16   use the term "grimace"?

17         A.    He said it was like a grimace, like he

18   turned his mouth down, like disapproval.

19         Q.    Like a frown?

20         A.    He used the term grimace.  As I stated, I

21   did not see it myself, so I can't attest to what it

22   looked like.

23         Q.    So you have no personal knowledge of that?

24         A.    No, I don't.

25         Q.    My recollection of grimace is Ronald's

1  friend, so I'm not sure what your husband meant by

2  that.  You said reported incident to Paul Hutter.  How

3  did you report this incidence to Paul Hutter?

4       A.    My husband actually reported the incident.

5  And I also told him from my perspective and my

6  involvement in it what my husband said happened.

7       Q.    So your husband made contact with the

8  general counsel for the Department of Veteran's

9  Affairs?

10      A.    I believe my husband made an official

11 report with the Office of Special Counsel concerning

12 this incident as well as an incident that followed

13 this.

14      Q.    What incident followed this?

15      A.    After he met Mark Romaneski, he took me to

16 lunch that very same day after Mark Romaneski

17 previously met him.  Jeffrey Stacy was summoned by Mark

18 Romaneski over to the area in which we were standing in

19 line, and Mark Romaneski was laughing and said, "This

20 is Vanessa's husband."  And my husband put his hand out

21 and shook Jeffrey Stacy's hand.

22      Q.    Describe.  Were you present at this?

23      A.    I was.

24      Q.    Describe laughing.

25      A.    Actually laughing, smiling and laughing.

1     Q.    How did you take the smiling and laughing?

2     A.    I thought it was odd because there was

3 nothing to laugh about.  But there was obviously some

4 kind of joke that was going on between Mr. Stacy and

5 Mr. Romaneski that I was not aware of.

6     Q.    The two instances that your husband made a

7 formal complaint to Office of General Counsel were both

8 on February 14th:  A grimace, as he put it, from

9 Mr. Romaneski; and an instance where Mr. Romaneski

10 laughed upon introducing Jeffrey Stacy to your husband?

11     A.    That was reported to the Office of General

12 Counsel and also subsequently after another event to

13 Office of Special Counsel.

14     Q.    What is the other event?  What's the third

15 event?

16     A.    My husband picked me up on another day

17 that was probably a few days later.  I don't know the

18 exact date offhand.  And Mark Romaneski was exiting the

19 building, at which time after I entered into the

20 vehicle with my husband he turned around and went back

21 inside.  A few minutes later because we were sitting

22 outside -- I had to put my belongings in the vehicle.

23 I believe my husband was on the telephone making a

24 call.  He looked in his rear-view mirror approximately

25 maybe four minutes later and noticed a police vehicle,

1   VA police vehicle behind our car.

2        Q.    And can you describe this a little more?

3   What interaction did you have with the VA police?

4        A.    None, I had none.

5        Q.    Did the VA police block you in in any way

6   that you could not leave?

7        A.    No, but they proceeded to follow my

8   husband as he pulled out through the campus and out the

9   main entrance.

10       Q.    Do you have any personal knowledge why the

11   VA police proceeded to follow your husband as he backed

12   out and left the campus?

13       A.    No, I have no knowledge.

14       Q.    Do you have any personal knowledge of any

15   verbal interactions between your husband, Mark

16   Romaneski, or Jeff Stacy in addition to the statements

17   that you provided earlier?

18       A.    I have no knowledge of that.

19       Q.    Did you ever -- do you have any other

20   complaints of other interactions between your husband

21   and Mr. Romaneski or Mr. Stacy?

22       A.    I believe on one occasion I was actually

23   out of the office after collapsing in the work place on

24   or about, I believe it was February 27th.  I

25   subsequently had to take leave while going through the

1    care of a cardiologist.  And Jeffrey Stacy was calling

2    my home.  He was inquiring about keys.  He wanted me to

3    deliver my keys to the building and all VA equipment.

4    I believe that there was some sort of verbal exchange

5    between my husband and him where my husband asked him

6    not to call me at home because of the situation I was

7    in.

8           Q.    Time line of this event, this verbal

9    exchange regarding keys in relationship to your

10   resignation:  Before or after?

11          A.    It was during the course of my leave.  So

12   it would have commenced probably intermittently.  My

13   leave began where I had to go to the care of a

14   cardiologist, I believe, starting February 28th or

15   29th, and continuing until March 21st.  So it would

16   have been within that time frame.

17          Q.    March 21st, were you on some type of

18   sabbatical?  Had you just submitted sick leave?

19          A.    It was intermittent leave.  And then on

20   March 21st due to the fact that I still was

21   experiencing medical problems related to stress, that

22   is when I went out on leave.

23          Q.    And did you -- strike that.  What did your

24   husband tell you about that call?

25          A.    He said that Jeffrey Stacy had called

1   numerous times.  He said that he was conducting

2   business.  He was on a business call.  He answered the

3   phone and told him that he was currently on a call for

4   business, and if he can call back later and what was it

5   concerning.  Jeffrey Stacy informed him that he needed

6   to speak to me.  I believe at the time he indicated he

7   wanted me to deliver keys and all VA equipment back to

8   VA.  And this was prior to June 7th.

9          Q.   Any other communications between your

10  husband and any management official from Region 19?

11         A.   Management official at Region 19, no.

12  Michael Hogan, yes.

13         Q.   Talk about that.  What interaction did

14  your husband have with Michael Hogan?

15         A.   My husband initiated a call to Michael

16  Hogan after the FBI job offer was rescinded.  It was to

17  basically ask him if there were other options available

18  because I could not return to the hostile work

19  environment.

20         Q.   And did you listen in on that call, or --

21  I just need to ask if you have personal knowledge of

22  it, or is your knowledge of it based on what your

23  husband told you?

24         A.   I listened, basically I listened in on a

25  call where it was loud enough for me to hear Michael

1    Hogan.  And I heard my husband speaking to him.  At

2    first Michael Hogan refused to speak to him until I

3    gave my express permission to do so.

4         Q.    After you gave him your permission, can

5    you describe the rest of the exchange?

6         A.    My husband inquired about the possibility

7    of other alternatives because of my health.  I could

8    not return to that environment because of the stress

9    that resulted in my medical issues.

10        Q.    And what was Mike Hogan's response?

11        A.    Michael Hogan had no definitive response.

12   He did not offer any options and he said that he would

13   speak to me about it.

14        Q.    Anything else?

15        A.    At which time my husband handed me the

16   telephone.  And that is when Michael Hogan said he

17   would not impose me on anyone else.

18        Q.    Do you recall roughly what date this

19   occurred?  This is shortly after the FBI rescission?

20        A.    This was June 4th, approximately, of 2008.

21        Q.    That's the statement that we talked about

22   earlier:  "I will not impose you"?

23        A.    Yes.

24        Q.    Anything else happen in that conversation

25   between you and Mr. Hogan?

1          A.     No.

2          Q.     Any other interaction between your husband

3    and Mr. Hogan?

4          A.     No.

5          Q.     Any other interactions between your

6    husband and any other employee of Region 19?

7          A.     No.

8          Q.     Any other interaction between your husband

9    and Dana Heck?

10         A.     No.

11         Q.     Aside from Mark Romaneski and Jeff Stacy,

12   has your husband ever felt that anyone else -- this is

13   during your relationship with your husband -- has made

14   an odd look at him?

15         A.     I'm sorry.  I have to go back.  There was

16   contact with Rachel Spelghatti.  After June 7th of

17   2008, I was told to return certain items.  My husband

18   volunteered to do that so that I did not have to go

19   back into that environment.

20              He proceeded to ask Rachel Spelghatti what

21   the exit process was because he would want to take any

22   forms that were necessary for completion back home to

23   me, have me complete them and deliver them.  And she

24   said there was no such process.

25              He said that he told her that he found

1  that hard to believe because every agency has an exit

2  process.  He then asked someone in HR, I believe it was

3  Sharon Heaths, what the process was.  She informed him

4  that he needed to get a form from regional counsel.  So

5  he kind of bounced back and forth with no outcome.  I

6  never got a form to exit.  I was told no such form

7  existed.

8         Q.    And who initiated these contacts between

9  Rachel Spelghatti and the HR person and your husband?

10 Did your husband?

11        A.    My husband went to HR.

12        Q.    And did your husband go to Rachel?

13        A.    He went to Rachel and asked her for the

14 exit form.  And he told her that HR had told him that

15 he was supposed to obtain it from her.

16        Q.    What was her response?

17        A.    There is no such exit form or process.

18        Q.    Okay.  And what occurred after that?

19        A.    Basically I think that that was the end of

20 his efforts with regard to obtaining any exit

21 information or forms for me to complete.

22        Q.    You talk about property return.  What

23 property are you referring to?

24        A.    Computer and keys and any other equipment.

25 I think that the e-mail specifically stated, "Please

1  return all keys and VA equipment."

2      Q.    Do you recall what date that e-mail was

3  sent?

4      A.    It was sent on a continuous basis, even

5  prior to me leaving the environment between the period

6  of March, roughly March 5th all the way through March

7  21st I received the same e-mail on a continuous basis.

8  And when items were completed, they were removed and

9  replaced with additional items.  For example, items 1

10 through 7 for completion.  I would complete one.  It

11 would be removed and an additional item would be

12 replaced, say, for number 2.

13     Q.    I think we're getting confused again.

14 You're referring to certain tasks and things that

15 Mr. Stacy felt that you had to finish before leaving

16 the VA; correct?

17     A.    He specifically stated that these items

18 need to be completed.

19     Q.    My question was physical items that needed

20 to be returned, which you said computer and keys?

21     A.    He used the term immediately, prior to my,

22 the termination of my employment.

23     Q.    Okay.  Any other physical items besides

24 the computer and the keys that needed to be returned?

25     A.    I specifically recall computer and keys.

1   No other items.  I think it was labeled office

2   equipment, specifically computer and keys.

3          Q.    And when we're talking about e-mails on a

4   continuous basis, I think the record needs to be

5   clarified.  You were referring to an e-mail that we'll

6   get to later, certain things that had to be done, tasks

7   that had to be completed.  Did you receive multiple

8   e-mails about the return of computer and keys?

9          A.    I received a list of items during the

10  period of approximately March 5th through March 21st.

11  After Jeffrey Stacy became aware of my conditional

12  offer of appointment with the FBI, I believed he used

13  the term, "Since you might be leaving to go to the FBI,

14  these are basically the things that need to happen

15  between now and then."

16         Q.    Getting back to my question, though, how

17  many e-mails did you get that said, "Vanessa, please

18  give us back the computer and the keys"?  Just that.

19         A.    It was the same list that was re-presented

20  to me over and over and over again with a list of

21  items.

22         Q.    So your testimony, because I think we're

23  on the same page finally.  I'm a little confused.  Once

24  you get the conditional offer from the FBI and you told

25  Mr. Stacy about it, it was:  So looks like you're

1  leaving.  We got to get this list of stuff done?

2       A.    I think the specific language was, "Since

3  you might be leaving to go to the FBI, these are the

4  things I need completed in the interim."

5       Q.    Okay.  So, good.  In addition to keys

6  returned, computer returned, what tasks were on there

7  on this list of things?

8       A.    CFD program tasks, other tasks.  Whenever

9  I completed that task -- and I believe that there is a

10 follow-up e-mail stating that we went from four items

11 seven 7 items.  Additional items would be put in the

12 place of items that I completed.

13      Q.    What do you recall?  You seem to recall

14 the number of items.  Do you recall the substance?  One

15 is finish up the CFDs.  What else?

16      A.    Return all keys.  Basically report on the

17 status of the CFD program.  Some other items, and I

18 can't recall them off hand.  But it was a list of four,

19 which progressed to a list of seven.

20      Q.    So out of the four, we know three of them:

21 Keys being one; computer being one; CFDs being one.  We

22 don't know the other one.

23      A.    Other items.  Basically tasks that were

24 assigned, I believe, by Dana Heck and maybe even some

25 other tasks.

1    Q.    Was there training that you had to

2    complete to stay on the rolls of VA so you could stay

3    on payroll?

4    A.    No training to remain on payrolls.  But

5    there was annual required security training that was to

6    be completed a specific date.  And that was for all VA

7    employees.

8    Q.    When I say payrolls, you're still

9    considered a VA employee whether you leave without pay,

10   AWOL, whatever.  So you had to complete the security

11   training would have been an item, then, correct?

12   A.    That's annual training.  You're given a

13   date and you can take it all the way up to including

14   midnight if you're on duty.

15   Q.    I have done that.

16   A.    Right.

17   Q.    Anything else?  So we have some stuff

18   you're supposed to do for Dana Heck, CFDs, keys,

19   computer, some training.  Anything else?

20   A.    I think it was basically a list of seven

21   items.  I'm not really recalling the other two.  But I

22   subsequently e-mailed Michael Hogan saying this list

23   was four.  Now it's seven.  And I want, you know, to

24   make sure that I include this.  But this came about

25   because I was scheduled and approved for leave by

1    general counsel to commence on March 14th.

2              After that approval was done, Mark

3    Romaneski approached me and he was angry.  And he said

4    that I ambushed him and he was not happy with it.  And

5    I asked him what the problem was.  And it seemed as if

6    he was angry that his superior had approved leave that

7    did not go through him.  So there started this list

8    that expanded instead of shrinking by the 14th of

9    March.

10        Q.    Expanded by three items?

11        A.    It expanded.  It was supposed to be a list

12   of four things to be completed before the commencement

13   of my leave.  It expanded to seven.  And then my

14   approval, the approval of leave by Office of General

15   Counsel was withdrawn because Mark Romaneski said that

16   the other items needed to be completed that weren't

17   originally on the list.

18        Q.    Okay.  And you don't recall what the extra

19   items are, but if I can produce that e-mail by Friday,

20   we can probably refresh your memory.

21        A.    I can produce the e-mail by Friday.

22        Q.    Would you like to do that?

23        A.    I can.

24        Q.    We can compare e-mails.

25              MR. STROJNIK:  Why don't you go ahead and

1  produce the e-mail?

2           MR. LANTKA:  I get to use my new

3  concordance search engine.  Tickled pink to do that.

4           MR. STROJNIK:  Searches through PDF?  You

5  can do that?  Scanned documents?

6           MR. LANTKA:  Kind of.  The box is a lot

7  more promising than the program is.

8           MR. STROJNIK:  Okay.  We're on the record.

9  BY MR. LANTKA:

10       Q.    Getting back to my question.  Before we

11  talked about interaction with Rachel Spelghatti and

12  your husband.  We're still talking about your husband.

13  I think the question pending was did he ever make a

14  statement of anyone else, just making odd facial

15  gestures at him?

16       A.    No, it was just that specific incident

17  that I just spoke about.

18       Q.    Okay.  And this I want to be in general.

19  Is it something that he had ever complained about ever

20  since you knew him?

21       A.    You mean in general about anyone?

22       Q.    I mean in general, because, you know, is

23  it something that once or twice when you're in

24  Washington he complained about?  Because he made a big

25  deal about this.  He filed a complaint.

1        A.     As a matter of fact, I would have to say

2    that my husband is the last to complain or even notice

3    anyone's facial expressions, so it must have been very

4    overt and very noticeable by him.

5        Q.     So to answer my question, though, do you

6    recall any other instances, just your recollection,

7    that you husband complained to you about someone making

8    an odd facial gesture to him?

9        A.     Never.  That was the first time.

10        Q.     First time and even the last time,

11    correct?  Was it the last time?

12        A.     Last time.

13        Q.     So the only time in your relationship with

14    your husband was Mark and Jeff and resulted in this

15    complaint.

16        A.     Yes, it was the first time.

17        Q.     I want to talk about another phrase you

18    use, which is a term of art.  We need to elaborate on

19    it.  You use the phrase to give management "carte

20    blanche to carry out reprisal and ongoing disparate

21    treatment."  Is the carte blanche to carry out reprisal

22    and ongoing treatment fairly summarized in your

23    testimony so far?

24        A.     That statement is on the exhibit that you

25    handed me.  And if I can elaborate.

1          Q.    Sure.

2          A.    On the things that had occurred with

3   respect to the issuance of a reprimand.

4          Q.    Actually, I'd like to talk to that ad

5   nauseam at the end.  So reprimand would be part of

6   that?

7          A.    Part of the carte blanche.

8          Q.    Anything else?  Reprimand and there's the

9   wiggy?

10         A.    Just the entire environment of reprisal

11  and disparate treatment that went unfettered would be

12  carte blanche.  No one stepped in to stop it from

13  occurring.

14         Q.    This Page 5 and 6.  On February 15th you

15  sent an e-mail to management regarding increased number

16  of assignments and taskings by Dana and disparity with

17  regard to Norma.  And then you go on and talk a little

18  bit about Charlie Latchem.  I'm going to mark this

19  exhibit as 13.

20         (Whereupon, Deposition Exhibit No. 13 was marked

21  for identification.)

22  BY MR. LANTKA:

23         Q.    Ms. Hall is reviewing that.  For the

24  record, this is Hall-PLA-859.  It is an e-mail dated

25  Friday, February 15th at 4:34 p.m. from Vanessa Hall to

1   Jeffrey Stacy with the subject "New Claim".  Do you

2   recognize this e-mail, ma'am?

3           A.    Yes, I do.

4           Q.    Is it a fair assumption that you wrote

5   this on February 15th and sent it to Jeff Stacy?

6           A.    That's correct.

7           Q.    Okay.  February 15th would have been the

8   day following the meeting where you discussed roping

9   things off, correct?

10          A.    I'm sorry.  Could you please state that?

11          Q.    The meeting in which you, Mr. Romaneski

12  and Mr. Stacy talked about roping things off occurred

13  on the 14th, correct?

14          A.    I believe so, yes.

15          Q.    So this is the following day, then?

16          A.    Yes.

17          Q.    What prompted you to write this e-mail on

18  the day following that meeting?

19          A.    Nothing had changed.  As a matter of fact,

20  by 4:34 p.m. on Friday the 15th I had already been

21  requested to pull my caseload because Mr. Heck didn't

22  think that I should be assigning him new medical

23  malpractice cases when it was not my decision.

24          Q.    Let's stop there.  What do you mean pull

25  your caseload?

```
 1          A.     Pull my cases.  He wanted me to bring in
 2   my medical malpractice caseload and sit down with him
 3   so he can determine how many medical malpractice cases
 4   I had in comparison to himself.
 5          Q.     Who told you to pull your caseload?
 6          A.     It was Dana Heck.
 7          Q.     So as around about of by 4:34 on the 15th,
 8   Mr. Heck had come to you and said, "Pull your
 9   caseload"?
10          A.     I believe he sent me an e-mail stating can
11   you pull your caseload and come here.
12          Q.     And in this e-mail what do you recall his
13   reasons for pulling that caseload?
14          A.     Basically, I believe he stated -- I don't
15   know if it was in the e-mail or in passing, that he
16   wanted to find out how many medical malpractice cases
17   that I had and why he was being assigned one.
18          Q.     Okay.  And at this time we learned from
19   testimony earlier, you had about 20 med mal cases;
20   would that be correct?
21          A.     That would be correct.
22          Q.     So as of the writing of this e-mail had
23   your -- strike that.
24                 Your testimony earlier when we were
25   talking about the February 14th meeting, we went
```

1  through what your caseload was.  Would your caseload

2  have changed in any way from the time period of that

3  discussion to the drafting of this e-mail?

4       A.   No, I don't think so.

5       Q.   So when you state in Paragraph 2, "I am

6  overwhelmed!", you were referring to the caseload

7  discussion we talked about earlier?

8       A.   I was told by Dana Heck that I would be

9  receiving that additional medical malpractice case.

10      Q.   One case?

11      A.   One case, but in addition to all the other

12 tasks that I received.

13      Q.   The statement here:  "I already have a

14 brief which was assigned to me by Dana yesterday."

15 What brief are you referring to?

16      A.   I'm not sure.  I would have to speculate.

17 I'm not sure which brief it was.

18      Q.   Is this the Nancy Marshal brief we were

19 discussing earlier, the arbitration brief?

20      A.   I'm not sure which brief it is.  But I

21 would say it was Nancy Marshal.  That's the relevant

22 time frame.

23      Q.   Was that the brief we were discussing

24 earlier?

25      A.   There was a closing arbitration brief as

1  well.  Because it's only identified as a brief, I

2  cannot accurately answer that question.

3        Q.    Is the closing arbitration brief different

4  from the Nancy Marshal brief?

5        A.    Yes.

6        Q.    What is the Nancy Marshal brief?

7        A.    I'm not sure what that particular brief

8  involved.  It may be the same.  Again, I'm trying to

9  tap into my memory from two years ago.  I haven't

10  referred to that individual by that name associated

11  with a closing brief for two years, over two years.

12        Q.    So you're not sure if you had two briefs

13  or one brief?

14        A.    Well, I had multiple assignments.

15        Q.    But as far as labor law briefs?

16        A.    I was also -- I'm sorry.

17        Q.    That's okay.  It's very easy for us to get

18  off track because your mind is as expansive as mine.

19  Too bad we're in the same room.

20              As far as labor law briefs, this could be

21  Nancy Marshal.  Nancy Marshal could have been the

22  arbitration, but you just don't remember?

23        A.    What's missing from the entire picture is

24  Bron Steinmetz.  I was also providing writing work for

25  Bron Steinmetz.

1    Q.    What tasks were you providing for Bron

2  Steinmetz?

3    A.    The same.  I believed I performed several

4  writing assignments for Bron Steinmetz.  So when

5  something is identified without a name, it's just a

6  brief.  It's very difficult for me to recall the

7  specific case.

8    Q.    Let's go back.  I mean, we don't need to

9  know specific cases.  I just want ballpark.  We're

10  talking the 14th, 15th, which is probably the same

11  caseload.  On your own personal cases you stated about

12  20 med mal pre-District Court cases, about 10 non-med

13  mal FDCA; correct?

14    A.    Correct.

15    Q.    And then for Mr. Heck we had CFD reports?

16    A.    Uh-huh.

17    Q.    And I'm going just going to refer to that

18  as one category.  I know there were multiple things.

19  We did not have the Ned Rafilson case yet, correct?

20    A.    Right, but if I could just clarify.  I had

21  CFD program, mot just the reports.  The reports

22  comprised a very, very minute aspect of the

23  Confidential Financial Disclosure program.

24    Q.    And you had a brief for Mr. Heck in

25  addition to that?

1      A.    And also I believe at the same time a

2 brief for Bron Steinmetz.  But I would say since I used

3 the term brief in connection with Dana, that it was a

4 brief assigned to me by Dana.  I'm not sure if that is

5 a correct name associated with Dana's brief, or if I

6 was working on a name associated with a brief for Bron

7 Steinmetz that was the same.  So I can't identify it

8 beyond saying it's the brief.

9      Q.    So for Dana we definitely had the CFD

10 program, and we definitely had a brief, regardless of

11 what it was called.  And for Bron -- Is it Bron or

12 Brom?

13      A.    Bron -- B-R-O-N.

14      Q.    I apologize.  Bron, we maybe had one

15 brief, but that could have been the same one?

16      A.    I believe a brief and a motion at the same

17 time for Bron.

18      Q.    Now it's a brief and a motion?

19      A.    Yeah.

20      Q.    So you had maybe one brief, and a motion.

21 Anything else with Bron?

22      A.    Just assignments as he asked or requested

23 me to perform.  I did do some copying for Bron.  And I

24 think that because Dana articulated to me that Bron was

25 low on the food chain, in that his cases took a lower

1  priority than his, then Dana often got the support

2  before Bron.

3        Q.    Got a little off track again.

4        A.    Yeah.

5        Q.    Task wise, Dana is covered.  Not asking

6  about that.  For Bron we have definitely a motion,

7  brief maybe, but that could be the same one.  Anything

8  else for Bron as of Valentine's Day of 2000?

9        A.    Just support, whatever he requested.

10        Q.    If there was a fire that needed to be put

11  out?

12        A.    I would, uh-huh.

13        Q.    The reference in this paragraph of Charlie

14  Latchem, do you believe we covered that adequately

15  before when we discussed Mr. Latchem and the

16  assignments you received from him?  We discussed him in

17  the context of Norma Kaping.

18              MR. STROJNIK:  Form.

19              THE WITNESS:  I'm sorry.  Can you rephrase

20  that question?

21  BY MR. LANTKA:

22        Q.    I don't want to repeat ourselves.  So

23  because we talked about Charlie Latchem in the context

24  of some documents I showed you.  In the context of this

25  statement where you're talking about Charlie Latchem,

1    do you think we have to go into that anymore, or do you

2    think we covered it enough?

3              MR. STROJNIK:  Form.

4    BY MR. LANTKA:

5         Q.    Because I just want to get to the crux of

6    your claim.  Right here:  "Also was required to work on

7              more complex cases assigned to me.  And when

8              another staff attorney, Charlie Latchem, left

9              and was not required to complete any of his

10             pending tasks or assignments prior to departure,

11             I was assigned a majority of his caseload."

12             Do you recall earlier when we talked about

13   cases you got when Charlie left?

14        A.    Yes, and I do need to speak about that.

15        Q.    That was my question.  Go ahead.

16        A.    With regard to disparate treatment,

17   Charlie Latchem was not held to the same standard in

18   terms of performance.  Even though he was an attorney,

19   he was leaving the office, was not given a list of

20   tasks to complete, as subsequently his incomplete tasks

21   became my responsibility.

22        Q.    Charlie had a different job than you,

23   correct?

24        A.    I stated that, yes.

25        Q.    So anything else you want to add regarding

1   Charlie Latchem's departure and your receipt of cases

2   aside from you feel he was held to a different

3   standard?

4              MR. STROJNIK:  Form.

5              THE WITNESS:  And also Norma Kaping was

6   involved in the transfer of those cases.  She cherry

7   picked those cases that were not, did not contain

8   voluminous medical records, did not have complex

9   issues.  I don't know how many of them that existed.

10  But I subsequently ended up with what remained.

11  BY MR. LANTKA:

12        Q.    And that's what we talked about earlier?

13        A.    Yes, sort of.

14        Q.    Anything else?  Well sort of?  What more

15  do we need to talk about?

16              MR. STROJNIK:  Form.

17              THE WITNESS:  I just needed to clarify

18  that because of the fact that there was a different

19  standard in his departure versus mine, I was given a

20  list, and exhaustive list of tasks and writings that

21  needed to be completed when I was transferred cases

22  that an attorney previously had and he had not

23  completed those tasks.

24  BY MR. LANTKA:

25        Q.    Do you have any personal knowledge of

1  communications between either Mark Romaneski or Jeff

2  Stacy and Charlie Latchem prior to his departure

3  concerning tasks that needed to be completed?

4              MR. STROJNIK:  Form.

5              THE WITNESS:  I believe there was none.

6  And I state that because there were notes in files, and

7  I can't get into what those notes were.  He was not in

8  the office on a frequent basis.  Individuals were

9  looking for him to complete tasks or to respond to

10  items and he was not available.

11  BY MR. LANTKA:

12       Q.    But you believe there were none.  Do you

13  have any personal knowledge whether or not there

14  existed any discussions between Romaneski, Stacy and

15  Latchem concerning tasks he needed to complete?

16       A.    Due to the fact that I can ascertain that

17  there were incomplete tasks associated with those

18  files, some of the same or similar tasks --

19       Q.    So is your answer yes?

20       A.    Yes, there were incomplete tasks.

21       Q.    Yes, you have personal knowledge?

22       A.    I have personal knowledge as a result of

23  me inheriting those files and there being incomplete

24  tasks, and also calls that were coming into the office

25  at the time where he did not follow through with

1    different assignments.

2        Q.    Ms. Hall, I totally understand that you

3    have personal knowledge that he didn't finish stuff.  I

4    got that.  Okay.  But my question, again, is do you

5    have knowledge of discussions between Charlie and Mark

6    or Charlie and Jeff?

7            MR. STROJNIK:  Counsel, let her finish.

8    She was answering your question.  And you're becoming

9    frustrated again.  I can tell.

10   BY MR. LANTKA:

11       Q.    I am becoming frustrated.  Just yes or no.

12   Just two questions.  And if you can answer yes or no,

13   then elaborate.

14           Do you have personal knowledge of

15   communications between Mark Romaneski and Charlie

16   Latchem prior to Charlie's departure regarding Mark's

17   desire for Charlie to complete certain tasks?

18           MR. STROJNIK:  Form, unintelligible.

19           THE WITNESS:  I have no personal knowledge

20   of any communications.

21   BY MR. LANTKA:

22       Q.    Okay.  Do you have -- I'm going to ask you

23   another unintelligible question.  Do you have personal

24   knowledge of any communications between Jeff Stacy and

25   Charlie Latchem made before Charlie Latchem left which

1  concerned Charlie's completion of tasks?

2              MR. STROJNIK:  Argumentative, compound.

3              THE REPORTER:  What was the second

4  objection?

5              MR. STROJNIK:  Compound.

6              If I interpose and objection, allow me to

7  finish.

8              THE REPORTER:  I didn't get the answer.

9              MR. LANTKA:  Repeat your answer.

10             THE WITNESS:  No.

11             MR. STROJNIK:  You want to break now,

12 Counsel?

13             MR. LANTKA:  No, I don't, unless you do.

14 BY MR. LANTKA:

15      Q.    I think we're still on February 15th.

16 This paragraph states, "Made contact with agency's EEO

17 manager, Roberto Pearl."  Do you see that?

18      A.    Yes, Roberto Peart.

19      Q.    That's my typing.

20             When you say EEO manager, is Roberto Peart

21 the EEO counselor mandated by federal regulations that

22 you have to talk to?

23      A.    I am not certain of whether or not he is

24 encompassed as initial contact.  Is that the question

25 you're asking me?

1    Q.    Yes.  Then I will ask you based on your
2  knowledge, who is Roberto Peart?
3    A.    He is the EEO manager at the VA Medical
4  Center in Phoenix.
5    Q.    And you contacted him on February 15th?
6    A.    That's correct.
7    Q.    What was the basis of the contact with
8  Mr. Peart?
9    A.    I informed him on that date I was filing
10 an EEO complaint for disparate treatment based on my
11 race.
12   Q.    That is the EEO complaint at issue in this
13 litigation?
14   A.    It was continuous.  It was ongoing, so it
15 is encompassed by the current litigation, yes.
16   Q.    And you seem to make emphasis that
17 Mr. Romaneski knew about this.  When you contacted
18 Mr. Peart, who did you tell him was the discriminating
19 official?
20   A.    I discussed the environment within the
21 office.  And I also informed him that Mark Romaneski
22 was the individual who failed to take action to correct
23 it.  Though I believe I identified Mark Romaneski as
24 the responsible management official.
25   Q.    That same day did you communicate with

1    anyone in human resources named James Pinger --

2    P-I-N-G-E-R?

3        A.    Mr. Pinger, as far as I know, I'm not sure

4    of his capacity, but I spoke with Mr. Pinger because he

5    was an individual who was a confidential filer.

6        Q.    You mean you had a discussion with him in

7    your capacity as completing tasks related to the CFD

8    program?

9        A.    I'm not sure what his inquiry was, but I

10   remember Mr. Pinger becoming upset because he was not

11   getting the information that he wanted from Mr. Heck.

12   And I attempted to help him, but by that time he was

13   yelling and screaming.  And I believe I reported that

14   incident to Mark Romaneski.

15       Q.    That's the next exhibit I'm going to show

16   you.  This is Exhibit No. 13.

17                THE REPORTER:  You said 13?

18                MR. LANTKA:  I didn't write that down.

19   This is 14.  I apologize.  This is 14.

20       (Whereupon, Deposition Exhibit No. 14 was marked

21   for identification.)

22   BY MR. LANTKA:

23       Q.    I'm not going to hit every paragraph in

24   this, Ms. Hall, so please just direct your attention to

25   Paragraph 22 on the last page.  While you do that --

1       A.     Excuse me.  Can you please ask me if I've

2   ever seen this document?

3       Q.     I will.  Going to read it in the record

4   first.  This is a memorandum on the Department of

5   Veteran's Affairs letterhead Bates stamped Hall-VA-1357

6   through Hall-VA-1360, dated February 22nd, 2008,

7   titled --

8              MR. STROJNIK:  We're going to take a break

9   while you're testifying.  Two-minute break.

10             MR. LANTKA:  I'm going to finish my

11  statement, if that's all right.  Titled -- from Mark

12  Romaneski, Regional Counsel, to Vanessa Hall.  Subject:

13  Result of Investigation.

14             Appears counsel wants a break.  Go off.

15             THE VIDEOGRAPHER:  Off the record 5:05

16  p.m.

17        (Whereupon, a recess was taken from 5:05 p.m. to

18  5:09 p.m.)

19             THE VIDEOGRAPHER:  Back on the record at

20  5:09 p.m.

21  BY MR. LANTKA:

22       Q.     All right.  Ms. Hall, from your question,

23  I take it you haven't seen this.  Have you seen this

24  document before?

25             A.     No, I have not.

 1          Q.    Okay.  Then I would like you to read the

 2    paragraph titled 22 to yourself.  I just have a few

 3    questions on that.

 4                MR. STROJNIK:  In Exhibit No. 11?

 5                MR. LANTKA:  In Exhibit No. 14.

 6                THE WITNESS:  I'm sorry, I think I'm --

 7    BY MR. LANTKA:

 8          Q.    Actually, you can look at that one.  We're

 9    not going to mark it up.

10                Okay.  My only question with regard to

11    this is in the statements regarding the yelling and

12    screaming by James Pinger, you had testified earlier

13    that you were meeting with Mr. Pinger regarding CFD

14    disclosures.  Did your conversation with Mr. Pinger

15    occur on the phone or in person?

16          A.    It was on the phone.

17          Q.    Okay.  Who initiated the contact?

18          A.    Mr. Pinger, I believe.

19          Q.    And, again, what was the basis?

20          A.    Mr. Pinger was upset regarding something

21    involving a Confidential Financial Disclosure program.

22    He was seeking information and follow-up of a

23    discussion he had with Dana Heck.  I was not able to

24    provide him with the information that he was seeking,

25    and he asked for a copy of our internal policy relating

1    to the Confidential Financial Disclosure program.

2         Q.    Were you able to provide that to him?

3         A.    I attempted to and was told not to.

4         Q.    Who told you not to?

5         A.    Jeffrey Stacy told me I cannot basically

6    supply that information.  And I can't recall what the

7    document is.  But it's basically a map for the

8    Confidential Financial Disclosure program.

9         Q.    Who is James Pinger?

10        A.    I'm not sure.  I never met Mr. Pinger in

11   person.  As far as I knew him, he was a confidential

12   financial filer.

13        Q.    So you have no personal knowledge of what

14   his employment position was at the VA?

15        A.    No, none.

16        Q.    Did you have any interactions with

17   Mr. Pinger before this date?

18        A.    That was the only date that I can recall I

19   ever spoke to Mr. Pinger.

20        Q.    Did you ever file a complaint or make

21   reference to Mr. Pinger screaming and yelling to your

22   supervisors?

23        A.    I mentioned it, I believe, to Mark

24   Romaneski.

25        Q.    And could you describe that conversation

1  with Mark?

2       A.    Basically that I received a call from

3  Mr. Pinger.  He became upset.  He requested a copy of

4  an internal policy.  I was not able to provide it to

5  him, and he yelled and screamed at me.

6       Q.    What was Mr. Romaneski's response to your

7  complaint?

8       A.    He wanted more information about the

9  incident.  I provided him with that information.  And

10 there was no further discussion.

11      Q.    What additional information did you

12 provide him?

13      A.    The call, the nature of the call, the

14 approximate time of the call, and the nature.

15      Q.    And you also said that you talked to

16 Jeffrey Stacy about this, correct?

17      A.    I'm not sure if I spoke to Mr. Stacy.  I

18 recall speaking to Mark Romaneski about it.

19      Q.    Your testimony was that Mr. Stacy told you

20 not to provide procedures to Mr. Pinger?

21      A.    Yes.  My contact with Mr. Stacy was to see

22 if I could provide internal policy externally.

23      Q.    Did you recall discussing the substance of

24 the yelling and screaming with Mr. Stacy?

25      A.    I'm not sure.  I don't think that I did.

1  My conversation was, again, was limited to whether or

2  not I could turn over a copy of internal policy.

3          Q.    Anything else pertinent that you think

4  occurred with regard to supervisors' treatment of our

5  complaint about Mr. Pinger yelling and screaming at

6  you?

7          A.    Well, I have to say that I've never seen

8  this document before.  Didn't realize that there was a

9  result of an investigation.  I received a memorandum

10 containing similar contextual information, but the

11 title is different.

12         Q.    So in answer to my question, did you

13 receive anymore information, you stated you received a

14 memorandum?

15         A.    I received a memorandum, but not this one.

16         Q.    When did you receive this memorandum?

17         A.    It was approximately February 19th, I

18 believe.

19         Q.    And what was the substance of this memo?

20         A.    The only time I remember any of this --

21 and not all of it, but some of it, being addressed was

22 in that proposed paralegal duties or response to

23 proposal, or something to that effect.  I've never seen

24 a results of investigation memorandum.

25         Q.    I understand you've never seen this

1  before.  What I'm asking for the is the memo you got on

2  February 19, 2008, what was that memo about?

3      A.    It was about paralegal duties and it also

4  included termination of telecommuting.

5      Q.    Did that memo make reference to yelling

6  and screaming?

7      A.    Not to my knowledge.  I believe there may

8  have been an e-mail to me regarding that or a follow-up

9  e-mail.  But nothing in the form of this memorandum.

10      Q.    Okay.  You said you got a memo on this on

11  2/19, but that wasn't it.  That was a paralegal duty

12  memo.  And you stated you received an e-mail following

13  up.  Who was the e-mail from?

14      A.    I believe it was from Mark Romaneski.

15  Again, he requested additional information regarding

16  the Pinger incident.  So I'm not sure what date that

17  was.  And I can't recall anything further than to say

18  he requested additional information as to the James

19  Pinger incident.

20      Q.    Do you recall if you responded to that

21  request for information?

22      A.    No, I don't believe that I did.

23      Q.    Why not?

24      A.    I had already supplied it previously to

25  his face, the requested information.  I didn't have

1  anything more to add.  I believe I responded there is

2  no more information.  I did not know Mr. Pinger.  That

3  was the incident.  That was the extent of it.  And I

4  cordially ended the call.  There was nothing more to

5  report.

6         Q.    Was it a call or e-mail between you and

7  Mr. Romaneski?

8         A.    I'm speaking of the call with Mr. Pinger.

9         Q.    And the request for information from

10  Mr. Romaneski came via e-mail?

11        A.    First, I believe verbally he asked.  And

12  then he asked for any additional information, in which

13  there was none.  It was limited to that one call, which

14  was Mr. Pinger calling me, requesting information.  I

15  could not supply it.  He became angry, and I cordially

16  ended the call.

17        Q.    I understand that.

18              Anything else between you and

19  Mr. Romaneski aside from that e-mail regarding this

20  instance on February 15th about Mr. Pinger?

21        A.    None that I recall.

22        Q.    I know you don't recall this, but I'm

23  going to use Paragraph 3.  In Paragraph 3 this memo

24  references six statements that apparently you stated

25  that Mr. Heck had made.  This is on Bates number, at

 1   the risk of me testifying, Hall-VA-1357, Paragraph 3,

 2   A. through F.  Take a brief moment and read that.

 3         A.    Okay.

 4         Q.    I believe that this paragraph is

 5   referencing the meeting that you, Mr. Stacy, and

 6   Mr. Romaneski had on February 14th.  Would that be a

 7   fair assumption?

 8               MR. STROJNIK:  Foundation.

 9               THE WITNESS:  Again, I'm not sure.  This

10   is the first time I've actually seen this memorandum.

11   I'm not sure as to what time frame it fits in.  I see

12   it's dated February 22nd.  However, I've never received

13   this memorandum.

14   BY MR. LANTKA:

15         Q.    I understand that.  All I'm interested in

16   is Lines A through F in these statements.  Is this an

17   adequate summary of statements which you reported to

18   Mr. Romaneski and Mr. Stacy as being heard from, by

19   Mr. Heck, or being spoken by Mr. Heck?

20         A.    I believe, even though out of context,

21   yes, these are statements that I reported as being

22   inappropriate, made by Dana Heck.

23         Q.    And when do you recall reporting these

24   statements to management?

25         A.    Not all at the same time.  I think at

1  various times.  As a matter of fact, the statement,

2  "His tastes run from petite white women to fat black

3  women," was made in front of other individuals.  And I

4  see no mention of that here in this memorandum.  And

5  that occurred at a different time frame.  So I would

6  say all of these did not occur at the same time.

7      Q.    No, not the statements were made at the

8  same time.  I mean when did you complain to

9  Mr. Romaneski, or did you complain to management as

10 these statements occurred?

11     A.    I went to management regarding statements

12 made by Dana Heck, at which time Mr. Romaneski asked me

13 to provide him with a list of statements that were

14 inappropriate.

15     Q.    And did you do that?

16     A.    I verbally supplied him with the

17 information, statements that Dana made that were

18 inappropriate.

19     Q.    When did this supply of information take

20 place?

21     A.    I would say approximately February 14th,

22 February 13th, 14th of 2008.

23     Q.    Okay.  Among these statements which you

24 provided to Mr. Romaneski, is this a list of those

25 statements?

1      A.    Yes, I believe that this is, are

2 statements that I reported to Mr. Romaneski.

3      Q.    Okay.  Are there any other utterances that

4 Mr. Heck made during the time you were employed at the

5 VA Region 19 that were offensive to you that are not

6 listed here?

7      A.    These are the statements, to my

8 recollection, for the period October 1st through the

9 period March 21st of 2008.

10      Q.    Okay.  I'm going to go through the context

11 of them.  And just this is just briefly tell me your

12 impression, like when they were heard and who was

13 around:  "Better you than me."

14      A.    I believe that this was in the context of

15 Charlie Latchem's caseload being divided.  And he

16 basically stated, "Better you than me getting it."

17      Q.    Okay.  Do you recall a time period?  This

18 was around the same time period we were talking before

19 when Mr. Latchem's caseload was distributed?

20      A.    Approximately around that time, yes.

21      Q.    Letter B.: "Join the club."  Start with

22 the time period and the context.

23      A.    He stated this in the context of me

24 telling him that I was overwhelmed with recent tasks

25 that he had assigned me.  He said, "Join the club."

1        Q.    Okay.  Letter C.:  "Phoenix is largely a
2    white city."
3        A.    I'm not sure what Mr. Heck meant.  He
4    basically made this statement that Phoenix was largely
5    a white city.
6        Q.    Let's context.  Did he state this directly
7    to you?
8        A.    He stated it directly to me while I was in
9    his office.
10        Q.    You were in his office.  And let's start
11    with date.  When did this occur?
12        A.    It was toward the beginning of my
13    employment.  I believe that he told me that I would
14    have to get used to the culture in Phoenix and that
15    Phoenix is a largely white city.  And he said it's a
16    different ball game.
17        Q.    What were you two conversing about?
18        A.    There was no conversation leading up to it
19    at that particular time.  I would go in his office and
20    file documents and files that were on his bookshelf.
21    And at that particular time I asked him about a case, I
22    believe, and he basically told me when I find it I'll
23    give it to you.
24            And leading up to that there must have
25    been something in between.  I'm not sure.  He told me I

1  had to get used to the culture in Phoenix, and that it

2  was a largely white city.  It was not consistent with

3  the conversation that we were having, so I turned

4  around and left.  It was not even a subject of

5  discussion at that time.

6          Q.    Is that your total recollection of that

7  statement?

8          A.    That's my recollection of that statement.

9          Q.    And you don't recall the context?

10          A.    There was no context.  There was nothing

11  leading up to that.  Like I said, he basically informed

12  me that I had to get used to the culture in Phoenix,

13  and that Phoenix is a largely white city.

14          Q.    Were there any other people around that

15  overheard this statement?

16          A.    No, it was just Dana Heck and myself.

17          Q.    Are you aware if Mr. Heck ever made this

18  statement to any other individuals in Region 19?

19          A.    I have no knowledge of that.

20          Q.    Letter D.:  "His tastes run from petite

21  white women to fat black women."  Date and context,

22  please?

23          A.    Approximate date, January -- no, December,

24  around the holidays.  There were witnesses to that

25  statement.  I believe that Maxine Romero and also an

1  individual who was visiting the office.

2         Q.    Do you recall who this individual was?

3         A.    No, it was an associate or acquaintance of

4  Ms. Romero.

5         Q.    Okay.  So were you present -- when I say

6  "in on the conversation", were you part of the people

7  talking, or were you off to the side over here?

8         A.    I was part of the individuals talking.

9         Q.    So there was Mr. Heck, Ms. Romero,

10 Ms. Romero's acquaintance, and you?

11        A.    Yes.

12        Q.    And what was the context?  What was the

13 context of this conversation in which this statement

14 came up?

15        A.    I believe Mr. Heck was speaking about a

16 case that he was working.  And he was speaking about

17 the individual who was identified as, I believe, a

18 sexual harasser.  And he laughed and said, "You have to

19 meet this guy.  He's a character.  And I just don't

20 understand it."  He said, "His tastes run from petite

21 white women to fat black women."

22        Q.    It's hard to recreate tone of voice.  When

23 Mr. Heck said, "This gentleman is a character," do you

24 believe he meant this is someone I need to invite over

25 and meet my mom, or this guy is a piece of work in the

1  colloquial sense?

2          A.    I do not know.  I reported the comment as

3  being inappropriate based on "his tastes went from

4  petite white women to fat black women".  He was

5  actually describing what he felt about the gentleman

6  was not a part of the case.  So to me, that was an

7  inappropriate comment.

8          Q.    Okay.  Anything else about that?

9          A.    No.

10         Q.    Letter E.:  "If it were up to me, you

11  would not be telecommuting."  Date and context?

12         A.    It was approximately January or February,

13  2008.

14         Q.    And context, please.

15         A.    Dana Heck was discussing telecommuting and

16  the fact that he was not at that particular time

17  telecommuting.  He said out of the blue, "If it were up

18  to me, you wouldn't be telecommuting."  So that's

19  basically the conversation.  Again, I was in his

20  office.  I turned around, left, went back to my

21  cubicle.

22         Q.    Were there any witnesses to this other

23  than you and Mr. Heck?

24         A.    No.

25         Q.    And it was in the context of a

1   conversation regarding telecommuting?

2        A.    He basically expressed his dissatisfaction

3   with not telecommuting at that time.  The attorneys in

4   Region 19 did not telecommute, and I was telecommuting.

5        Q.    And Dana Heck was expressing a

6   dissatisfaction that he was not allowed the opportunity

7   to telecommute?

8        A.    Right.  And he said, "If it were up to me,

9   you would not be telecommuting."

10        Q.    Anything else contextual wise?

11        A.    No, that's all I recall with regard to

12   that conversation.

13        Q.    Paragraph F.:  "You are not a good

14   candidate for telecommuting."  Is this part of the same

15   conversation?

16        A.    I believe this was a separate occasion

17   when I began to get e-mails from Mr. Heck as well as

18   Bron Steinmetz during my telecommuting days.  And I

19   believe I sent the e-mail to Ms. Romero asking her what

20   was going on because I received a huge number of

21   e-mails, or began to receive e-mails when on my

22   telecommuting days it was not usual for me to receive

23   e-mails because I could not perform certain tasks in

24   support of Dana Heck and Bron Steinmetz.

25             But that began to happen.  I sent her an

1  e-mail basically saying, "What's going on?"  And

2  subsequently had a conversation with Mr. Heck.

3         And his response was, "You're not a good

4  candidate for telecommuting."

5      Q.    Again, do you -- the basis out of which

6  this comment arose.  But do you recall when this

7  comment took place?

8      A.    I would have to say it was in February of

9  2008.  I'm not sure of the exact date.

10     Q.    And it took place in Mr. Heck's office?

11     A.    I'm not sure.  I believe that this comment

12 may have occurred at my cubicle.  I asked him why all

13 of a sudden I was receiving e-mails during my

14 telecommuting days.  And he said, "You're not a good

15 candidate for telecommuting."

16     Q.    Was he referencing you in particular, or

17 paralegals in general?

18     A.    He never, to my knowledge, made a similar

19 or the same statement to Norma Kaping.

20     Q.    Did Mr. Heck work with Norma Kaping on any

21 tasks?

22     A.    No, Norma Kaping refuses to work with Dana

23 Heck.

24     Q.    So no?

25     A.    No.

1          Q.     That's it.  Let me just check some things.

2                 Let's go off for a second.

3                 THE VIDEOGRAPHER:  Off the record at 5:29.

4          (Whereupon, a recess was taken from 5:29 p.m. to

5     5:34 p.m.)

6                 THE VIDEOGRAPHER:  Back on the record at

7     5:34 p.m.

8                 MR. LANTKA:  Okay.  We're going to break

9     for the day in light of Ms. Hall's commitments with her

10    children.  So the deposition will be formally recessed

11    until Friday at 2:30ish at Plaintiff Counsel's office,

12    Room 1102.  The United States will make arrangements

13    for court reporting service.

14                As far as the video is concerned, is it

15    possible to get a time stamp where we are at right now?

16                THE VIDEOGRAPHER:  Yes, 5:34 p.m.  And

17    were at one hour and four minutes and 28 seconds into

18    this DVD.

19                MR. LANTKA:  How long is the first DVD?

20                THE VIDEOGRAPHER:  The very first one?  An

21    hour and 29 minutes and 37 seconds.

22                MR. LANTKA:  Okay.  Let's go off.

23         (Whereupon, the deposition was concluded at 5:34

24    p.m.)

25

1  VANESSA HALL,

2          vs.

3  ERIC K. SHINSEKI, SECRETARY,
   UNITED STATES DEPARTMENT of
4  VETERANS AFFAIRS

5  Tuesday, June 8, 2010

6

7

8

9

10

11              J U R A T

12

13      I, VANESSA HALL, having read the foregoing

14  deposition consisting of my testimony at the

15  aforementioned time and place, do hereby attest to the

16  correctness of the transcript under penalty of perjury.

17

18

19

20

21

22

23              (Signed)_____

24              (Dated)_____

25

1  STATE OF ARIZONA      )
                          )  ss.
2  COUNTY OF MARICOPA    )

3

4        BE IT KNOWN that the foregoing deposition was

5  taken before me, that I was then and there a Certified

6  Reporter #50337 in and for the State of Arizona, and by

7  virtue thereof authorized to administer an oath; that

8  the witness before testifying was duly sworn by me to

9  testify to the whole truth and nothing but the truth;

10 that the questions propounded by counsel and the

11 answers of the witness thereto were taken down by me in

12 shorthand and thereafter transcribed under my

13 direction, and that the foregoing pages are a full,

14 true and accurate transcript of all proceedings had and

15 adduced upon the taking of said deposition, all done to

16 the best of my skill and ability.

17       I FURTHER CERTIFY that I am not related to nor

18 employed by any of the parties thereto, and have no

19 interest in the outcome hereof.

20       DATED at Phoenix, Arizona, this 20th day of

21 June, 2010.

22

23

24                       _____
                                   APRIL M. HUNT
25                         Certified Reporter #50337